**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
APR - 1 2026
JEFFREY P. COLWELL
CLERK

Civil Action No. ______________________

JASON BROOKS,
Plaintiff.

v.
NISSAN NORTH AMERICA, INC,
Defendant.

---

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not. contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**A. PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Jason Brooks 636 Barberry Drive Longmont, CO 80503
(Name and complete mailing address)

(925)366-0803 geniusjasonbrooks@gmail.com
(Telephone number and e-mail address)

**B. DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages*

*regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Nissan North America One Nissan Way
(Name and complete mailing address) Franklin, TN 37067

Phone: (615) 725-1000 Email:

Defendant Nissan North America, Inc. ("Nissan") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business at One Nissan Way, Franklin, Tennessee 37067. Nissan is registered to do business in the State of Colorado and may be served through its registered agent, Corporation Service Company, located at 1900 W. Littleton Blvd., Littleton, Colorado 80120.

**C. JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship), as Plaintiff is a citizen of Colorado and Defendant is a citizen of California and Tennessee, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

This Court has additional subject matter jurisdiction pursuant to 15 U.S.C. § 2310(d)(1)(B), the Magnuson-Moss Warranty Act, which confers federal jurisdiction over warranty claims where the amount in controversy exceeds $50,000.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the State of Colorado, and the lease agreement at issue was executed in Longmont, Colorado.

**D. STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

## FACTUAL ALLEGATIONS

### A. The Lease Agreement

1. On October 31, 2024, Plaintiff leased a 2024 Nissan Ariya, Engage E-4ORCE AWD, VIN JN1CF0BB2RM740913 ("the Vehicle"), from Valley Nissan, LLC, located at 1005 Ken Pratt Blvd, Longmont, Colorado 80501, pursuant to a Motor Vehicle Lease Agreement with Arbitration Clause ("the Lease").

2. The Lease was assigned to and serviced by Nissan Motor Acceptance Company LLC ("NMAC"), a subsidiary and agent of Nissan North America, Inc.

3. Under the terms of the Lease, Plaintiff agreed to make 24 monthly payments of $418.66, with a gross capitalized cost of $47,710.87 and an adjusted capitalized cost of $32,110.87. The amount due at signing of $17,378.20 was structured primarily through non-cash credits, including a capitalized cost reduction of $15,600 consisting of federal and/or state electric vehicle incentives, with Plaintiff's only out-of-pocket obligation being his monthly lease payments of $418.66.

4. Plaintiff leased the Vehicle primarily for personal, family, and household transportation, and additionally relied upon the Vehicle as an income-generating tool in his capacity as a gig worker, as his livelihood depended entirely on the availability of his personal vehicle.

5. The Vehicle was marketed by Nissan with an advertised battery range of 216 miles. Plaintiff relied on these representations in deciding to lease the Vehicle.

**B. The Vehicle's Repeated Mechanical Failures**

6. The Vehicle began experiencing severe mechanical failures at just 3,649 miles — a fraction of its expected useful life — and continued to fail repeatedly throughout the lease period.

7. The Vehicle's first mechanical failure occurred on December 24, 2024, at 3,649 miles, just 54 days after the lease commenced.

8. In total, the Vehicle experienced four complete mechanical failures, leaving Plaintiff without a functioning vehicle for a cumulative total of 51 days, including 36 business days, which exceeds the Colorado statutory threshold of 24 business days triggering the presumption of a defective vehicle.

9. During the first, third, and fourth breakdowns, Nissan provided Plaintiff with loaner vehicles. However, because Plaintiff's income as a gig worker depended entirely on his specific registered personal vehicle, loaner vehicles did not substitute for his lost earning capacity, and Plaintiff suffered lost income during each of those periods as a result.

10. During the second breakdown, Nissan failed to provide Plaintiff with any loaner vehicle whatsoever, leaving Plaintiff completely without transportation and unable to work. Plaintiff suffers from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act, and his complete dependence on his personal vehicle for both income and daily functioning made Nissan's failure to provide substitute transportation during this period particularly harmful.

11. As a direct result of being without his income-generating vehicle during all four breakdown periods — whether because no loaner was provided, or because loaners provided could not be substituted for his registered personal vehicle in his gig work — Plaintiff suffered lost income exceeding $5,100.

**C. The Prior Settlement and the Fourth Breakdown**

12. Following the third breakdown, Plaintiff and Nissan entered into a settlement agreement ("the Prior Settlement") under which Nissan paid Plaintiff $2,500 in compensation. The Prior Settlement released claims arising from the first through third breakdowns through February 26, 2025.

13. Prior to the execution of the Prior Settlement, a Nissan engineer personally inspected the Vehicle and represented that the defect had been identified and remediated.

14. On March 1, 2025 — just three days after the Prior Settlement's release window closed — the Vehicle suffered its fourth complete mechanical failure. The Vehicle remained out of service from March 1, 2025 through March 20, 2025, a period of 20 additional days.

15. The fourth breakdown, occurring within days of the purported repair by Nissan's own engineer, demonstrates that the Vehicle was never truly repaired, that Nissan's representations regarding the repair were false or reckless, and that the Vehicle constitutes a defective product that Nissan failed to remedy despite multiple opportunities to do so.

16. Because Plaintiff could not be without a vehicle — having already suffered

significant income loss and consequential harm from prior breakdowns — the fourth breakdown forced Plaintiff to immediately obtain alternative transportation.

**D. The Battery Performance Misrepresentation**

17. Nissan marketed the 2024 Nissan Ariya with an advertised battery range of 216 miles. Plaintiff relied on this representation when entering the Lease.

18. In real-world conditions in Colorado's climate, the Vehicle's battery range dropped by up to 76 miles in cold weather, representing a reduction of more than 35% from the advertised range. Even while charging to full capacity, the Vehicle consistently failed to approach its advertised range.

19. Additionally, when driven at highway speeds above 55 miles per hour, the Vehicle lost up to 20% of its expected range, making it impractical for regular use as a primary and income-generating vehicle.

20. Nissan failed to disclose these material limitations to Plaintiff at the time of leasing. Had Plaintiff been aware of the Vehicle's true real-world battery performance in Colorado's climate, he would not have entered the Lease.

21. Plaintiff's subsequent experience with a different electric vehicle confirmed that the Ariya's battery deficiencies were not inherent to electric vehicles generally, but were specific to the defective Vehicle.

**E. Nissan's Inadequate Repurchase Offers and Bad Faith Conduct**

22. On March 25, 2025, Nissan issued an initial repurchase offer which, on its face, showed only a usage deduction of $1,996.78, resulting in a proposed refund to

Plaintiff of $1,456.06. Plaintiff is informed and believes this offer was issued in error, as it failed to account for the $2,500 Prior Settlement deduction that Nissan had agreed to apply.

23. Nissan subsequently issued a corrected repurchase offer — bearing an erroneous date of October 2, 2024, a date that predates the Lease itself and further reflects the careless manner in which Nissan administered this entire process — reinstating the $2,500 settlement deduction alongside the usage deduction of $1,996.78. Under this corrected final offer, Plaintiff would owe Nissan $1,043.94 simply to surrender a defective vehicle he had been paying for. Neither offer provided any compensation whatsoever for Plaintiff's lost income, forced replacement lease costs, credit damage, or emotional distress. Both were structured to return Plaintiff to a position as though the defective vehicle had never caused any harm — while Plaintiff had in fact suffered substantial, documented, and ongoing financial injury.

24. Plaintiff formally notified Nissan of all outstanding defects, the inadequacy of the repurchase offers, and his legal position in a written notice dated March 26, 2025, sent directly to Nissan North America's Consumer Affairs department, documenting 51 total days and 36 business days out of service.

25. Following receipt of Nissan's final repurchase position requiring Plaintiff to pay $1,043.94 to surrender the Vehicle, Plaintiff made one additional monthly lease payment of $418.66, reducing the net amount in dispute to approximately $625.28. Rather than engage in good faith arbitration or negotiate a reasonable

resolution over this modest remaining balance, Nissan chose to ignore a formally commenced JAMS arbitration proceeding, fail to pay required arbitration fees, and allow Plaintiff's credit profile to be systematically destroyed — inflicting tens of thousands of dollars in cascading financial harm over a dispute that could have been resolved for approximately $625. This conduct was not an oversight. It was a deliberate financial pressure campaign designed to coerce Plaintiff into accepting terms that left him with nothing, by making the cost of resistance greater than the cost of capitulation.

**F. Nissan's Refusal to Engage in Dispute Resolution**

26. The Lease, at Section 28, contains a mandatory arbitration clause requiring disputes to be resolved through binding arbitration before JAMS or the American Arbitration Association. That clause makes no reference to BBB AUTO LINE as a required or exclusive dispute resolution mechanism. Separately, Nissan participates in the BBB AUTO LINE informal dispute resolution program administered by BBB National Programs, Inc., pursuant to its warranty program obligations under the Magnuson-Moss Warranty Act and 16 C.F.R. Part 703.

27. Plaintiff filed a formal claim with BBB AUTO LINE on April 23, 2025, assigned Case Number NIS2507014. BBB AUTO LINE advised Plaintiff that the program was structurally incapable of awarding the damages Plaintiff sought, including lost income, emotional distress, and consequential damages — remedies expressly excluded from the BBB AUTO LINE program under

Nissan's own Program Summary. Nissan directed Plaintiff toward BBB AUTO LINE as the appropriate dispute resolution mechanism despite knowing that: (a) the Lease's own arbitration clause designated JAMS or AAA, not BBB AUTO LINE; and (b) BBB AUTO LINE could not award the full damages to which Plaintiff was entitled. Nissan's direction of Plaintiff to a structurally inadequate forum, in direct contradiction of the Lease's own arbitration clause, constitutes a further act of bad faith designed to frustrate Plaintiff's ability to obtain complete relief.

28. Prior to the BBB claim, Plaintiff had filed a formal demand for arbitration with JAMS pursuant to Section 28 of the Lease. JAMS formally commenced the proceeding, assigned it Case ID No. 37461, captioned Brooks, Jason v. Nissan North America, Inc., and issued a JAMS Arbitration Agreement to the parties. Nissan failed to participate in, respond to, or engage with the JAMS proceeding in any manner, notwithstanding JAMS' formal commencement of the case. Nissan's failure to participate in a fully commenced, institutionally administered JAMS arbitration proceeding — after directing Plaintiff to an inadequate forum that could not award his damages through BBB, and after the Lease's own arbitration clause specifically designated JAMS as the proper forum — constitutes the clearest possible conduct inconsistent with the right to arbitrate under Morgan v. Sundance, Inc., 596 U.S. 411 (2022). Under the Tenth Circuit's Peterson factors, every relevant consideration weighs in favor of waiver: Nissan's actions were entirely inconsistent with its arbitration

rights; it took no steps to preserve or invoke those rights; it caused Plaintiff to expend time and resources pursuing a properly filed arbitration; and it used the ongoing unresolved dispute as financial leverage to damage Plaintiff's credit while a live JAMS case sat unaddressed. Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 467–68 (10th Cir. 1988); BOSC, Inc. v. Bd. of Cnty. Comm'rs, 853 F.3d 1165, 1170 (10th Cir. 2017); Hill v. Ricoh Americas Corp., 603 F.3d 766 (10th Cir. 2010). Under JAMS Streamlined Arbitration Rules, Rule 6(c), Nissan's failure to participate triggered JAMS' confirmation of that failure in writing. Nissan has waived any right to compel arbitration in this or any future proceeding arising from this dispute.

29. Nissan's bad faith conduct in connection with the JAMS arbitration extended beyond mere non-participation. Pursuant to the JAMS Consumer Minimum Standards of Procedural Fairness, effective May 1, 2024, which govern consumer arbitrations conducted pursuant to pre-dispute arbitration clauses such as the one contained in Section 28 of the Lease, Nissan was required to bear all arbitration costs beyond Plaintiff's initial $250 filing fee, including all JAMS Filing Fees, Case Management Fees, and professional fees for the arbitrator's services. Nissan's failure to pay the required arbitration fees caused those costs to shift to Plaintiff, who was informed that continuing the arbitration would require him to pay between $4,000 and $5,000 in fees — an amount Plaintiff, as a gig worker whose income had already been decimated by Nissan's conduct, could not bear. Nissan's non-payment of arbitration fees

thus had the practical effect of rendering the arbitration Plaintiff had properly filed financially inaccessible, forcing Plaintiff out of the very forum Nissan's own contract designated and Nissan's own minimum standards required Nissan to fund. A defendant's refusal to pay arbitration fees, resulting in prohibitive cost-shifting to the consumer, constitutes an independent basis for waiver of the right to arbitrate. Morgan v. Sundance, Inc., 596 U.S. 411 (2022); Hill v. Ricoh Americas Corp., 603 F.3d 766 (10th Cir. 2010).

**G. Credit Damage and Cascading Financial Harm**

30. As a direct and foreseeable result of Nissan's bad faith conduct in prolonging the dispute, failing to resolve the repurchase, and continuing to report the Lease account negatively, Plaintiff sustained severe and ongoing damage to his credit profile.

31. Prior to Nissan's conduct, Plaintiff maintained a credit profile reflecting 17 active accounts and two auto loans, with a perfect payment history across every single account. The Nissan lease account represents the sole derogatory mark on Plaintiff's entire credit history.

32. As a direct result of this derogatory mark, Bank of America closed Plaintiff's credit card account ending in 8836, which carried a $3,700 credit limit, in June 2025 — despite Plaintiff having maintained a perfect payment history on that account throughout its existence.

33. As a further direct result of the same derogatory mark, Citi declined to reissue Plaintiff's credit card account ending in 2147, which carries a $3,000 credit

limit. Citi's own written response, dated March 27, 2026 and bearing Citi Reference Number 202603121701211336005, confirmed that the non-reissuance decision was based on a credit scoring system that reviewed Plaintiff's credit report — the sole negative item on which is the derogatory Nissan lease account. The account is set to close on April 30, 2026, despite Plaintiff's perfect payment history on that account throughout its existence.

34. The loss of $6,700 in credit access, the damage to Plaintiff's credit utilization ratio, the reduction in average account age, and the resulting score deterioration constitute tangible, ongoing financial injury directly and foreseeably caused by Nissan's bad faith conduct.

35. Because the $2,500 Prior Settlement payment represented the only compensation Plaintiff had received from Nissan for the first three breakdowns, and because Plaintiff was forced to deploy that entire sum as a down payment on a replacement vehicle in order to qualify for a lease given his damaged credit profile, Plaintiff received zero net compensation from Nissan for any of the harm Nissan caused.

36. Plaintiff was forced to immediately lease a replacement vehicle — a 2024 Kia EV6 — with a monthly payment of $669, representing a premium of $250.34 per month over his prior Ariya payment of $418.66. Over the term of the replacement lease, this premium totals $9,012.24 in excess costs directly and foreseeably caused by the credit damage Nissan inflicted through its bad faith conduct.

37. Nissan's own repurchase offer documentation expressly warned Plaintiff that failure to make payments would adversely affect his credit. Nissan was therefore fully aware that prolonging the dispute and refusing to engage in good faith arbitration would foreseeably damage Plaintiff's credit — and proceeded regardless.

**H. Nissan's Retention of Federal and State EV Tax Credits**

38. The Vehicle was leased pursuant to a structure that incorporated a capitalized cost reduction of $15,600, which represents the benefit of federal and/or state electric vehicle tax credits applied at the point of lease origination, including credits available under the Inflation Reduction Act, 26 U.S.C. § 30D, and Colorado's clean vehicle tax credit under C.R.S. § 39-22-516.

39. Under the applicable federal and state frameworks, these credits were received by and inured to the benefit of Nissan and/or its financing subsidiary, Nissan Motor Acceptance Company LLC, as the lessor and legal owner of the Vehicle.

40. The Vehicle experienced four complete mechanical failures totaling 51 days and 36 business days out of service, meeting and exceeding the statutory thresholds for a defective vehicle under Colorado law. Nissan itself acknowledged the Vehicle's defective nature by twice offering to voluntarily repurchase it under the Colorado Lemon Law.

41. A vehicle that qualifies as defective under Colorado's lemon law — and that Nissan has acknowledged as such — raises a material question as to whether the federal and state electric vehicle tax credits applied to that vehicle's lease

were legitimately earned and properly retained by Nissan upon repurchase, or whether such retention constitutes unjust enrichment, misrepresentation, or fraud upon the applicable taxing authorities and upon Plaintiff.

42. Nissan's repurchase calculations made no accounting for, disclosure of, or adjustment related to the EV tax credits applied to the Vehicle's lease. By structuring the repurchase to return only a fraction of Plaintiff's actual payments while retaining the full benefit of $15,600 in tax credits on a vehicle it acknowledges to be defective, Nissan has been made more than whole at Plaintiff's direct expense.

43. Plaintiff is informed and believes that Nissan's retention of EV tax credits in connection with lemon law buybacks of defective vehicles may represent a systematic practice affecting consumers beyond this Plaintiff, the full scope of which can only be determined through discovery.

## IV. CAUSES OF ACTION

### COUNT I — MAGNUSON-MOSS WARRANTY ACT

### 15 U.S.C. §§ 2301 et seq.

44. Plaintiff incorporates by reference all prior allegations.

45. The Vehicle is a "consumer product" as defined by 15 U.S.C. § 2301(1), and Plaintiff is a "consumer" as defined by 15 U.S.C. § 2301(3).

46. Nissan provided written and implied warranties in connection with the Vehicle, including an express warranty covering defects in materials and workmanship.

47. The Vehicle's repeated mechanical failures — four complete failures totaling 51 days and 36 business days out of service — constituted breaches of Nissan's express written warranty.

48. The Vehicle's failure to conform to its advertised battery specifications constituted an additional breach of Nissan's express warranties and representations made in connection with the lease.

49. Nissan failed to remedy the defects within a reasonable number of attempts despite being given multiple opportunities to do so.

50. As a result of Nissan's breach of warranty, Plaintiff has suffered actual damages including but not limited to lost income, forced replacement lease costs, credit damage, loss of credit access, and emotional distress.

51. Pursuant to 15 U.S.C. § 2310(d), Plaintiff is entitled to recover damages, costs, and attorney's fees.

## COUNT II — BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

52. Plaintiff incorporates by reference all prior allegations.

53. The Lease constitutes a valid and enforceable contract between Plaintiff and Nissan.

54. Colorado law implies a covenant of good faith and fair dealing into every contract, requiring each party to act honestly and in a manner that does not frustrate the other party's reasonable expectations under the agreement.

55. Nissan breached the Lease and its implied covenant of good faith and fair

dealing by: (a) providing a vehicle that repeatedly failed to function as warranted; (b) refusing to provide adequate substitute transportation during the second breakdown, despite knowing Plaintiff's complete financial dependence on his vehicle; (c) providing loaner vehicles during other breakdowns that could not be used as substitutes for Plaintiff's income-generating work; (d) structuring repurchase offers that returned Plaintiff to zero while he had sustained thousands of dollars in actual losses; (e) attempting to claw back the Prior Settlement payment through the repurchase offset, thereby nullifying the only compensation Plaintiff had ever received; (f) using the Lease's credit reporting mechanism as a coercive financial tool to pressure Plaintiff into accepting an inadequate repurchase offer rather than engaging in good faith dispute resolution; and (g) directing Plaintiff to a dispute resolution forum that could not award his damages, in direct contradiction of the Lease's own arbitration clause, and then failing to pay the fees required to maintain the properly designated JAMS arbitration proceeding.

56. As a direct and proximate result of Nissan's breaches, Plaintiff has suffered actual damages in an amount to be proven at trial.

## COUNT III — COLORADO CONSUMER PROTECTION ACT

## C.R.S. §§ 6-1-101 et seq.

57. Plaintiff incorporates by reference all prior allegations.

58. The Colorado Consumer Protection Act ("CCPA") prohibits deceptive trade

practices in the course of business, including knowingly making false representations about the characteristics or qualities of goods and failing to disclose material information that a consumer would consider relevant to a transaction.

59. Nissan engaged in deceptive trade practices by: (a) marketing the Vehicle with an advertised range of 216 miles while knowing or recklessly disregarding that the Vehicle would perform materially below that range in Colorado's climate; (b) failing to disclose the Vehicle's material battery limitations at the time of lease; (c) engaging in bad faith conduct designed to coerce Plaintiff into accepting an inadequate remedy rather than honoring the dispute resolution process Nissan itself contractually imposed; and (d) failing to disclose to Plaintiff that Nissan had received and retained significant federal and state electric vehicle tax credits in connection with the Vehicle's lease, and that those credits would not be accounted for in any repurchase offer made to Plaintiff.

60. Plaintiff relied on Nissan's representations and was harmed by Nissan's omissions in entering the Lease and throughout the dispute resolution process, to his substantial detriment.

61. Nissan's conduct was knowing and willful, entitling Plaintiff to treble damages pursuant to C.R.S. § 6-1-113(2)(a)(III).

62. As a direct and proximate result of Nissan's deceptive trade practices, Plaintiff has suffered actual damages in an amount to be proven at trial, subject to trebling.

## COUNT IV — UNJUST ENRICHMENT

63. Plaintiff incorporates by reference all prior allegations.

64. Over the course of the Lease, Plaintiff made five monthly payments totaling $2,093.30, in exchange for a vehicle that failed completely on four separate occasions and was out of service for 51 days.

65. Nissan will receive the Vehicle back in near-new condition, having collected payments for a vehicle it knew to be defective and that it failed to adequately repair despite multiple opportunities and the involvement of its own engineer.

66. Nissan's initial repurchase offer showed a refund of $1,456.06 but was issued in error. Its corrected final offer demanded Plaintiff pay $1,043.94 to surrender the very vehicle Nissan warranted — providing zero compensation for the cascading financial harm Nissan's conduct caused.

67. Nissan's unjust enrichment is further compounded by its retention of federal and state electric vehicle tax credits totaling approximately $15,600, applied at the origination of the Lease. Nissan has acknowledged the Vehicle's defective nature through its own voluntary repurchase offers, yet has made no accounting for or relinquishment of the tax credits it received in connection with a vehicle it now seeks to reclaim as defective. To permit Nissan to retain those credits while simultaneously recovering the Vehicle and providing Plaintiff with inadequate compensation would constitute a windfall to Nissan at both Plaintiff's expense and at the expense of the public fisc.

68. Under these circumstances, it would be unjust and inequitable for Nissan to

retain the benefit of Plaintiff's payments and the EV tax credits without providing full compensation for all harm caused.

69. Plaintiff is entitled to restitution in an amount to be proven at trial.

## COUNT V — NEGLIGENT MISREPRESENTATION

70. Plaintiff incorporates by reference all prior allegations.

71. Nissan, in the course of its business, supplied false information to Plaintiff regarding the battery range and real-world performance of the Vehicle, specifically representing an advertised range of 216 miles without disclosing material limitations in cold-weather climates and at highway speeds.

72. Nissan failed to exercise reasonable care in communicating accurate performance information to consumers leasing the Vehicle in Colorado, where cold-weather battery degradation is a foreseeable and material concern for any reasonable consumer evaluating an electric vehicle.

73. Plaintiff justifiably relied on Nissan's representations in entering the Lease.

74. As a direct and proximate result of Nissan's negligent misrepresentation, Plaintiff suffered damages including lease payments made on an unfit vehicle, costs of a replacement vehicle, and all other damages flowing from his reliance on Nissan's misrepresentations.

## COUNT VI — BAD FAITH AND ABUSE OF PROCESS

75. Plaintiff incorporates by reference all prior allegations.

76. The Lease's arbitration clause, at Section 28, constitutes a binding contractual obligation requiring Nissan to arbitrate disputes with Plaintiff. Nissan

imposed this clause on Plaintiff as a non-negotiable condition of leasing the Vehicle.

77. When Plaintiff formally invoked the arbitration clause and filed a demand with JAMS, JAMS formally commenced the proceeding as Case ID No. 37461, captioned Brooks, Jason v. Nissan North America, Inc. Nissan ignored the proceeding entirely, failed to pay the fees it was required to pay under the JAMS Consumer Minimum Standards, and took no action to participate in or initiate the arbitration in any manner.

78. Nissan's refusal to participate in its own contractually mandated dispute resolution process, its failure to pay required arbitration fees causing prohibitive cost-shifting to Plaintiff, and its simultaneous use of the ongoing unresolved dispute as leverage to damage Plaintiff's credit and coerce acceptance of an inadequate offer, together constitute bad faith conduct and an abuse of the arbitration process.

79. Under Morgan v. Sundance, Inc., 596 U.S. 411 (2022), Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 467–68 (10th Cir. 1988), BOSC, Inc. v. Bd. of Cnty. Comm'rs, 853 F.3d 1165, 1170 (10th Cir. 2017), and Hill v. Ricoh Americas Corp., 603 F.3d 766 (10th Cir. 2010), Nissan has waived any right to compel arbitration in this or any future proceeding arising from this dispute.

80. As a direct result of Nissan's bad faith conduct, Plaintiff was forced to incur the costs and burdens of litigation that the arbitration clause was designed to

avoid, and suffered all the credit and financial damages described herein.

## COUNT VII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81. Plaintiff incorporates by reference all prior allegations.

82. Nissan's conduct, described in full above, was extreme and outrageous. Specifically: Nissan leased Plaintiff a defective vehicle; failed to provide adequate transportation during the second breakdown knowing Plaintiff depended entirely on his vehicle for income; provided loaners during other breakdowns that could not substitute for his income-generating work; induced Plaintiff to enter a settlement for $2,500 representing the only compensation he would ever receive; watched the vehicle fail again three days after its own engineer declared it repaired; structured repurchase offers designed to leave Plaintiff with nothing or owing money; directed Plaintiff to a dispute resolution forum structurally incapable of awarding his damages while ignoring the contractually designated forum; failed to pay required JAMS arbitration fees causing the cost to shift to Plaintiff at $4,000 to $5,000 — rendering the arbitration financially inaccessible to a gig worker whose income had already been destroyed; ignored a fully commenced JAMS arbitration proceeding, Case ID No. 37461; retained $15,600 in EV tax credits on a vehicle it acknowledged to be defective while offering Plaintiff a fraction of his actual losses; and used its control over credit reporting as a financial weapon to coerce Plaintiff into capitulating — all while Plaintiff was managing a long-standing autoimmune condition, struggling to maintain his financial stability, and watching a

previously unblemished credit profile be systematically dismantled through no fault of his own.

83. Nissan either intended to cause Plaintiff severe emotional distress, or acted with reckless disregard of the substantial probability that its conduct would do so.

84. As a direct and proximate result of Nissan's conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including anxiety, financial stress, deterioration of his autoimmune condition, the loss of two credit accounts representing $6,700 in credit access, and the ongoing psychological burden of navigating a financial crisis manufactured entirely by Nissan's deliberate bad faith.

**D. REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

***WHEREFORE***, Plaintiff Jason T. Brooks respectfully requests that this Court:

a) Enter judgment in favor of Plaintiff on all Counts;

b) Award Plaintiff compensatory damages in an amount to be proven at trial, but not less than $60,405.54;

c) Award Plaintiff treble damages pursuant to the Colorado Consumer Protection Act, C.R.S. § 6-1-113;

d) Award Plaintiff punitive damages for Nissan's willful, wanton, and bad faith conduct in an amount sufficient to deter such conduct in the future;

e) Award Plaintiff fees and costs pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d), and the Colorado Consumer Protection Act, C.R.S. § 6-1-113;

f) Declare that Nissan has waived its right to compel arbitration by refusing to

participate in the contractually mandated arbitration process it imposed on Plaintiff, failing to pay required arbitration fees, and directing Plaintiff to an inadequate forum in contradiction of its own contract;

g) Order an accounting of the federal and state electric vehicle tax credits received and retained by Nissan in connection with the Vehicle's lease and repurchase;

h) Award such other and further relief as this Court deems just and proper.

**Damages: $491,622.16 + fees**

As a direct and proximate result of Nissan's conduct, Plaintiff has suffered the following damages:

- Monthly lease payments made on a defective vehicle: $2,093.30
- Prior Settlement funds entirely consumed by forced replacement lease down payment: $2,500.00
- Lost gig income during all vehicle outage periods: in excess of $5,100.00
- Excess replacement lease costs over 36 months ($250.34/month): $9,012.24
- Loss of Bank of America credit access (account closed June 2025): $3,700.00
- Loss of Citi credit access (account closing April 30, 2026): $3,000.00
- Compensatory subtotal (economic): $25,405.54
- Emotional distress damages: $25,000.00
- Credit profile damage and impairment of future credit accessibility: $10,000.00
- Total compensatory damages: in excess of $60,405.54
- CCPA treble damages (3× compensatory): in excess of $181,216.62
- Punitive damages for Nissan's willful, wanton, and malicious conduct: $250,000.00

**Attorney's Fees, Costs, and Pro Se Litigation Compensation**

Plaintiff seeks an award of fees and costs pursuant to 15 U.S.C. § 2310(d)(2) (Magnuson-Moss), C.R.S. § 6-1-113 (CCPA), C.R.S. § 42-10-103(3) (Colorado Lemon Law), 28 U.S.C. § 1927, and the Court's inherent equitable powers. Plaintiff further presents a novel claim for compensation for pro se litigation services at market paralegal and associate attorney rates, grounded in the following:

(1) Under *Missouri v. Jenkins*, 491 U.S. 274 (1989), legal work has compensable market value independent of the employment relationship through which it is

performed. The Supreme Court held that paralegal services are recoverable at market rates under fee-shifting statutes because they have demonstrable economic value — not by virtue of the paralegal's employment status. The Colorado General Assembly has since codified this principle by enacting C.R.S. § 13-17-102(1.5), which expressly authorizes courts to award "reasonable licensed legal paraprofessional fees" in any civil action. This legislative recognition that paraprofessional legal work carries compensable market value applies with equal force to a pro se litigant performing equivalent, documented work of the same character.

(2) Plaintiff is not a typical pro se litigant. Plaintiff litigated *Brooks v. Colorado Department of Corrections*, No. 13-cv-02894-SKC (D. Colo.), over thirteen years, proceeding pro se for approximately 80% of the litigation, winning two remands from the Tenth Circuit Court of Appeals, and ultimately obtaining a $3.5 million resolution. That litigation required sustained, sophisticated legal work — including appellate briefing, discovery motion practice, summary judgment opposition, and settlement negotiation — that a litigation firm handling the case would have billed at between $1.5 million and $4 million in fees over the same period. Plaintiff performed the substantial majority of that work himself and produced a superior result. Plaintiff additionally litigated *Brooks v. Tarsadia Hotels*, No. 3:18-cv-02290-GPC-KSC (S.D. Cal.), a securities fraud and ILSA action in which, proceeding pro se and in forma pauperis while incarcerated, Plaintiff successfully identified and briefed a controlling legal standard that class counsel in the related *Beaver* litigation had either conceded or failed to effectively argue. The Court expressly agreed with Plaintiff's legal analysis and denied the defendants' motion to dismiss on those grounds. A pro se litigant identifying and successfully briefing a controlling legal error that represented class counsel missed is precisely the category of market-value legal work that *Jenkins* recognizes as compensable.

(3) Colorado courts have held that it is "not appropriate" to award attorney's fees to a non-attorney pro se litigant under C.R.S. § 13-17-102 because such a litigant has no "attorney fees." *Smith v. Furlong*, 976 P.2d 889 (Colo. App. 1999). Plaintiff

respectfully submits, however, that *Smith* predates the General Assembly's 2024 amendment adding C.R.S. § 13-17-102(1.5), which for the first time created a parallel fee category for paraprofessional legal services. The legislature's express extension of fee-shifting to paraprofessional work reflects a recognition that sophisticated legal work has compensable market value regardless of whether it is performed by a licensed attorney. *Smith*'s rationale — that no "attorney fees" exist for a non-attorney — does not address the new paraprofessional fee category, and that gap creates space for this Court to award fees at market paralegal rates for the legal work Plaintiff has performed in this matter.

(4) Denying compensation to Plaintiff for legal work that produced a $3.5 million result in one federal case and substantive legal victories in others — while awarding compensation to licensed paraprofessionals for functionally identical work under § 13-17-102(1.5) — creates an irrational and arbitrary classification that serves no legitimate government interest and is difficult to reconcile with the Equal Protection principles that guarantee meaningful access to courts regardless of wealth or employment status. The administrative convenience rationale for denying pro se fees — avoiding fee valuation disputes — is answered by *Jenkins* itself: market rates provide the standard. Colorado has already accepted that standard for paraprofessional work. There is no principled basis for applying it to hired legal workers but not to a pro se litigant with Plaintiff's documented record of sophisticated, successful federal litigation across multiple jurisdictions.

(5) A rule requiring pro se litigants to perform market-value legal work without compensation — while opposing counsel bills at prevailing Colorado rates of $400–$700 per hour for associate work — does not serve the remedial purposes of the CCPA, Magnuson-Moss, or the Lemon Law's mandatory fee provision. It defeats them, by making sustained pro se litigation economically irrational and effectively available only to those with independent means. Plaintiff seeks an award of pro se litigation fees at market paralegal rates for legal work performed, and at market associate attorney rates for work — including motion practice and legal research — that would

have been performed by an attorney in a represented case. To the extent this Court declines to award pro se litigation fees at the trial level, Plaintiff respectfully requests that the Court certify this question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), as it presents a controlling question of law as to which there is substantial ground for difference of opinion, and immediate resolution would materially advance termination of this litigation and have substantial precedential effect on the rights of pro se litigants throughout this Circuit.

## F. PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, has overwhelming evidentiary support and more to come after a reasonable opportunity for further investigation and discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

(Plaintiff's signature)

03/26/26
(Date)