**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01385-SKC-STV

JASON BROOKS

Plaintiff(s),

v.

NISSAN NORTH AMERICA, INC,

Defendants.

---

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT NISSAN NORTH AMERICA, INC.**

---

Plaintiff Jason T. Brooks, appearing *pro se*, respectfully moves this Court pursuant to Fed. R. Civ. P. 55(b)(2) for entry of default judgment against Defendant Nissan North America, Inc. ("NNA" or "Defendant"), and in support thereof states as follows:

## I. INTRODUCTION

On May 2, 2026, Plaintiff filed a Motion for Entry of Default with the Clerk of Court pursuant to Fed. R. Civ. P. 55(a) for Defendant's failure to plead or otherwise defend this action. Defendant Nissan North America, Inc. was properly served on April 10, 2026, through its designated registered agent, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203. The 21-day deadline

to respond expired on May 1, 2026. As of the filing of this Motion, Defendant has filed nothing — no answer, no motion, no notice of appearance.

This is not a case of inadvertent non-response. The documented record — spanning more than a year before this lawsuit was filed and continuing through Defendant's silence in this Court — establishes a deliberate, systematic pattern of bad faith designed to deprive Plaintiff of every avenue of relief while simultaneously using credit reporting as a financial weapon to coerce his capitulation. Every act of bad faith is documented in Defendant's own written communications, in the records of neutral third-party institutions, and in the dockets of this Court. That record is set forth in Plaintiff's Affidavit in Support of Motion for Default Judgment, submitted herewith ("Affidavit"), with exhibits authenticated thereunder.

## II. PROCEDURAL BACKGROUND

1. Plaintiff filed his Verified Complaint on April 1, 2026, asserting seven counts against Defendant: (I) Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq.; (II) Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing; (III) Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 et seq.; (IV) Unjust Enrichment; (V) Negligent Misrepresentation; (VI) Bad Faith and Abuse of Process; and (VII) Intentional Infliction of Emotional Distress. See ECF No. 1.
2. The Court granted Plaintiff leave to proceed in forma pauperis on April 1, 2026, and directed the United States Marshals Service to effect service. See ECF No. 4.

3. Defendant was served with the Summons and Complaint on April 10, 2026, through its designated registered agent, Corporation Service Company ("CSC"), at 2908 Poston Avenue, Nashville, Tennessee 37203. The United States Marshal contacted CSC by telephone at (615) 666-4532 prior to service to coordinate delivery. Service was personally accepted by Glenda Sheppard, an individual designated by law at CSC's Nashville office to accept service on behalf of Defendant. The Marshal's Proof of Service was filed with the Court on April 15, 2026. See ECF No. 13. Service is complete as of April 10, 2026 — the date of actual delivery — not the date proof of service was filed. See *Bolte v. Home Insurance Co.*, 744 F.2d 761 (10th Cir. 1984).

4. Corporation Service Company also serves as Nissan North America, Inc.'s registered agent in the State of Colorado, with an office at 1900 W. Littleton Blvd., Littleton, CO 80120, as reflected in the Colorado Secretary of State's records for Nissan North America, Inc. (Entity No. 19871034144). Service through CSC's Tennessee office — the same registered agent company Defendant designated in this jurisdiction — confirms Defendant received actual notice regardless of which CSC office accepted service. See *National Development Co. v. Triad Holding Corp.*, 930 F.2d 253 (2d Cir. 1991).

5. Defendant's 21-day deadline to respond under Fed. R. Civ. P. 12(a)(1)(A)(i) expired on May 1, 2026. Defendant filed nothing. The Clerk entered default on May 2, 2026. See ECF No. 14.

## III. FACTUAL BACKGROUND

### *A. The Lease and the Vehicle's Repeated Mechanical Failures*

6. On October 31, 2024, Plaintiff leased a 2024 Nissan Ariya, Engage E-4ORCE AWD, VIN JN1CF0BB2RM740913 ("the Vehicle"), from Valley Nissan, LLC in Longmont, Colorado. The Lease was assigned to and serviced by Nissan Motor Acceptance Company LLC ("NMAC"), a wholly-owned subsidiary and agent of Nissan North America, Inc. Plaintiff's monthly lease payment was $418.66. (Affidavit, Ex. E.)

7. The Vehicle experienced four complete mechanical failures, leaving Plaintiff without a functioning vehicle for a cumulative total of 51 days, including 36 business days — exceeding Colorado's statutory threshold of 24 business days. The first failure occurred on December 24, 2024, at just 3,649 miles, 54 days after the lease commenced. (Affidavit, Ex. Q.)

8. Plaintiff is a gig worker whose entire income depends on his personal registered vehicle. He suffers from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act. During the second breakdown, Nissan failed to provide any loaner vehicle, leaving Plaintiff completely without transportation or income. As a direct result of all four breakdown periods, Plaintiff suffered lost income exceeding $5,100. (Affidavit ¶¶ 6, 8.)

9. Plaintiff photographed the Vehicle's dashboard on January 26, 2025, while it was stationary, battery charged to 100%, in 23°F weather. The dashboard showed an

estimated range of only 139 miles — a deficit of 77 miles, or 35.6%, from the advertised 216-mile range — before a single mile had been driven. Nissan never disclosed these material battery limitations at the time of leasing. (Affidavit, Ex. A.)

***B. Nissan North America's Direct Involvement in Every Disputed Act***

10. Every material action taken by Nissan in this dispute was taken directly by Nissan North America, Inc.—not by NMAC or NILT acting independently:

a. The Prior Settlement of $2,500 was entered into directly with Nissan North America, Inc. (Affidavit, Ex. O.)

b. The March 20, 2025, voluntary repurchase offer was issued on Nissan North America, Inc. Consumer Affairs letterhead, signed by Desiray Neely, Arbitration Specialist, Dispute Resolution Programs, Nissan North America, Inc. (Affidavit, Ex. B.)

c. The corrected repurchase offer was also issued by Nissan North America, Inc. Consumer Affairs. (Affidavit, Ex. C.)

d. Desiray Neely — Arbitration Specialist, Dispute Resolution Programs, Nissan North America, Inc. — was the individual who refused JAMS arbitration in writing and directed Plaintiff to BBB AUTO LINE. (Affidavit, Ex. D.)

e. The New Vehicle Limited Warranty was issued by Nissan North America, Inc.

f. The BBB AUTO LINE program is administered pursuant to Nissan North America, Inc.'s warranty program obligations under the Magnuson-Moss Warranty Act and 16 C.F.R. Part 703.

### C. The Prior Settlement and the Fourth Breakdown

11. Following the third breakdown, Plaintiff entered into a settlement agreement with Nissan North America, Inc., releasing claims through February 26, 2025, in exchange for $2,500. Prior to executing the settlement, a Nissan engineer personally inspected the Vehicle and represented that the defect had been remediated. (Affidavit, Ex. O.)

12. On March 1, 2025 — three days after the Prior Settlement's release window closed — the Vehicle suffered its fourth complete mechanical failure, remaining out of service from March 1 through March 20, 2025. (Affidavit, Ex. Q.)

13. On March 20, 2025, Desiray Neely of Nissan North America, Inc.'s Dispute Resolution Programs issued a new voluntary repurchase offer — 22 days after the settlement release window closed — acknowledging the Vehicle's continued defective condition. (Affidavit, Ex. B.) Nissan's issuance of this new offer confirms that the fourth breakdown was a new, post-settlement event requiring independent resolution — directly contradicting BBB's later claim that the matter had been previously resolved.

### D. Nissan North America's Inadequate Repurchase Offers

14. Nissan issued two repurchase offers. The initial offer of March 25, 2025, was issued in error, failing to deduct the Prior Settlement amount, and showed a proposed refund of $1,456.06. (Affidavit, Ex. C.) The corrected offer — bearing an erroneous date of October 2, 2024, predating the Lease itself — reinstated the $2,500 settlement deduction alongside a usage deduction of $1,996.78, resulting

in Plaintiff owing $1,043.94 to surrender a defective vehicle. Neither offer provided any compensation for lost income, replacement vehicle costs, credit damage, or emotional distress.

15. Following Nissan's final position, Plaintiff made one additional lease payment of $418.66 in a good faith attempt to resolve the parties differences, reducing the net dispute to approximately $625.28. Rather than resolve this modest balance in good faith, Nissan chose to obstruct every available dispute resolution mechanism, weaponize credit reporting, and ultimately default in this federal court — inflicting tens of thousands of dollars in cascading harm over a $625 dispute.

***E. Nissan North America's Systematic Obstruction of Every Dispute Resolution Mechanism***

16. Section 28 of the Lease contains a mandatory arbitration clause designating JAMS or the American Arbitration Association as the arbitration forums. (Affidavit, Ex. E.) That clause makes no reference to BBB AUTO LINE.

17. On March 26, 2025, Plaintiff filed a formal demand for arbitration with JAMS, Case ID No. 37461, captioned *Brooks, Jason v. Nissan North America, Inc.* (Affidavit, Ex. F.) JAMS Case Manager Brianne Strickland confirmed commencement of the proceeding, highlighted the JAMS provision in Section 28, and on April 8, 2025 wrote: *"I will give Nissan a week to respond, and will reach out again if we don't hear anything."* On April 15, 2025, JAMS confirmed: *"For 37461 Brooks vs. Nissan, I haven't seen a reply come back from Nissan at all."* (Affidavit, Ex. G.)

18. On April 23, 2025 — copied simultaneously to JAMS at arbitrationdocs@jamsdenver.com — Desiray Neely, Arbitration Specialist, Dispute Resolution Programs, Nissan North America, Inc., stated in writing: *"NNA does not participate with JAMS. JAMS is only for if you have an actual concern with your lease. The BBB auto line is for if you believe there is a defect with your vehicle."* (Affidavit, Ex. D.) This affirmative, written statement by Nissan North America's own Arbitration Specialist — transmitted simultaneously to Plaintiff and to JAMS — constitutes the clearest possible evidence of deliberate arbitration waiver. Under *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), a party waives arbitration by acting inconsistently with the right to arbitrate. Nissan's affirmative refusal to participate in two separate forums its own contracts designated is inconsistency with arbitration rights in its most direct form.

19. Nissan's statement that it does not participate with JAMS is directly contradicted by Section 28 of its own Lease agreement, which designates JAMS as the contractually required arbitration forum. Under the doctrine of *contra proferentem*, any ambiguity in the contract must be construed against Nissan as the drafter. Nissan cannot simultaneously impose a JAMS arbitration clause on consumers as a non-negotiable condition of leasing and then disclaim participation in JAMS when a consumer properly invokes that clause. See *Peterson v. Shearson/American Express, Inc.*, 849 F.2d 464, 467–68 (10th Cir. 1988); *BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165, 1170 (10th Cir. 2017); *Hill v. Ricoh Americas Corp.*, 603 F.3d 766 (10th Cir. 2010).

20. Directed by Nissan to BBB AUTO LINE, Plaintiff filed Case NIS2507014 on April 23, 2025. Within two days — April 25, 2025 — BBB closed the case. BBB's communications were internally contradictory: the automated notification stated the claim was *"not eligible under the guidelines set forth in your manufacturer's program summary"* (Affidavit, Ex. H.), while the formal closure letter stated the claim was ineligible because it *"was resolved by a previous settlement with the manufacturer."* (Affidavit, Ex. I.) These are two entirely different and irreconcilable bases for the same denial. The settlement-based closure was factually incorrect — the Prior Settlement released only claims through February 26, 2025, while Plaintiff's BBB claim arose from the fourth breakdown of March 1, 2025. Nissan's own March 20, 2025, repurchase offer confirms Nissan knew the fourth breakdown was a new, unresolved event. The BBB Program Summary's own exclusion bars only claims *"identical"* to previously settled claims — a standard the fourth breakdown plainly does not meet. (Affidavit, Ex. K.) Plaintiff immediately placed Nissan on direct written notice of the contradictory and incorrect closure on April 25, 2025. Nissan took no action.

21. On May 1, 2025, Plaintiff formally rescinded the Lease pursuant to UCC-206 and explicitly warned Nissan North America in writing that he would be filing a federal lawsuit in the U.S. District Court for the District of Colorado. (Affidavit, Ex. J.) Nissan received this warning and continued to report the Lease account negatively for eleven months.

22. The systematic foreclosure of every dispute resolution avenue — JAMS refused by written admission, BBB closed on false and contradictory information, federal court defaulted — constitutes the most extreme pattern of bad faith in this record. Nissan has waived any right to compel arbitration. See *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022); *Peterson v. Shearson/American Express, Inc.*, 849 F.2d 464 (10th Cir. 1988); *BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165 (10th Cir. 2017); *Hill v. Ricoh Americas Corp.*, 603 F.3d 766 (10th Cir. 2010).

***F. Credit Damage and Cascading Financial Harm***

23. Prior to Nissan's conduct, Plaintiff maintained a credit profile reflecting 17 active accounts and two auto loans, with a perfect payment history across every single account — not a single late payment in his entire credit history. The Nissan lease account is the only negative mark on Plaintiff's entire credit profile.

24. Nissan North America transmitted negative information to Experian on no fewer than four separate occasions — reporting delinquencies in July, August, and September 2025, and reporting a charge-off on March 31, 2026, as "Voluntary surrender / Balance charged to loss." Both notations are false. Plaintiff never voluntarily surrendered the Vehicle — he formally rescinded the Lease under UCC-206 on May 1, 2025. (Affidavit, Ex. J.) The charge-off is not the result of any financial default — it is the direct result of Nissan's deliberate bad faith. Nissan's own repurchase offer documentation expressly warned Plaintiff that failure to make payments would adversely affect his credit. Nissan had actual, documented

knowledge that its conduct would damage Plaintiff's credit and proceeded regardless. This constitutes malice under C.R.S. § 13-21-102.

25. As a direct result of the fraudulent charge-off, Bank of America closed Plaintiff's credit card account ending in 8836 ($3,700 credit limit) in June 2025 — despite an otherwise perfect payment history across his entire credit profile. (Affidavit ¶ 25.)

26. Citi declined to reissue Plaintiff's credit card account ending in 2147 ($3,000 credit limit). Citi's written response bearing Reference Number 202603121701211336005 confirmed the decision was based on a credit scoring system that reviewed Plaintiff's credit report — the sole negative item on which is the Nissan charge-off. (Affidavit, Ex. M.)

27. The fraudulent charge-off suppressed Plaintiff's VantageScore 3.0 by approximately 100 points — from a baseline consistent with a consumer carrying 17 accounts and a perfect payment history, to a current score of 593.

28. Because the $2,500 Prior Settlement payment represented the only compensation Plaintiff received from Nissan, and because Plaintiff was forced to deploy that entire sum as a down payment on a replacement vehicle, Plaintiff received zero net compensation from Nissan for any of the harm it caused. Plaintiff was forced to lease a 2024 Kia EV6 at $669.39 per month — a premium of $250.73 per month over the prior Ariya payment of $418.66. Over the 36-month lease term this premium totals $9,026.28 in excess costs directly caused by Nissan's conduct. (Affidavit, Ex. L.). Plaintiff had no ability to “shop around” for a vehicle. He was forced to ensure he had reliable transportation, got a $20,500 rebate on the Kia,

and had to see if his credit profile would permit him to get another vehicle, with the Nissan Ariya still reporting positively, before deciding whether he could endure this dispute.

29. On April 6, 2026, Plaintiff applied for housing at Residences at Nova West Phase 2 in Longmont, Colorado. His application was denied. The RentGrow screening report (Report ID: 80696099) cited a single reason: "Severe level of Charge-offs." The sole charge-off on Plaintiff's entire credit history is the Nissan account. Plaintiff qualified on every other screening metric. (Affidavit, Ex. N.)

30. On April 29, 2026, Plaintiff was required to pay a double security deposit of $3,800 at a second property due to his VantageScore being so low— the sole cause being the Nissan charge-off. (Affidavit, Ex. P.). Plaintiff can not afford the deposit, resulting in the possibility of homelessness.

31. At the time of these housing-related harms and throughout the post-filing period, Plaintiff was recovering from surgical repair of a torn distal bicep tendon, physically unable to perform his gig work for approximately three months. The confluence of physical incapacity, housing insecurity, and credit destruction — all directly traceable to Nissan's deliberate bad faith over a $625 dispute — has caused severe, ongoing, and compounding harm to Plaintiff's financial stability, housing security, and wellbeing. (Affidavit ¶¶ 31–32.)

32. Nissan's retention of $15,600 in federal and state EV tax credits — applied at lease origination under 26 U.S.C. § 30D and C.R.S. § 39-22-516 — on a vehicle it acknowledged as defective and offered to repurchase, while providing Plaintiff a

fraction of his actual losses, constitutes additional unjust enrichment. (Affidavit, Ex. E.)

## IV. LEGAL STANDARD

Upon entry of default, the well-pleaded factual allegations of the complaint are deemed admitted. See *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1541 (10th Cir. 1996). The Court must determine damages through a hearing or on the papers submitted. See Fed. R. Civ. P. 55(b)(2). Default judgment is appropriate where, as here, the complaint states a valid claim, default has been properly entered, and damages can be established by evidence. See *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269 (D. Kan. 2016). The Court may also grant injunctive relief necessary to make the plaintiff whole. See *James v. Frame*, 6 F.3d 307 (5th Cir. 1993).

Plaintiff's well-pleaded allegations establish valid claims on all seven counts, each independently supporting the relief sought. Because Defendant has defaulted, those allegations are admitted. See *Olcott*, 76 F.3d at 1541.

## *V. THE COMPLAINT STATES VALID CLAIMS ON ALL SEVEN COUNTS*

### Count I — Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq.

The Vehicle is a "consumer product" and Plaintiff is a "consumer" under 15 U.S.C. § 2301. Nissan provided express and implied warranties. The Vehicle's four complete failures totaling 51 days and 36 business days out of service, and its failure to conform to its advertised 216-mile battery range — documented by the January 26, 2025, dashboard photograph showing only 139 miles at 100% charge (Affidavit,

Ex. A) constitute breaches of those warranties. Nissan failed to remedy the defects within a reasonable number of attempts. Plaintiff is entitled to damages and fees under 15 U.S.C. § 2310(d).

**Count II — Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

The Lease is a valid, enforceable contract. Colorado law implies a covenant of good faith and fair dealing into every contract. See *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995). Nissan breached both by: providing a defective vehicle; refusing adequate substitute transportation during the second breakdown knowing Plaintiff's disability and financial dependence; structuring repurchase offers leaving Plaintiff with nothing; using credit reporting as a coercive instrument; and systematically obstructing every designated dispute resolution mechanism.

**Count III — Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 et seq.**

Nissan engaged in deceptive trade practices by: marketing the Vehicle with a false 216-mile battery range without disclosing material cold-weather and highway-speed limitation losses; directing Plaintiff to dispute resolution forums in contradiction of its own contract; and retaining $15,600 in EV tax credits on an acknowledged defective vehicle without disclosure. Nissan's conduct was knowing and willful, entitling Plaintiff to treble damages under C.R.S. § 6-1-113(2)(a)(III). See *Hall v. Walter*, 969 P.2d 224 (Colo. 1998).

**Count IV — Unjust Enrichment**

Nissan collected lease payments on a defective vehicle, will receive the Vehicle back in near-new condition, retained $15,600 in EV tax credits, and structured its final repurchase offer to require Plaintiff to pay $1,043.94 to surrender the vehicle Nissan warranted. Nissan has been made more than whole at Plaintiff's direct expense. See *DCB Construction Co. v. Central City Development Co.*, 965 P.2d 115 (Colo. 1998).

**Count V — Negligent Misrepresentation**

Nissan represented an advertised range of 216 miles without disclosing material cold-weather and highway-speed limitations. In Colorado, where cold-weather battery degradation is foreseeable for any reasonable electric vehicle consumer, this failure constitutes negligent misrepresentation. The January 26, 2025 dashboard photograph — showing 139 miles at 100% charge in 23°F weather — proves the Vehicle's actual performance fell far short of its advertised specifications. (Affidavit, Ex. A.) *Keller v. A.O. Smith Harvestore Products, Inc.*, 819 P.2d 69 (Colo. 1991).

**Count VI — Bad Faith and Abuse of Process**

Nissan imposed a JAMS arbitration clause on Plaintiff as a non-negotiable condition of leasing, then refused to participate in JAMS when Plaintiff properly invoked it — stating in writing through its own Arbitration Specialist that "NNA does not participate with JAMS." (Affidavit, Ex. D.) Nissan then directed Plaintiff to BBB AUTO LINE, which closed his claim within two days based on factually incorrect

information Nissan allowed to stand. (Affidavit, Exs. H, I, K.) Nissan then defaulted in this federal court. Under *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) and the Tenth Circuit's *Peterson* factors, Nissan has waived arbitration entirely. This systematic pattern constitutes bad faith and abuse of process. See *Peterson v. Shearson/American Express, Inc.*, 849 F.2d 464 (10th Cir. 1988); *BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165 (10th Cir. 2017).

**Count VII — Intentional Infliction of Emotional Distress**

Nissan's conduct was extreme and outrageous: it leased Plaintiff a defective vehicle; failed to provide transportation during the second breakdown knowing his disability and financial dependence; induced a $2,500 settlement while concealing that the vehicle remained defective; watched the vehicle fail three days after its own engineer declared it repaired; structured repurchase offers leaving Plaintiff owing money; systematically closed every dispute resolution forum Nissan was contractually required to enter; reported false credit information over a $625 dispute; caused multiple housing denials, resulting in an inability for Plaintiff to secure housing; and inflicted all of this while Plaintiff was recovering from surgery, unable to work, managing a disabling autoimmune condition, and facing homelessness — all as the direct and foreseeable result of Nissan's deliberate bad faith. See *Rugg v. McCarty*, 173 Colo. 170 (1970); *Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999).

## VI. DAMAGES

Upon default, the well-pleaded allegations are admitted and Plaintiff is entitled to the damages demanded in the Complaint. Fed. R. Civ. P. 54(c). The following damages are supported by the Affidavit and exhibits submitted herewith.

### A. Economic Compensatory Damages

| Category | Amount | Support |
|---|---|---|
| Monthly lease payments — defective vehicle (5 × $418.66) | $2,093.30 | *Affidavit, Ex. E* |
| Prior Settlement entirely consumed as replacement lease down payment | $2,500.00 | *Affidavit, Ex. O* |
| Lost gig income during all breakdown periods | $5,100.00+ | *Affidavit ¶ 6* |
| Excess Kia EV6 replacement lease costs (36 mo × $250.34) | $9,012.24 | *Affidavit, Ex. L* |
| Loss of Bank of America credit access | $3,700.00 | *Affidavit ¶ 25* |
| Loss of Citi credit access | $3,000.00 | *Affidavit, Ex. M* |
| **Economic compensatory subtotal** | **$25,405.54** | |

### B. Non-Economic Compensatory Damages

| Category | Amount | Support |
|---|---|---|
| Emotional distress — housing denial, shame, fear, helplessness, surgery recovery, autoimmune condition worsening, threat of homelessness | $25,000.00 | *Affidavit ¶¶ 31–32* |
| Credit profile damage and future credit accessibility impairment | $10,000.00 | *Affidavit ¶ 27* |
| **Non-economic subtotal** | **$35,000.00** | |

**C. Total Compensatory Damages: $60,405.54**

**D. CCPA Treble Damages**

Pursuant to C.R.S. § 6-1-113(2)(a)(III), Plaintiff is entitled to treble damages for Nissan's knowing and willful deceptive trade practices: **$181,216.62**

**E. Punitive Damages**

Pursuant to C.R.S. § 13-21-102, Nissan's malicious conduct warrants punitive damages of **$250,000.00.**

Consider what Plaintiff was forced to endure. A vehicle that failed completely — not once, not twice, but four times in five months. Four times Plaintiff was stranded. Four times he watched his only means of income and survival rendered useless. Four times he waited for a tow truck, not knowing when or whether the vehicle would be repaired. Four times his gig work — his only source of income, the only way he feeds himself and survives — was interrupted without warning and without compensation. This was not an inconvenience. This was a man whose entire financial existence depends on having a functioning vehicle, being repeatedly stripped of that vehicle by a company that had warranted it would work. The first breakdown came just 54 days after signing the lease, at only 3,649 miles. The vehicle Nissan sold him as reliable, as capable, as worth $47,000 — broke down before the first oil change was even due. And then it broke down again. And again. And again.

To understand the full weight of what Nissan destroyed, the Court must understand what Plaintiff had built. Following his release from more than 12 years of incarceration, Plaintiff committed himself to rebuilding his financial life with the

same discipline and determination he had applied to mastering the law behind bars. He honored every single payment on every single account — 17 accounts, two auto loans, not one late payment, not one default, not one blemish. He built that credit profile painstakingly, one on-time payment at a time, knowing that his financial future depended on it. He was not a man who could ever default on obligations again. That credit profile — that hard-won testament to his commitment to rebuilding his life — was the foundation on which he was building everything else. Housing. Stability. A future.

Nissan destroyed it. Not through negligence. Not through oversight. Deliberately. knowingly, maliciously, from its own written repurchase offer documentation, that adverse credit reporting would result. Knowing that Plaintiff had no legal representative to fight back. Knowing that every month of delay made it harder and more expensive for Plaintiff to resist. Rather than honor the arbitration clause it imposed as a non-negotiable condition of leasing, Nissan — through its own Arbitration Specialist — flatly refused to participate in JAMS, the very forum its contract designated. Plaintiff was left to navigate a formal JAMS arbitration proceeding alone, investing time, energy, and legal resources into a process Nissan had already decided to ignore. When JAMS confirmed Nissan would not respond, Plaintiff was redirected to BBB AUTO LINE — a forum Nissan knew could not award the damages Plaintiff sought and that closed his claim within two days based on factually incorrect information. Every door Plaintiff opened, Nissan slammed shut. Every forum Plaintiff properly invoked, Nissan abandoned or manipulated. And

throughout all of it — while Plaintiff fought alone, without counsel, against a Fortune 500 corporation — Nissan was simultaneously reporting false information to credit bureaus, watching two credit accounts close, watching Plaintiff get denied housing, and watching a $625 dispute cascade into financial devastation.

Nissan was contractually obligated to arbitrate. It refused. It was contractually obligated to honor its warranty. It failed. It was legally obligated to report accurately. It lied. The punitive damages demanded here are not a windfall — they are the minimum necessary response to conduct that was deliberate, documented, and sustained across more than a year of calculated bad faith by a multi-billion-dollar company against a man who had done everything right and deserved better.

The punitive multiplier of approximately 4.1× compensatory is well within constitutional limits established by *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). Nissan's conduct — affirmatively warning Plaintiff that credit damage would result while reporting false information, systematically closing every dispute resolution forum, and causing housing denial and risk of homelessness over a $625 dispute — constitutes particularly reprehensible conduct supporting substantial punitive damages. See *Leidholt v. District Court*, 619 P.2d 768 (Colo. 1980).

**F. Pro Se Litigation Fees**

Plaintiff seeks an award of fees and costs pursuant to 15 U.S.C. § 2310(d)(2) (Magnuson-Moss), C.R.S. § 6-1-113 (CCPA), C.R.S. § 42-10-103(3) (Colorado Lemon Law), 28 U.S.C. § 1927, and the Court's inherent equitable powers. Plaintiff further

presents a novel claim for compensation for pro se litigation services at market paralegal and associate attorney rates, grounded in the following:

(1) Under Missouri v. Jenkins, 491 U.S. 274 (1989), legal work has compensable market value independent of the employment relationship through which it is performed. The Supreme Court held that paralegal services are recoverable at market rates under fee-shifting statutes because they have demonstrable economic value — not by virtue of the paralegal's employment status. The Colorado General Assembly has since codified this principle by enacting C.R.S. § 13-17-102(1.5), which expressly authorizes courts to award "reasonable licensed legal paraprofessional fees" in any civil action. This legislative recognition that paraprofessional legal work carries compensable market value applies with equal force to a pro se litigant performing equivalent, documented work of the same character.

(2) Plaintiff is not a typical pro se litigant. Plaintiff litigated Brooks v. Colorado Department of Corrections, No. 13-cv-02894-SKC (D. Colo.), over thirteen years, proceeding pro se for approximately 80% of the litigation, winning two remands from the Tenth Circuit Court of Appeals, and ultimately obtaining a $3.5 million resolution. That litigation required sustained, sophisticated legal work — including appellate briefing, discovery motion practice, summary judgment opposition, and settlement negotiation — that a litigation firm handling the case would have billed at between $1.5 million and $4 million in fees over the same period. Plaintiff performed the substantial majority of that work himself and produced a superior

result. Plaintiff additionally litigated *Brooks v. Tarsadia Hotels*, No. 3:18-cv-02290-GPC-KSC (S.D. Cal.), a securities fraud and ILSA action in which, proceeding pro se and in forma pauperis while incarcerated, Plaintiff successfully identified and briefed a controlling legal standard that class counsel in the related Beaver litigation had either conceded or failed to effectively argue. The Court expressly agreed with Plaintiff's legal analysis and denied the defendants' motion to dismiss on those grounds, leading to a settlement. A pro se litigant identifying and successfully briefing a controlling legal error that represented class counsel missed is precisely the category of market-value legal work that Jenkins recognizes as compensable.

(3) Colorado courts have held that it is "not appropriate" to award attorney's fees to a non-attorney pro se litigant under C.R.S. § 13-17-102 because such a litigant has no "attorney fees." *Smith v. Furlong*, 976 P.2d 889 (Colo. App. 1999). Plaintiff respectfully submits, however, that *Smith* predates the General Assembly's 2024 amendment adding C.R.S. § 13-17-102(1.5), which for the first time created a parallel fee category for paraprofessional legal services. The legislature's express extension of fee-shifting to paraprofessional work reflects a recognition that sophisticated legal work has compensable market value regardless of whether it is performed by a licensed attorney. *Smith's* rationale — that no "attorney fees" exist for a non-attorney — does not address the new paraprofessional fee category, and that gap creates space for this Court to award fees at market paralegal rates for the legal work Plaintiff has performed in this matter.

(4) Denying compensation to Plaintiff for legal work that produced a $3.5 million result in one federal case and substantive legal victories in others — while awarding compensation to licensed paraprofessionals for functionally identical work under § 13-17-102(1.5) — creates an irrational and arbitrary classification that serves no legitimate government interest and is difficult to reconcile with the Equal Protection principles that guarantee meaningful access to courts regardless of wealth or employment status. The administrative convenience rationale for denying pro se fees — avoiding fee valuation disputes — is answered by Jenkins itself: market rates provide the standard. Colorado has already accepted that standard for paraprofessional work. There is no principled basis for applying it to hired legal workers but not to a pro se litigant with Plaintiff's documented record of sophisticated, successful federal litigation across multiple jurisdictions.

(5) A rule requiring pro se litigants to perform market-value legal work without compensation — while opposing counsel bills at prevailing Colorado rates of $400–$700 per hour for associate work — does not serve the remedial purposes of the CCPA, Magnuson-Moss, or the Lemon Law's mandatory fee provision. It defeats them, by making sustained pro se litigation economically irrational and effectively available only to those with independent means. Plaintiff seeks an award of pro se litigation fees at market paralegal rates for legal work performed, and at market associate attorney rates for work — including motion practice and legal research — that would have been performed by an attorney in a represented case. To the extent this Court declines to award pro se litigation fees at the trial level, Plaintiff respectfully requests

that the Court certify this question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), as it presents a controlling question of law as to which there is substantial ground for difference of opinion, and immediate resolution would materially advance termination of this litigation and have substantial precedential effect on the rights of pro se litigants throughout this Circuit. Plaintiff seeks an award of pro se litigation fees at $150 per hour for 115 hours of documented legal work, totaling $17,250.00. This is a reasonable and conservative estimate of the hours Plaintiff invested in this matter at each stage of litigation, as broken down in Plaintiff's Affidavit in Support of Motion for Default Judgment, pgs. 11-12.

### G. Total Monetary Relief Requested

| Category | Amount |
|---|---|
| Total Compensatory Damages | $60,405.54 |
| CCPA Treble Damages (3×) | $181,216.62 |
| Punitive Damages | $250,000.00 |
| **Total Monetary Damages** | **$491,622.16** |
| Pro Se Litigation Fees (115 hrs × $150) | $14,550.00 |
| **Grand Total** | **$506,172.16** |
| Post-judgment interest under 28 U.S.C. § 1961 | Additional |

## VII. INJUNCTIVE RELIEF

Plaintiff additionally requests that this Court enter an order pursuant to Fed. R. Civ. P. 55(b)(2) and the Court's equitable authority requiring Nissan North America, Inc. to:

1. Immediately instruct Experian Information Services, Equifax Information Services, and TransUnion LLC to delete the Nissan-Infiniti LT lease account (Subscriber No. 3690580) from Plaintiff's credit file in its entirety within 5 business days of this Order;
2. Cease and desist from reporting any negative information in connection with the lease of Vehicle VIN JN1CF0BB2RM740913;
3. Provide Plaintiff with written confirmation that deletion instructions have been transmitted to all three major credit bureaus within 5 business days;
4. File a compliance report with this Court within 30 days confirming deletion has been completed; and
5. Be subject to contempt of Court for failure to comply, including daily monetary sanctions of not less than $1,000 per day until full compliance is achieved.

The injunctive relief is necessary to make Plaintiff whole. A monetary judgment alone does not remedy the ongoing daily harm of the fraudulent charge-off remaining on Plaintiff's credit report. Every day the charge-off remains, Plaintiff faces continued housing denials, excess security deposits, subprime financing rates, and cascading credit score suppression. The Court has broad equitable authority to order injunctive relief as part of a default judgment where monetary damages alone are insufficient to remedy the harm. *James v. Frame*, 6 F.3d 307 (5th Cir. 1993); *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552 (9th Cir. 1992).

## VIII. REQUEST FOR HEARING OR DECISION ON THE PAPERS

The documentary record submitted herewith is complete and sufficient to establish all elements of liability and damages without the need for an evidentiary hearing. Plaintiff respectfully submits that this Court may and should enter default judgment on the papers pursuant to Fed. R. Civ. P. 55(b)(2), without the need for a hearing, as the Affidavit and authenticated exhibits A through Q establish every element of the relief requested with documentary certainty. A hearing would add nothing that the papers do not already conclusively demonstrate.

Therefore, Plaintiff respectfully requests that this Court enter default judgment following either: (a) an evidentiary hearing on damages pursuant to Fed. R. Civ. P. 55(b)(2), at which Plaintiff will present testimony and documentary evidence in support of all damages claimed; or (b) in the alternative, on the papers submitted herewith — including Plaintiff's Affidavit and exhibits A through Q.

## IX. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court:

a) Enter default judgment against Defendant Nissan North America, Inc. in the amount of $506,172.16.

b) Enter the injunctive relief described in Section VII compelling immediate deletion of all negative credit reporting from all three major credit bureaus;

c) Award post-judgment interest at the statutory rate under 28 U.S.C. § 1961 from the date of entry of judgment; and

d) Grant such other and further relief as this Court deems just and proper.

Respectfully submitted on this 5th day of May 2026.

s/Jason T. Brooks______________
Jason T. Brooks
636 Barberry Drive
Longmont, CO 80503
(925) 366-0803
geniusjasonbrooks@gmail.com
*Pro Se Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May 2026, a true and accurate copy of the foregoing **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT NISSAN NORTH AMERICA, INC.** was filed with the Clerk of the United States District Court for the District of Colorado via the Court's CM/ECF system. Because Defendant Nissan North America, Inc. has not entered an appearance in this action and has not registered with CM/ECF, no service on Defendant is required at this time pursuant to Fed. R. Civ. P. 5(a)(2).

s/ Jason Brooks________________

***Jason Brooks***
636 Barberry Drive
Longmont, CO 80503
Telephone: (925) 366-0803
E-mail: geniusjasonbrooks@gmail.com
Plaintiff, *pro se*