IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01385-SKC-STV

JASON T. BROOKS, Plaintiff v. NISSAN NORTH AMERICA, INC., Defendant.

# EXHIBIT C

## FIRST AMENDED VERIFIED COMPLAINT (DRAFT)

*Transmitted to Defendant's Counsel — August 14, 2026*

*Offered for the Limited Purpose of:*
*(1) Establishing the Scope of Documented Liability That Caused Nissan to Withdraw ECF No. 19*
*(2) Demonstrating That O'Hagan Meyer PLLC Faces an Unwaivable Conflict of Interest if the Default is Set Aside and the FAC is Filed*

*Not Offered to Expand Claims Before This Court on ECF No. 16*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01385-SKC-STV

JASON BROOKS,
Plaintiff.

v.
NISSAN NORTH AMERICA, INC, a Delaware Corporation
and O'HAGAN MEYER PLLC, a professional limited liability company,

Defendants.

---

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not. contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**A. PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Jason Brooks 636 Barberry Drive Longmont, CO 80503
(Name and complete mailing address)

(925)366-0803 geniusjasonbrooks@gmail.com
(Telephone number and e-mail address)

**B. DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Nissan North America One Nissan Way
(Name and complete mailing address) Franklin, TN 37067

Phone: (615) 725-1000 Email:

Defendant Nissan North America, Inc. ("Nissan") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business at One Nissan Way, Franklin, Tennessee 37067. Nissan is registered to do business in the State of Colorado and may be served through its registered agent, Corporation Service Company, located at 1900 W. Littleton Blvd., Littleton, Colorado 80120.

Defendant 1: O'Hagan Meyer PLLC 1331 17th Street, Suite 350
(Name and complete mailing address) Denver, Colorado 80202

Phone: Email:

**C. JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims arising under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq. (Count I), and the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) (Count VIII).

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over all claims against Defendant Nissan North America, Inc. Plaintiff is a citizen of Colorado. Defendant Nissan North America, Inc. is incorporated in Deleware with its principal place of business in Tennessee. Complete diversity exists between Plaintiff and Defendant Nissan. The amount in controversy exceeds $75,000 exclusive of interest and costs.

This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a). All claims in this action — including those against Defendant O'Hagan Meyer PLLC — form part of the same case or controversy and share a common nucleus of operative fact. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). The claims against O'Hagan Meyer arise from conduct that occurred within this federal proceeding and are inextricably linked to the underlying claims against Nissan. Supplemental jurisdiction over those claims is proper.

This Court alternatively has federal question jurisdiction over the abuse of process claim against

O'Hagan Meyer PLLC (Count IX) pursuant to 28 U.S.C. § 1331, as that claim arises from the misuse of federal court process in violation of Fed. R. Civ. P. 11(b)(1) and (b)(3) and this Court's Standing Order for Civil Cases §§ A.2 and C.2 — federal rules governing conduct before a federal tribunal. Conduct that violates federal court rules and occurs within a federal proceeding raises a federal question cognizable under 28 U.S.C. § 1331. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991).

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District — specifically in Longmont, Colorado, where the Vehicle was leased, where the mechanical failures occurred, where the economic harm was suffered, and where Plaintiff currently resides. Defendant O'Hagan Meyer PLLC maintains an office in Denver, Colorado, within this District, and the tortious conduct alleged against O'Hagan Meyer occurred in proceedings before this Court, which sits in this District.

## D. STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

## FACTUAL ALLEGATIONS

### A. The Vehicle and the Lease

1. On or about October 31, 2024, Plaintiff entered into a closed-end motor vehicle lease agreement ("the Lease") with Defendant Nissan North America, Inc., through its authorized dealership Valley Nissan, an authorized Nissan dealership located in Longmont, Colorado, for a 2024 Nissan Ariya Engage FWD electric vehicle ("the Vehicle"), VIN JN1CF0BB2RM740913.

2. The Lease carried a monthly payment of $418.66 over a 36-month term. Plaintiff made an initial signing payment and down payment totaling $17,378.20. The Vehicle

was subject to a $395.00 disposition fee. At the time of origination, the Vehicle qualified for $15,600 in federal and state electric vehicle tax credits, which were applied to the transaction and retained by Nissan.

3. Section 28 of the Lease contains a mandatory arbitration clause designating JAMS or AAA as the exclusive dispute resolution forums for all disputes arising from the Lease.

4. Plaintiff is a gig worker whose entire income depends on personal vehicle access. Plaintiff has no alternative income source and no alternative means of transportation for work purposes. This dependency was known to Nissan through formal JAMS arbitration filings Nissan received prior to its refusal to participate, in which Plaintiff stated explicitly: "I make all my money through the use of a car, as I am a gig worker, and lost in excess of $5,100 in income since this all started for me." Plaintiff also disclosed in those filings that he suffers from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act that is directly affected by financial stress and periods of vehicle unavailability. Plaintiff is a man rebuilding his life after incarceration, with no financial cushion and no margin for the cascading financial harm Nissan's conduct would cause.

**B. The Four Mechanical Failures**

5. The Vehicle experienced four complete and separate mechanical failures during the first five months of the Lease — at 3,649 total miles — rendering it inoperable and requiring towing on each occasion:

**First Failure — December 24, 2024:** The Vehicle experienced a complete electrical system failure 54 days after delivery. Plaintiff was stranded. The Vehicle was towed to Valley Nissan for repair.

**Second Failure — January 2025:** The Vehicle experienced a second complete failure. Plaintiff was again stranded and the Vehicle was towed for repair. Plaintiff lost documented gig income during this period.

**Third Failure — February 2025:** The Vehicle experienced a third complete failure. A Nissan engineer was brought in specifically to diagnose and resolve the recurring defect. The engineer declared the repair complete. The Vehicle was returned to Plaintiff.

**Fourth Failure — March 1, 2025:** Three days after Nissan's own engineer declared the repair complete — the Vehicle experienced its fourth and final complete failure. Plaintiff was stranded for the fourth time. The Vehicle was towed and never returned to Plaintiff in working condition.

6. The four mechanical failures totaled 51 calendar days and 36 business days out of service — meeting and exceeding both triggering thresholds of Colorado's Lemon Law presumption under C.R.S. § 42-10-104, which presumes unreasonable repair attempts at four or more failures for the same or substantially similar nonconformity, or 35 or more business days out of service.

7. During each breakdown period, Plaintiff was unable to perform gig work, resulting in documented lost income exceeding $5,100.

8. A prior settlement agreement between the parties released claims through February 26, 2025. The fourth failure occurred on March 1, 2025 — three days after

the release date — and is not subject to that release.

**C. Nissan's False Advertising of the Vehicle**

9. At the time Plaintiff leased the Vehicle, Nissan marketed the 2024 Ariya through its official platforms with the following representations: (a) Nissan USA Features Page — "Its liquid-cooled thermal management system means better performance in hot and cold weather" and "all-weather confidence," prominently displaying an EPA-estimated range of 216 miles; (b) 2024 Nissan Ariya Range & Charging Interactive Brochure — "An advanced liquid-cooled thermal management system allows ARIYA to better handle extremes — whether it's freezing cold or very hot outside," stating the vehicle was "Built for Extreme Conditions"; and (c) Nissan North America Press Release — January 8, 2025 — Nissan's Senior Manager of Zero Emission Vehicles stated publicly: "We want to test the worst-case scenario so that our customers will still get the same performance in a wide variety of weather conditions."

10. These representations were false and misleading. Simultaneously — buried in the 2024 Nissan Ariya Owner's Manual, Section 9.35.6.1, which was never presented to Plaintiff at the point of sale — Nissan disclosed: "Driving range may be substantially reduced in extremely cold conditions" and "Using the climate control system to heat the cabin when outside temperature is below 0°C (32°F) uses more electricity and affects driving range more."

11. On January 26, 2025 — eighteen days after Nissan's Senior Manager publicly promised "the same performance in a wide variety of weather conditions" — Plaintiff documented the following with an authenticated dashboard photograph: Vehicle at

100% charge, stationary, plugged in, outside temperature 23°F, zero miles driven. Displayed range: 139 miles. Advertised EPA range: 216 miles. Deficit: 77 miles — a 35.6% range reduction before driving a single mile.

11(a). The practical usable range degradation was far more severe than the documented 35.6% deficit alone suggests. Plaintiff's residence is equipped with a Level 1 charger — a standard 120V residential electrical outlet — which is the standard charging infrastructure available to the majority of residential consumers without specialized and costly electrical upgrades. In Colorado winter temperatures — consistently below freezing during the months Plaintiff operated the Ariya — Plaintiff documented an overnight Level 1 charging gain of approximately 3 miles of range per hour. In below-freezing temperatures, the Ariya's battery thermal management system consumes more incoming Level 1 power simply to maintain the battery at a temperature sufficient to accept a charge — causing only 2 hours of charge per hour, a 33% drop. A vehicle that gains 3 miles of range per overnight Level 1 charge provides a practical daily range of approximately 30-50 miles for a gig worker who cannot allow the battery to fully deplete. To operate the vehicle for gig work requiring meaningful daily range, Plaintiff had no alternative but to use public DC fast charging at commercial rates of approximately $0.48 per kWh —exceeding the gasoline costs of a conventional vehicle, eliminating the fuel savings that were central to the economic rationale for the lease.

12. This deception is documented in five primary sources — Nissan's own marketing pages, its own interactive brochure, its own Owner's Manual, its own press release,

and Plaintiff's authenticated dashboard photograph — all submitted as Exhibit A to the Affidavit in Support of Motion for Default Judgment [ECF No. 15-1, Ex. A]. Nissan's own words contradict Nissan's own words. The deception was deliberate — Nissan knew from its Owner's Manual that cold weather substantially reduces range while simultaneously advertising "better performance in cold weather" and "all-weather confidence."

**D. The Systematic Destruction of Every Dispute Forum**

13. Following the fourth mechanical failure on March 1, 2025, Plaintiff attempted to resolve the dispute through every available forum. Nissan destroyed each one in succession:

> **Forum One — JAMS Arbitration:** On March 26, 2025, Plaintiff filed a formal demand for arbitration with JAMS pursuant to Section 28 of the Lease, which expressly designates JAMS or AAA as the mandatory and exclusive arbitration forum. JAMS assigned the proceeding Case ID No. 37461, captioned Brooks, Jason v. Nissan North America, Inc., and formally commenced the arbitration. JAMS Case Manager Brianne Strickland confirmed commencement and on April 8, 2025 wrote: "I will give Nissan a week to respond, and will reach out again if we don't hear anything." On April 15, 2025, JAMS confirmed: "For 37461 Brooks vs. Nissan, I haven't seen a reply come back from Nissan at all." Nissan did not respond to the arbitrator at JAMS. It did not respond to JAMS. It did not acknowledge the proceeding in any manner. On April 23, 2025 — copied simultaneously to JAMS — Desiray Neely, Arbitration Specialist, Dispute Resolution Programs, Nissan North America, Inc., stated in writing: "NNA does not participate with JAMS. JAMS is only for if you have an actual concern with your lease. The BBB auto line is

for if you believe there is a defect with your vehicle." This affirmative, written statement by Nissan's own Arbitration Specialist — transmitted simultaneously to Plaintiff and to JAMS — constitutes deliberate refusal to participate in a formally commenced arbitration proceeding under the forum Nissan itself designated in its own Lease. Nissan also failed to pay the required JAMS arbitration fees under the JAMS Consumer Minimum Standards of Procedural Fairness, causing those costs to shift to Plaintiff — a gig worker whose income had been destroyed by four vehicle failures — who was informed that continuing the arbitration would require him to pay between $4,000 and $5,000 in fees he could not afford. Nissan abandoned the contractually designated forum entirely.

**Forum Two — BBB AUTO LINE:** Nissan directed Plaintiff to BBB AUTO LINE — a forum its own Lease does not designate — in direct contradiction of the Lease's mandatory arbitration clause. BBB AUTO LINE opened Case No. NIS2507014 and closed it within two days — on April 25, 2025 — on the false grounds that the dispute had been resolved by the Prior Settlement. The Prior Settlement released claims only through February 26, 2025. The fourth failure occurred March 1, 2025 — three days after that release date. Nissan received notice of the erroneous closure and took no corrective action.

**Forum Three — UCC § 2A-517 Revocation:** On May 1, 2025, Plaintiff served Nissan with a formal written notice of revocation of acceptance pursuant to UCC § 2A-517, codified at C.R.S. § 4-2.5-517. The notice explicitly warned Nissan that the Lease was legally terminated and that any further negative credit reporting would constitute a willful violation of the Fair Credit Reporting Act and would be litigated accordingly. Nissan did not respond. Nissan did not challenge the revocation in any court. Nissan never refunded any payments.

**Forum Four — This Court:** Plaintiff filed his Verified Complaint on April 1, 2026. Service was effected April 10, 2026 through Nissan's registered agent. Nissan did not appear for 68 days.

### E. The UCC § 2A-517 Revocation — Legal Effect

14. Plaintiff's May 1, 2025 revocation of acceptance was valid and effective under C.R.S. § 4-2.5-517 for the following reasons: (a) Nonconformity substantially impairing value — four complete mechanical failures at 3,649 miles, totaling 51 days and 36 business days out of service, meeting both Colorado Lemon Law presumption thresholds under C.R.S. § 42-10-104. For a gig worker whose entire income depends on vehicle access, four complete failures in five months constitutes substantial impairment under Colorado's subjective test; (b) Accepted on reasonable assumption nonconformity would be cured — Plaintiff accepted the Vehicle on October 31, 2024. Nissan's own engineer declared the repair complete before the fourth failure. The Vehicle failed three days later. The nonconformity was never seasonably cured; (c) Revocation within reasonable time — Plaintiff served the revocation notice on May 1, 2025 — approximately two months after the fourth failure, during which Plaintiff was pursuing JAMS arbitration and BBB dispute resolution. Two months is reasonable under the circumstances; (d) Written notice to lessor — the May 1, 2025 revocation notice was served on Nissan in writing. No formal notice format is required under Colorado law; (e) Not a finance lease — the Vehicle was selected, manufactured, and supplied by Nissan through its own authorized dealership network. Full revocation rights apply.

15. Upon Plaintiff's valid revocation of acceptance on May 1, 2025: (a) the Lease was legally terminated by operation of Colorado law; (b) Nissan was in default under the Lease, see C.R.S. § 4-2.5-508; (c) Plaintiff was entitled to cancel the Lease and recover all rent and security deposits paid; (d) Nissan was required to refund all payments before repossessing the Vehicle; and (e) no balance was owed by Plaintiff to Nissan or NMAC from May 1, 2025 forward. The account had no outstanding balance, no delinquency, and no charge-off as a matter of Colorado law.

**F. The Unlawful Repossession**

16. On July 12, 2025 — 72 days after the Lease was legally terminated by Plaintiff's UCC § 2A-517 revocation — Defendant Nissan, acting through its wholly owned subsidiary and agent NMAC, repossessed the Vehicle without first refunding any of Plaintiff's payments. This repossession was unlawful under C.R.S. § 4-2.5-508, which requires the lessor to refund all payments before repossessing following a valid revocation.

17. On July 16, 2025, NMAC transmitted to Plaintiff a Notice of Intent to Dispose of Repossessed or Surrendered Motor Vehicle. That notice stated the Date of Repossession as July 12, 2025, and simultaneously checked the box: "[X] You have voluntarily turned in your vehicle to us." A vehicle cannot be both voluntarily surrendered and repossessed on the same date. The "voluntary surrender" characterization was false.

18. The repo notice further stated a total amount to redeem of $30,908.03 — including an "Unpaid Adjusted Lease Balance" of $29,202.05 and "Estimated expenses of

retaking the vehicle" of $450.00. No such balance legally existed after the May 1, 2025 revocation. The repossession expenses were incurred in connection with an unlawful repossession of a legally terminated lease.

19. The repo notice included the following FDCPA disclosure: "We are attempting to collect a debt and any information obtained will be used for that purpose." By including this disclosure, NMAC acknowledged it was acting as a debt collector under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., in connection with the attempted collection of a debt that legally did not exist after the May 1, 2025 revocation.

**G. The Fraudulent Credit Reporting**

20. Following Plaintiff's valid UCC § 2A-517 revocation on May 1, 2025 — which legally terminated the Lease and eliminated any outstanding balance — Nissan, through NMAC as its agent, reported the following false information to Experian, Equifax, and TransUnion on at least four separate occasions: (a) July 2025 — reported a delinquency on the Lease account — false, as the account had been legally terminated and carried no balance since May 1, 2025; (b) August 2025 — reported a second delinquency — false for the same reason; (c) September 2025 — reported a third delinquency — false for the same reason; and (d) March 31, 2026 — reported "Voluntary surrender / Balance charged to loss" — false on both characterizations. The Vehicle was not voluntarily surrendered — it was repossessed, as confirmed by Nissan's own July 16, 2025 repo notice which noted a Date of Repossession of July 12, 2025. No balance was charged to loss — because no balance legally existed after

the May 1, 2025 revocation.

21. Each of these reporting events occurred after Nissan received written notice on May 1, 2025 that the Lease was legally terminated and that any further negative reporting would constitute a willful FCRA violation. Each occurred after consumer dispute notifications transmitted by Experian, Equifax, and TransUnion. The March 31, 2026 charge-off occurred after the filing of this federal lawsuit.

22. The false reporting is the Nissan-Infiniti LT lease account, Subscriber No. 3690580. It is the sole derogatory mark on an otherwise unblemished credit profile consisting of seventeen accounts — two auto loans and fifteen credit accounts — each with a perfect payment history.

23. Nissan's own repo notice proves the falsity of the credit reporting. The July 16, 2025 repo notice checks "voluntary surrender" while simultaneously noting a repossession date of July 12, 2025. Nissan's own document contradicts its own credit reporting. The "voluntary surrender / balance charged to loss" characterization was adopted from the false repo notice and reported to the credit bureaus as fact — despite being contradicted by Nissan's own records.

24. The fraudulent charge-off has suppressed Plaintiff's VantageScore by approximately 100 points — from a score that would have qualified for prime credit products to a score of 593, which triggers automatic denials and subprime terms across housing, credit, and financing applications.

**H. The Documented Post-Filing Harm**

25. The following harms arose during the pendency of this litigation — after the

Complaint was filed on April 1, 2026, after service was effected on April 10, 2026, after the response deadline expired on May 1, 2026, and after default was entered on May 5, 2026 — while Nissan sat silent:

> **Bank of America closure — June 2025:** Bank of America closed Plaintiff's credit card account (credit limit: $3,700) despite a perfect payment history on that account. The sole change to Plaintiff's credit profile was the Nissan charge-off. Loss of credit access: $3,700. See ECF No. 15-1, Ex. M.
>
> **Nova West housing denial — April 6, 2026:** Five days after Plaintiff filed this lawsuit, Plaintiff was denied housing at Residences at Nova West Phase 2, 525 Dry Creek Drive, Longmont, Colorado. The RentGrow screening report (Report ID 80696099) cited one reason: "Severe level of Charge-offs." That is the only charge-off on Plaintiff's entire credit history. See ECF No. 15-1, Ex. N.
>
> **Double security deposit requirement — April 29, 2026:** Plaintiff was conditionally approved for housing at a second property but was required to pay a double security deposit of $3,800 as a condition of tenancy solely because the Nissan charge-off suppressed his VantageScore below the standard 680-point threshold. Plaintiff could not afford the double deposit requirement. Plaintiff lost housing he was otherwise fully qualified to occupy.
>
> **Citibank non-renewal — April 30, 2026:** Citibank declined to reissue Plaintiff's credit card (credit limit: $3,000) effective April 30, 2026 — one day before Nissan's response deadline expired. Citibank's written response (Reference No. 20260312170121133 6005) cites a credit scoring review. The sole derogatory item on Plaintiff's credit report is the Nissan charge-off. See ECF No. 15-1, Ex. M.

**Housing insecurity — ongoing:** As of the date of this First Amended Complaint, Plaintiff is unable to obtain standard market-rate housing. Every housing application Plaintiff submits is denied on the same grounds — "Severe level of Charge-offs" — the single fraudulent entry Nissan has maintained for over fourteen months. Applying for housing has become a futile exercise. Plaintiff faces the realistic prospect of couch surfing or relying on friends for shelter while Nissan's fraudulent reporting remains on his credit file.

**H(a). The Mother's Vehicle — Direct Causation Chain**

26. The circumstances giving rise to Plaintiff's obligation to finance a replacement vehicle began when Plaintiff's mother — an elderly woman surviving on approximately $1,300 per month in Social Security income — experienced a mechanical breakdown of her own vehicle that rendered it permanently inoperable and beyond economical repair. With no financial resources to replace it and no ability to obtain financing independently on a fixed Social Security income, Plaintiff's mother was left without transportation entirely. Without a vehicle she could not attend medical appointments, access groceries, or meet essential daily needs. Plaintiff was obligated to provide her with transportation. To do so, Plaintiff gave his mother his own second personal vehicle — a fully paid-off car he owned free and clear of any lien — so that she could continue to function independently.

27. It is important to understand why Plaintiff leased the Ariya in the first place. Plaintiff leased the Ariya specifically because he needed a vehicle for gig work while giving his mother his paid-off personal vehicle. The economic decision was built on

Nissan's representations: the Ariya's advertised 216-mile range, fuel savings from home electricity charging instead of gasoline, and "all-weather confidence" in Colorado conditions. Plaintiff calculated that the elimination of gasoline costs — replaced by the modest cost of Level 1 home electricity charging — would offset a meaningful portion of the monthly lease payment, making the Ariya economically viable while simultaneously solving his mother's transportation crisis. Nissan's false advertising destroyed that economic calculation entirely. The vehicle gained 3 miles of range per overnight Level 1 charge in Colorado winter temperatures — forcing Plaintiff to use commercial DC fast charging at costs approaching gasoline prices — eliminating the anticipated fuel savings entirely.

28. While using Plaintiff's paid-off vehicle, Plaintiff's mother was subsequently struck by another driver who was 100% at fault in the collision. The at-fault driver presented insurance documentation to law enforcement at the scene to avoid an additional citation — however, the policy had been purchased the same day as the accident in an apparent attempt to fraudulently present coverage that did not exist at the time of the collision. The fraudulent same-day insurance provided no valid recovery. Plaintiff was forced to use his own insurance to cover the total loss. Plaintiff's fully paid-off vehicle — a free-and-clear asset representing years of financial effort — was totaled with no recovery from the at-fault driver. Plaintiff's mother also sustained serious physical injury in the collision — including a broken sternum — requiring medical treatment and a period of recovery.

29. Plaintiff was therefore left in the following position simultaneously: his mother's

original vehicle had broken down beyond repair; he had leased the Ariya specifically to solve that transportation problem — only to receive a vehicle that failed four times and whose false advertising destroyed the economic rationale for the lease; his own paid-off vehicle had been totaled by a driver carrying fraudulently obtained same-day insurance with no valid recovery; his mother was injured and unable to drive; and he needed transportation for both himself — for gig work — and for his mother's daily needs. He was forced to finance a replacement vehicle. This was not a discretionary purchase. It was an unavoidable emergency obligation created by a cascading series of circumstances — every one of which traces directly or proximately to Nissan's false advertising, Nissan's defective vehicle, and Nissan's fraudulent credit reporting.

30. It is at this point that Nissan's fraudulent charge-off became the proximate cause of direct, quantifiable, ongoing financial harm. Prior to Nissan's fraudulent charge-off — with a 17-account, perfect-payment-history credit profile — Plaintiff would have qualified for prime financing at approximately 6-8% APR. The fraudulent charge-off was the sole derogatory mark on that profile. It suppressed Plaintiff's VantageScore to 593 — deep subprime territory. Because of that suppression — caused entirely by Nissan's continued reporting of a false charge-off on a legally terminated account — Plaintiff was forced to finance through Capital One at 17.99% APR on a $19,181.12 financed amount over 66 months, generating a monthly payment of $496.36. Without the fraudulent charge-off, Plaintiff would have accessed prime financing and paid approximately $370-$380 per month on the same amount. The difference — approximately $116-$126 per month — is money Nissan's

fraudulent reporting costs Plaintiff every single month for 66 months. Total excess interest over the loan term: approximately $7,656 to $8,316. Every dollar of that excess comes directly out of Plaintiff's pocket as a direct and proximate result of Nissan's fraudulent charge-off on a legally terminated account.

31. The fraudulent charge-off is not self-correcting. Under 15 U.S.C. § 1681c, a derogatory entry may remain on a consumer's credit report for seven years from the date of first delinquency. The first delinquency Nissan reported — falsely — was July 2025. Without a mandatory court order compelling deletion, the fraudulent charge-off could remain on Plaintiff's credit file until July 2032 — seven years of housing application denials, credit score suppression, subprime financing rates, and financial opportunities foreclosed, all flowing from a $625.28 net dispute Nissan chose to weaponize rather than resolve. Nissan has demonstrated by its conduct — reporting false information four separate times after written notice, after consumer bureau disputes, and after the filing of this lawsuit — that it will not voluntarily correct the fraudulent reporting. Only a court order with enforcement teeth can end this harm.

**I. Nissan's Knowledge of Plaintiff's Vulnerability**

32. Nissan had actual, documented knowledge — transmitted through formal JAMS arbitration proceedings prior to its refusal to participate — that: (a) Plaintiff was a gig worker whose entire income depended on his personal registered vehicle; (b) Plaintiff suffered from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act that is directly affected by financial stress and vehicle unavailability; (c) four complete mechanical failures had

already destroyed more than $5,100 in income; (d) Plaintiff had no alternative income source and no financial cushion to absorb the cascading consequences of Nissan's fraudulent credit reporting; and (e) Plaintiff was a man rebuilding his life after incarceration with limited margin for financial error.

33. Nissan's own Arbitration Specialist received and read this information before responding "NNA does not participate with JAMS." Having received that knowledge and chosen deliberate non-engagement over resolution, Nissan then weaponized credit reporting — reporting false information four separate times after written notice — against a gig worker, rebuilding his life after incarceration, managing a chronic ADA-qualifying disability, with no alternative income and no financial margin, over a $625.28 net dispute.

34. Beyond Plaintiff's specific circumstances — which Nissan knew — any reasonable corporation in Nissan's position knows that weaponizing credit reporting against an individual consumer causes catastrophic, compounding financial harm. Nissan's deliberate decision to report false information — after receiving written notice, after consumer bureau disputes, and after the filing of this lawsuit — was not an accident or a good faith error. It was a deliberate deployment of the most powerful financial weapon available to a corporate creditor for the purpose of coercing capitulation in a $625.28 dispute. Any corporation that deliberately uses credit reporting as a coercive instrument to gain compliance knows the harm it causes. Nissan used it anyway.

**J. O'Hagan Meyer PLLC's Litigation Misconduct**

35. On June 22, 2026, Defendant O'Hagan Meyer PLLC, through its partner Russell

S. Kalvelage, appeared as counsel of record for Nissan and filed Defendant's Motion to Set Aside Default [ECF No. 19]. That motion devoted pages 14-15 to a public quote in which Plaintiff criticized this Court's legal reasoning in unrelated litigation — Brooks v. Colorado Department of Corrections, Case No. 13-cv-02894-SKC — presenting it to this Court as evidence of improper litigation motive in connection with a Rule 55(c) motion.

36. The public quote was presented to this Court without disclosing the following material facts: (a) the United States Court of Appeals for the Tenth Circuit previously issued a published, precedential opinion reversing this Court in the same underlying matter — *Brooks v. Colo. Dep't of Corrs.*, 12 F.4th 1160 (10th Cir. 2021) — the second remand in a thirteen-year case — without which the $3.5 million jury verdict Plaintiff references would never have occurred because it was this Court's own grant of summary judgment that the Tenth Circuit reversed; (b) the specific finding Plaintiff criticized — that the 19th Judicial District is a "state agency" under Colorado's intercept statute — was directly contrary to binding Colorado authority under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). See Dunafon v. Krupa, 2020 COA 149, ¶ 24, 477 P.3d 785, 790 (Colo. App. 2020). This Court reached the state agency finding by importing a definition from C.R.S. § 24-30-1502 — the Risk Management statutes — into C.R.S. § 24-30-202.4 — the intercept statute — despite the fact that C.R.S. § 24-30-1502's definitions expressly apply only to Part 15 of Article 30 and have no application to the intercept statute in Part 2 of Article 30, and despite the fact that this definitional borrowing was directly contrary to Dunafon's categorical and binding

holding under Erie; (c) Case No. 25-1256 was actively pending before the Tenth Circuit on June 22, 2026 — the day ECF No. 19 was filed — making Plaintiff's public criticism constitutionally protected speech about an actively appealed ruling that no court may penalize; and (d) the Tenth Circuit issued its operative amended ruling in Case No. 25-1256 on June 23, 2026 — the day after ECF No. 19 was filed — vacating the specific finding Plaintiff criticized. Plaintiff's criticism of that finding was legally correct.

37. At the time O'Hagan Meyer filed ECF No. 19 on June 22, 2026, Plaintiff had four active matters pending before Judge Crews simultaneously — this case, the companion civil rights matter Case No. 1:25-cv-02610-SKC-STV with a $60,000,000 damages claim and a pending preliminary injunction, the underlying CDOC matter Case No. 13-cv-02894-SKC with an active en banc petition in Case No. 25-1256, and Brooks v. DraftKings, Inc., Case No. 1:26-cv-01692-SKC-STV. The combined value of those matters exceeds $67,000,000. O'Hagan Meyer deliberately injected Plaintiff's criticism of this Court's judicial reasoning into a pending motion at the precise moment Plaintiff had maximum exposure before this Court.

38. On July 7, 2026 — the same day Nissan transmitted a settlement counteroffer to Plaintiff — O'Hagan Meyer filed Defendant's Reply in Support of Motion to Set Aside Default [ECF No. 22], pages 9-11, doubling down on the improper character attack and characterizing the deliberate omission of a published Tenth Circuit reversal, binding Colorado precedent under Erie, a vacated judicial finding, and an active appellate proceeding as "a matter of advocacy strategy." That characterization

confirms rather than excuses the violation.

39. O'Hagan Meyer's conduct in ECF No. 19 and ECF No. 22 violated: (a) this Court's Standing Order for Civil Cases § A.2 — requiring counsel to treat parties "with courtesy and respect" — violated on the first filing O'Hagan Meyer made in this litigation and compounded by the doubling down in ECF No. 22; (b) Colo. RPC 3.4(e) — prohibiting a lawyer from alluding to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence — violated on two independent grounds: first, the material is irrelevant to every recognized Rule 55(c) factor; and second, the material could never be admitted into evidence in this case under any circumstance — Fed. R. Evid. 404(b) prohibits evidence of other acts offered to prove a person's character or action in conformity therewith; (c) Colo. RPC 3.5(a) — prohibiting a lawyer from seeking to influence a judge by means prohibited by law — violated by deliberately placing Plaintiff's criticism of this Court's judicial reasoning before this Court in a pending motion for the purpose of influencing the Court's ruling through judicial psychology rather than law; (d) Colo. RPC 8.4(d) — prohibiting conduct that is prejudicial to the administration of justice — violated by deliberately injecting inflammatory and contextually incomplete material about a litigant into a pending federal proceeding before the presiding judge for the purpose of corrupting the judicial process; (e) Fed. R. Civ. P. 11(b)(1) — prohibiting filings presented for an improper purpose — violated because the sole coherent purpose of placing Plaintiff's criticism of this Court's judicial reasoning before this Court in a pending motion was to alert this Court to

that criticism and invite an adverse ruling. O'Hagan Meyer's own ECF No. 22 confirms the improper purpose in writing — arguing the material "bears directly on Plaintiff's relationship with this Court," a factor that does not exist in Rule 55(c) jurisprudence; and (f) the constitutional protection of Plaintiff's speech — Plaintiff's public criticism of an actively appealed judicial ruling is constitutionally protected expression under the First Amendment that no court may penalize.

40. O'Hagan Meyer's conduct destroyed the prospect of settlement between Plaintiff and Nissan. Prior to June 22, 2026, Plaintiff and Nissan were actively engaged in settlement negotiations — Plaintiff having served a demand and Nissan having responded with a counteroffer on July 7, 2026. Those negotiations had a reasonable probability of reaching some resolution — including credit deletion provision that would have begun to end Plaintiff's housing insecurity and financial destruction. By filing ECF No. 22 — after having been placed on notice of the violations in Plaintiff's Opposition [ECF No. 20] — O'Hagan Meyer destroyed the prospect of any settlement. As Plaintiff advised counsel in his written rejection of July 7, 2026, the settlement window closed not because of the inadequacy of Nissan's counteroffer but because of what O'Hagan Meyer chose to do on the same day the counteroffer arrived.

41. Plaintiff served a Rule 11 safe harbor letter on O'Hagan Meyer on July 7, 2026, pursuant to Fed. R. Civ. P. 11(c)(2), demanding withdrawal of pages 14-15 of ECF No. 19 and pages 9-11 of ECF No. 22 within 21 days. The 21-day safe harbor period expired on July 28, 2026. O'Hagan Meyer did not withdraw the offending material.

42. Plaintiff will be filing a complaint against Russell S. Kalvelage with the Colorado

Office of Attorney Regulation Counsel identifying violations of Colo. RPC 3.3(a)(1), Colo. RPC 3.4(e), and Colo. RPC 8.4(d) — conduct prejudicial to the administration of justice.

## IV. CLAIMS FOR RELIEF

### COUNT I — MAGNUSON-MOSS WARRANTY ACT

### 15 U.S.C. §§ 2301 et seq.

### (Against Defendant Nissan North America, Inc.)

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. The Vehicle is a "consumer product" as defined by 15 U.S.C. § 2301(1). The Lease is a "written warranty" and/or "service contract" as defined by 15 U.S.C. § 2301(6) and (8). Plaintiff is a "consumer" as defined by 15 U.S.C. § 2301(3).

90. Nissan provided written warranties in connection with the Vehicle — including the 2024 Nissan Ariya New Vehicle Limited Warranty — warranting that the Vehicle would be free from defects in materials and workmanship.

91. The Vehicle was not free from defects in materials and workmanship. It experienced four complete mechanical failures at 3,649 miles totaling 51 days and 36 business days out of service — within the first five months of the Lease. Nissan failed to repair or replace the defective components within a reasonable number of attempts or within a reasonable time.

92. Nissan's failure to remedy the Vehicle's defects after a reasonable number of attempts constitutes a breach of written and implied warranties under the

Magnuson-Moss Warranty Act.

88. Plaintiff provided Nissan with reasonable opportunity to cure the defects through four separate repair attempts — including a repair declared complete by Nissan's own engineer that failed within three days. Nissan failed to cure.

89. As a direct and proximate result of Nissan's breach of warranty, Plaintiff has suffered actual damages in an amount to be proven at trial, including but not limited to all lease payments made, consequential damages, and all damages set forth in the damages section of this Complaint.

90. Pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover costs and expenses including pro se litigation fees based on actual time expended at the prevailing market rate.

## COUNT II — BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Against Defendant Nissan North America, Inc.)**

91. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92. The Lease constitutes a valid and enforceable contract between Plaintiff and Nissan, through its agent NMAC, under Colorado law.

88. Nissan materially breached the Lease in the following respects: (a) by failing to provide Plaintiff with a vehicle free from defects and in good working condition throughout the Lease term; (b) by failing to repair or replace the Vehicle's defective components within a reasonable number of attempts or within a reasonable time; (c) by structuring repurchase offers that required Plaintiff to pay $1,043.94 to return a

vehicle Nissan twice acknowledged was defective; (d) by refusing to honor Section 28 of the Lease — the mandatory JAMS arbitration clause — despite formally commencing the arbitration proceeding, receiving the demand, and responding through its own Arbitration Specialist that "NNA does not participate with JAMS"; (e) by repossessing the Vehicle on July 12, 2025 — 72 days after the Lease was legally terminated by Plaintiff's valid UCC § 2A-517 revocation — without first refunding all payments made, in direct violation of C.R.S. § 4-2.5-508; and (f) by reporting false credit information on a legally terminated account, in violation of the implied covenant of good faith and fair dealing.

89. Every contract in Colorado contains an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that deprives the other party of the benefits of the contract. See Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995). Nissan's systematic destruction of every dispute resolution forum designated in the Lease — while simultaneously weaponizing credit reporting to coerce Plaintiff into abandoning his claims — constitutes a breach of the implied covenant.

90. As a direct and proximate result of Nissan's breach of contract and breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered actual damages in an amount to be proven at trial, including all lease payments made, consequential damages, lost income, and all damages set forth in the damages section of this Complaint.

**COUNT III — COLORADO CONSUMER PROTECTION ACT**

**C.R.S. §§ 6-1-101 et seq.**

**(Against Defendant Nissan North America, Inc.)**

91. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92. The Colorado Consumer Protection Act prohibits deceptive trade practices in the course of a person's business, vocation, or occupation. C.R.S. § 6-1-105(1).

88. Nissan engaged in the following deceptive trade practices in violation of C.R.S. § 6-1-105: (a) False advertising of vehicle range and cold-weather performance — Nissan marketed the 2024 Ariya as delivering 216 miles of EPA-estimated range and represented the vehicle provided "better performance in hot and cold weather," "all-weather confidence," and that customers would "get the same performance in a wide variety of weather conditions" — while its own Owner's Manual, Section 9.35.6.1, simultaneously disclosed that "driving range may be substantially reduced in extremely cold conditions" and that the vehicle was functionally unchargeable at home in Colorado winter conditions on a Level 1 charger, gaining approximately 3 miles of range per overnight charge. This deception is documented in five primary sources all submitted as ECF No. 15-1, Ex. A; (b) False characterization of the repossession as "voluntary surrender" — Nissan's July 16, 2025 repo notice checked "voluntary surrender" while simultaneously noting a Date of Repossession of July 12, 2025 — a vehicle cannot be both voluntarily surrendered and repossessed on the same date; (c) False credit reporting on a legally terminated account — Nissan reported "Voluntary surrender / Balance charged to loss" — and three prior delinquencies — on a Lease account that was legally terminated by UCC § 2A-517 revocation on May

1, 2025, in violation of C.R.S. § 6-1-105(1)(u); (d) Threatening litigation while refusing contractually mandated arbitration — Nissan's July 16, 2025 repo notice threatened "SUIT AND LIABILITY" against a consumer whose Lease had been validly revoked 72 days earlier in a matter where the Lease mandates JAMS or AAA arbitration as the exclusive dispute resolution mechanism; (e) Directing consumer to inadequate alternative forum — Nissan directed Plaintiff to BBB AUTO LINE, a forum its own Lease does not designate and that could not award the damages Plaintiff sustained, in direct contradiction of the Lease's mandatory JAMS arbitration clause; and (f) Misrepresentation of the contractually designated dispute resolution forum — Nissan's own Arbitration Specialist stated "NNA does not participate with JAMS. JAMS is only for if you have an actual concern with your lease. The BBB auto line is for if you believe there is a defect with your vehicle" — a material misrepresentation of the Lease's own terms violating C.R.S. § 6-1-105(1)(u) and C.R.S. § 6-1-105(1)(g).

89. Nissan's deceptive trade practices were committed knowingly. Nissan knew from its own Owner's Manual that cold weather substantially reduces range while advertising "better performance in cold weather." Nissan knew through its own Arbitration Specialist that it was directing Plaintiff away from the contractually designated JAMS forum. Nissan knew through Plaintiff's written UCC revocation notice that the account was legally terminated before reporting four separate derogatory entries.

90. Plaintiff suffered actual damages as a direct and proximate result of Nissan's deceptive trade practices as set forth in the damages section of this Complaint.

91. Pursuant to C.R.S. § 6-1-113(2), Plaintiff is entitled to treble damages — three times the amount of actual damages — for Nissan's knowing deceptive trade practices, plus attorney fees and costs.

**COUNT IV — UNJUST ENRICHMENT**

**(Against Defendant Nissan North America, Inc.)**

92. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Nissan has been unjustly enriched at Plaintiff's expense in the following respects: (a) Nissan retained $15,600 in federal and state electric vehicle tax credits applied at the origination of the Lease on a vehicle Nissan has twice acknowledged was defective and for which it offered voluntary repurchase; (b) Nissan structured its repurchase offers to require Plaintiff to pay $1,043.94 to return the defective vehicle; (c) following the valid UCC § 2A-517 revocation on May 1, 2025, Nissan repossessed the Vehicle on July 12, 2025 without refunding any of Plaintiff's payments — retaining both the vehicle and all lease payments made, in violation of C.R.S. § 4-2.5-508; and (d) Nissan retained the $450 repossession fee charged in connection with an unlawful repossession of a legally terminated lease.

89. Unjust enrichment is available as an independent theory alongside breach of contract claims where a party has been enriched through improper, deceitful, or misleading conduct. Nissan's retention of EV tax credits on an acknowledged defective vehicle — and its repossession without refund of a legally terminated lease — constitutes unjust enrichment supported by Nissan's improper and deceitful

conduct.

90. Additionally, following Plaintiff's valid UCC § 2A-517 revocation, the Lease ceased to exist as a legal framework. Nissan's obligations arose thereafter from the statute — C.R.S. § 4-2.5-508 — not the contract. Nissan's retention of Plaintiff's payments and the EV tax credits under those circumstances constitutes unjust enrichment independent of any contractual framework.

91. Plaintiff is entitled to restitution of all amounts by which Nissan has been unjustly enriched at Plaintiff's expense, in an amount to be proven at trial.

**COUNT V — FRAUDULENT MISREPRESENTATION**

**(Against Defendant Nissan North America, Inc.)**

92. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Nissan made the following false representations of material fact in connection with the lease of the Vehicle: (a) that the Vehicle delivers 216 miles of EPA-estimated range; (b) that the Vehicle provides "better performance in hot and cold weather"; (c) that the Vehicle provides "all-weather confidence"; and (d) that customers would "get the same performance in a wide variety of weather conditions."

89. These representations were false. Nissan knew they were false — or made them with reckless disregard for their truth or falsity — because: (a) Nissan's own Owner's Manual, Section 9.35.6.1, simultaneously disclosed that "driving range may be substantially reduced in extremely cold conditions" — directly contradicting the advertising claims; (b) Nissan's own Senior Manager publicly acknowledged cold-

weather performance limitations while simultaneously representing "the same performance in a wide variety of weather conditions"; and (c) Plaintiff's authenticated dashboard photograph documented a 35.6% range deficit at 100% charge in 23°F temperature before driving a single mile.

90. Nissan made these representations with the intent that Plaintiff and other consumers would rely on them in making leasing decisions.

91. Plaintiff reasonably relied on Nissan's representations in entering into the Lease on October 31, 2024. Specifically, Plaintiff leased the Ariya because: (a) he needed to give his mother his paid-off personal vehicle to replace her broken-down car; (b) Nissan's advertised range of 216 miles would support his gig work; and (c) Level 1 home charging would eliminate gasoline costs, offsetting the lease payment. All three of those economic premises were destroyed by Nissan's false advertising.

92. As a direct and proximate result of Nissan's fraudulent misrepresentations, Plaintiff suffered actual damages including but not limited to all lease payments made, the cost of replacement transportation, and all damages set forth in the damages section of this Complaint.

88. Nissan's fraudulent misrepresentations were made knowingly and with willful disregard for Plaintiff's rights, entitling Plaintiff to punitive damages under C.R.S. § 13-21-102.

**COUNT VI — BAD FAITH**

**(Against Defendant Nissan North America, Inc.)**

89. Plaintiff realleges and incorporates by reference all preceding paragraphs as if

fully set forth herein.

90. Nissan engaged in a systematic pattern of bad faith conduct spanning fourteen months designed to deprive Plaintiff of every available remedy: (a) refusing to participate in contractually mandated JAMS arbitration — in writing — through its own Arbitration Specialist; (b) directing Plaintiff to BBB AUTO LINE — a forum its own Lease does not designate; (c) allowing BBB AUTO LINE to close Plaintiff's claim on false grounds without taking corrective action; (d) refusing to respond to Plaintiff's formal UCC § 2A-517 revocation notice; (e) repossessing the Vehicle 72 days after the Lease was legally terminated without refunding any payments; (f) reporting false credit information four separate times after receiving written notice that the account was legally terminated and that further reporting would constitute a willful FCRA violation; (g) defaulting in this federal action for 68 days after service through its professional registered agent; and (h) filing a character attack on Plaintiff through its retained counsel on the first responsive filing in this litigation — in violation of this Court's own Standing Order.

91. Nissan's bad faith conduct was deliberate, systematic, and designed to coerce Plaintiff into abandoning legitimate legal claims through financial destruction rather than engaging in good faith dispute resolution.

92. As a direct and proximate result of Nissan's bad faith conduct, Plaintiff has suffered actual damages as set forth in the damages section of this Complaint, and is entitled to punitive damages under C.R.S. § 13-21-102.

**COUNT VII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, Jointly)**

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. Under Rugg v. McCarty, 173 Colo. 170, 476 P.2d 753 (1970), and Coors Brewing Co. v. Floyd, 978 P.2d 663, 665-66 (Colo. 1999), a defendant is liable for intentional infliction of emotional distress where its conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and causes severe emotional distress. Whether conduct meets this threshold is ordinarily a question for the jury. See Coors Brewing, 978 P.2d at 665-66.

90. Under Restatement (Second) of Torts § 46, comment f (1965), the outrageous character of conduct is amplified by the defendant's knowledge of the plaintiff's particular vulnerability. Defendant Nissan had actual, documented knowledge — through the formal JAMS arbitration filings it received and ignored — that Plaintiff was a gig worker with no alternative income source, financially dependent on a single vehicle for all earnings, managing a chronic autoimmune condition qualifying as a disability under the ADA, rebuilding his life after incarceration, and operating with no financial margin to absorb the harm Nissan's conduct would cause.

91. The following course of conduct by Defendants Nissan and O'Hagan Meyer — individually and in combination — constitutes outrageous conduct going beyond all possible bounds of decency: (a) leasing Plaintiff a vehicle that failed four complete times in five months at 3,649 miles — while advertising "all-weather confidence" and

"better performance in cold weather" knowing its own Owner's Manual disclosed the opposite; (b) refusing to honor the contractually designated JAMS arbitration forum — in writing — while simultaneously offering no viable alternative for complete relief; (c) destroying every dispute resolution forum available to Plaintiff — JAMS, BBB AUTO LINE, UCC revocation, and this Court — over a $625.28 net dispute; (d) weaponizing credit reporting — reporting false information four separate times after written notice — against a gig worker, rebuilding his life after incarceration, managing a chronic ADA-qualifying disability, with no alternative income and no financial margin, over a $625.28 net dispute; (e) repossessing the Vehicle 72 days after the Lease was legally terminated — without refunding any payments — unlawfully; (f) causing two housing denials and ongoing housing insecurity — leaving Plaintiff unable to obtain standard market-rate housing and facing the prospect of couch surfing and relying on friends for shelter; (g) causing the loss of two credit accounts, forced subprime financing for Plaintiff's mother's vehicle at 17.99% APR — excess interest paid by Plaintiff every month — and ongoing daily financial destruction; (h) defaulting in this federal action for 68 days after service — then appearing through counsel whose first act was to attack Plaintiff's character before the presiding judge in violation of this Court's own Standing Order; and (i) O'Hagan Meyer PLLC doubling down on that character attack in ECF No. 22 — after being placed on notice of the violations — characterizing the deliberate omission of a published Tenth Circuit reversal, binding Colorado precedent, a vacated judicial finding, and an active appellate proceeding as "a matter of advocacy strategy" —

simultaneously destroying the prospect of settlement and perpetuating every harm the settlement would have remediated.

92. Nissan's conduct has caused Plaintiff severe emotional distress — including anxiety, shame, fear, helplessness, and ongoing psychological harm — arising from: (a) fourteen months of deliberate financial coercion over a $625.28 dispute; (b) two housing denials and ongoing housing insecurity — unable to obtain standard market-rate housing and facing the prospect of couch surfing and relying on friends for shelter; (c) the destruction of his mother's financial position through forced subprime financing at 17.99% APR — excess interest paid by Plaintiff every month; (d) the knowledge that the fraudulent charge-off may remain on his credit file through July 2032 — seven years of continuing harm; and (e) the continued litigation misconduct by O'Hagan Meyer in this proceeding — which has destroyed the prospect of settlement and the immediate credit deletion it would have provided.

88. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff has suffered severe emotional distress in an amount to be proven at trial, not less than $1,000,000 in compensatory damages.

89. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages under C.R.S. § 13-21-102 in an amount up to three times the compensatory damages awarded.

**COUNT VIII — FAIR CREDIT REPORTING ACT — WILLFUL FURNISHER LIABILITY**

**15 U.S.C. § 1681s-2(b)**

**(Against Defendant Nissan North America, Inc.)**

90. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Nissan North America, Inc., through its agent NMAC, is a "furnisher of information" to consumer reporting agencies within the meaning of 15 U.S.C. § 1681s-2. Nissan transmitted negative information regarding Plaintiff's lease account to Experian, Equifax, and TransUnion on at least four separate occasions.

92. Under 15 U.S.C. § 1681s-2(b), after receiving notice of a consumer dispute from a consumer reporting agency, a furnisher must: (a) conduct a reasonable investigation with respect to the disputed information; (b) review all relevant information provided by the consumer reporting agency; (c) report the results of the investigation to the consumer reporting agency; and (d) if the information is found to be inaccurate or incomplete, report those results to all consumer reporting agencies to which the furnisher has provided the inaccurate information and correct that information.

88. Plaintiff transmitted dispute notifications regarding the false Nissan charge-off to Experian, Equifax, and TransUnion. Each bureau transmitted those disputes to Nissan as the furnisher pursuant to 15 U.S.C. § 1681i. Nissan failed to conduct a reasonable investigation and failed to correct the false information — continuing to report "Voluntary surrender / Balance charged to loss" despite: (a) written notice on May 1, 2025 that the Lease was legally terminated and that any further reporting would constitute a willful FCRA violation; (b) consumer dispute notifications from all three major credit bureaus; (c) the filing of this federal lawsuit on April 1, 2026; and (d) the entry of default on May 5, 2026.

89. The reporting is not merely inaccurate — it is legally false. The Lease was terminated by operation of Colorado law on May 1, 2025. From that date forward, no balance was owed, no delinquency existed, and no charge-off was warranted. Every reporting event after May 1, 2025 reported a legally fictitious obligation on a legally terminated account. Nissan's own repo notice — checking "voluntary surrender" while noting a repossession date — proves the "voluntary surrender" characterization was false from Nissan's own records.

90. Nissan's violations of 15 U.S.C. § 1681s-2(b) were willful within the meaning of Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57-58 (2007) — meaning either intentional violation or reckless disregard of the statute's requirements — for the following reasons: (a) Nissan received written notice on May 1, 2025 that further reporting would constitute a willful FCRA violation — and reported anyway; (b) Nissan's own records — including the July 16, 2025 repo notice — contradict the "voluntary surrender" characterization, proving Nissan knew the reporting was false; (c) Nissan reported false information four separate times across nine months — a sustained pattern of willful false reporting; (d) Nissan defaulted in this federal lawsuit rather than defend its reporting; and (e) the reporting occurred on a legally terminated account — Nissan had no legal right to report any balance or delinquency after May 1, 2025.

91. As a direct and proximate result of Nissan's willful violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages including: (a) suppression of VantageScore by approximately 100 points; (b) loss of Bank of America credit access — $3,700; (c)

loss of Citibank credit access — $3,000; (d) Nova West housing denial; (e) loss of housing Plaintiff was otherwise qualified to occupy — double deposit requirement he could not afford; (f) excess financing costs — Capital One 17.99% APR on mother's vehicle — approximately $7,656-$8,316 in excess interest; (g) emotional distress from ongoing housing insecurity; and (h) forward-looking damages through July 2032 if the charge-off is not deleted.

92. Pursuant to 15 U.S.C. § 1681n, Plaintiff is entitled to: (a) actual damages — uncapped — in an amount to be proven at trial; (b) statutory damages of $1,000 per willful violation — four violations — totaling $4,000; (c) punitive damages in an amount to be determined by the jury, not to exceed the constitutional maximum under BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); and (d) attorney fees and costs — mandatory under 15 U.S.C. § 1681n(a)(3).

**COUNT IX — ABUSE OF PROCESS**

**(Against Defendant O'Hagan Meyer PLLC)**

118. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

119. Colorado recognizes abuse of process as an independent tort where: (1) an ulterior purpose exists — one that the legal proceeding was not designed to accomplish; and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. See Mintz v. Accident & Injury Medical Specialists, PC, 284 P.3d 62, 66 (Colo. App. 2010), as modified (Feb. 24, 2011), aff'd, 2012 CO 50, 279 P.3d 658; Moore & Assocs. Realty, Inc. v. Arrowhead at Vail, 892 P.2d 367, 373 (Colo. App.

1994).

120. The litigation privilege does not bar abuse of process claims because the wrong is the misuse of the legal process itself — not the content of statements made. See Protect Our Mountain Environment, Inc. v. District Court, 677 P.2d 1361 (Colo. 1984).

121. O'Hagan Meyer misused the Rule 55(c) motion to set aside default — a legitimate procedural vehicle — through the following irregular and coercive act not proper in the regular conduct of a Rule 55(c) proceeding: deliberately placing Plaintiff's public criticism of the presiding judge's own judicial reasoning before that judge in a pending motion requiring that judge's ruling — at a moment when Plaintiff had four active matters before that judge with combined exposure exceeding $67,000,000 — for the sole purpose of alerting the Court to that criticism and inviting an adverse ruling on that basis.

122. The ulterior purpose is established by O'Hagan Meyer's own ECF No. 22, which defends the character attack by arguing the material "bears directly on Plaintiff's relationship with this Court" — a factor that does not exist in Rule 55(c) jurisprudence under United States v. Timbers Pres., Routt Cnty., Colo., 999 F.2d 452, 454 (10th Cir. 1993), or any other Tenth Circuit authority. O'Hagan Meyer invented a non-existent Rule 55(c) factor for one purpose: to justify placing inflammatory material before the presiding judge to influence the judicial outcome through judicial psychology rather than law. That admission — in writing, in a federal court filing — establishes the ulterior purpose.

118. The willful act is established by the filing of ECF No. 19 pages 14-15 and the doubling down in ECF No. 22 pages 9-11 — after being placed on notice in ECF No. 20 that the conduct violated this Court's Standing Order, Colo. RPC 3.4(e), Colo. RPC 3.5(a), Colo. RPC 8.4(d), and Fed. R. Civ. P. 11(b)(1). A party that doubles down on improper conduct after receiving notice cannot claim inadvertence.

119. Under Dixon v. Bowen, 85 Colo. 194, 274 P. 824 (Colo. 1929), a conspiracy to procure a judgment by improper means states a claim for abuse of process. O'Hagan Meyer and Nissan agreed to file the character attack — Nissan retained O'Hagan Meyer and directed the filing — for the purpose of procuring a favorable ruling through means unrelated to the legal standard governing that motion.

120. As a direct and proximate result of O'Hagan Meyer's abuse of process, Plaintiff has suffered the following damages: (a) additional pro se litigation fees caused directly by the improper filing — approximately 40 hours at $150 per hour: $6,000; (b) pre-judgment interest delay at the rate of 8% per year under C.R.S. § 5-12-102 on $506,172.16 — approximately $3,374 per month from June 22, 2026 through the date of judgment; (c) destruction of the prospective settlement — the settlement negotiations active as of July 7, 2026 were destroyed by O'Hagan Meyer's doubling down in ECF No. 22; (d) perpetuation of all ongoing harms — credit suppression, housing application denials, ongoing housing insecurity — that a settlement with credit deletion would have remediated; (e) if this Court granted Defendant Nissan's Motion to Set Aside Default as a result of O'Hagan Meyer's improper conduct — loss of the default judgment position valued at $506,172.16 plus injunctive credit deletion;

and (f) if Plaintiff is compelled to seek recusal of Judge Crews across four active matters — disruption damages across Case Nos. 13-cv-02894-SKC, 1:25-cv-02610-SKC-STV, 1:26-cv-01385-SKC-STV, and 1:26-cv-01692-SKC-STV — including delay damages on the $60,000,000 companion matter at 8% per year.

121. O'Hagan Meyer's abuse of process was willful, wanton, and malicious — particularly given the doubling down after notice — entitling Plaintiff to punitive damages under C.R.S. § 13-21-102.

## COUNT X — INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against Defendant O'Hagan Meyer PLLC)

122. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118. Colorado recognizes intentional interference with prospective economic advantage as an independent tort requiring: (1) a prospective economic relationship with a reasonable probability of future economic benefit; (2) defendant's knowledge of the relationship; (3) intentional and improper acts designed to disrupt the relationship; (4) actual disruption; and (5) economic harm proximately caused by defendant's acts. See Harris Grp., Inc. v. Robinson, 209 P.3d 1188, 1197-98 (Colo. App. 2009); Dolton v. Capitol Federal Savings & Loan Ass'n, 642 P.2d 21 (Colo. App. 1981).

119. Plaintiff had two prospective economic relationships that O'Hagan Meyer destroyed. First — the Pending Default Judgment: Plaintiff's Motion for Default Judgment [ECF No. 15] — fully briefed, supported by eighteen exhibits and a sworn

affidavit, pending before this Court — constituted a prospective economic relationship with a reasonable probability of future economic benefit: a judgment of $506,172.16 plus injunctive credit deletion. O'Hagan Meyer knew of its pendency and intentionally and improperly interfered. See Hein Enters., Ltd. v. San Francisco Real Estate Inv'rs, 720 P.2d 975 (Colo. App. 1985). Second — the Active Settlement Negotiations: Prior to June 22, 2026, Plaintiff and Nissan were engaged in active settlement negotiations — Plaintiff having served a $350,000 demand and Nissan having responded with a counteroffer on July 7, 2026. Those negotiations constituted a prospective economic relationship with a reasonable probability of reaching some resolution — including at minimum a credit deletion provision that would have ended Plaintiff's housing insecurity. O'Hagan Meyer knew of those negotiations — its own client transmitted the counteroffer the same day O'Hagan Meyer filed ECF No. 22. By doubling down on the improper character attack after being placed on notice of the violations, O'Hagan Meyer destroyed the prospect of any settlement.

120. O'Hagan Meyer's acts were intentional and improper — constituting violations of Colo. RPC 3.4(e), Colo. RPC 3.5(a), Colo. RPC 8.4(d), Fed. R. Civ. P. 11(b)(1), and this Court's Standing Order § A.2 — satisfying the wrongful means requirement under Harris Grp., 209 P.3d at 1197-98, which holds that wrongful means includes commission of independent torts.

121. The prospective economic relationships were actually disrupted. The settlement window closed on July 7, 2026. The default judgment motion remains at risk. The credit deletion that would have ended Plaintiff's housing insecurity has not occurred.

122. Plaintiff has suffered economic harm as a direct and proximate result of O'Hagan Meyer's interference — including the lost settlement opportunity valued at $350,000, the perpetuation of all ongoing credit and housing harm, and the pre-judgment interest accruing at $3,374 per month during the extended litigation period. See Batterman v. Wells Fargo Ag Credit Corp., 802 P.2d 1112 (Colo. App. 1990) — emotional distress is compensable in interference with prospective business relationship claims.

118. O'Hagan Meyer's intentional interference was willful and wanton, entitling Plaintiff to punitive damages under C.R.S. § 13-21-102.

## COUNT XI — CIVIL CONSPIRACY

**(Against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, Jointly)**

119. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

120. Colorado recognizes civil conspiracy requiring: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result. See Jet Courier Serv., Inc. v. Mulei, 771 P.2d 486, 502 (Colo. 1989). A conspiracy to procure a judgment by improper means states a cognizable claim. See Dixon v. Bowen, 85 Colo. 194, 274 P. 824 (Colo. 1929).

121. Element One: Defendant Nissan North America, Inc. — a corporation — and Defendant O'Hagan Meyer PLLC — a law firm — are two separate legal persons.

122. Element Two: Obtaining a favorable ruling on the Motion to Set Aside Default

[ECF No. 19] through means unrelated to the legal standard governing that motion — specifically by alerting this Court to Plaintiff's public criticism of this Court's judicial reasoning in unrelated litigation for the purpose of influencing the judicial outcome through judicial psychology rather than law.

118. Element Three: Nissan retained O'Hagan Meyer to defend this action. Nissan directed O'Hagan Meyer to file ECF No. 19. O'Hagan Meyer filed pages 14-15 of ECF No. 19 with Nissan's knowledge, authorization, and direction. When O'Hagan Meyer doubled down in ECF No. 22 — after being placed on notice of the violations — Nissan authorized that filing as well. The agreement is documented in the federal record.

119. Element Four: The filing of ECF No. 19 pages 14-15 and ECF No. 22 pages 9-11, in violation of Colo. RPC 3.4(e), Colo. RPC 3.5(a), Colo. RPC 8.4(d), Fed. R. Civ. P. 11(b)(1), and this Court's Standing Order § A.2 — each constituting an independent unlawful act.

120. Element Five: All damages set forth in Counts IX and X above, proximately caused by the conspiracy's overt acts.

121. As a direct and proximate result of the civil conspiracy between Nissan and O'Hagan Meyer, Plaintiff has suffered damages in an amount to be proven at trial. Both Defendants are jointly and severally liable for all damages arising from the conspiracy.

122. The conspiracy was willful and malicious, entitling Plaintiff to punitive damages under C.R.S. § 13-21-102.

**COUNT XII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS —**

**O'HAGAN MEYER INDEPENDENTLY**

**(Against Defendant O'Hagan Meyer PLLC)**

118. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

119. Independent of and in addition to the joint IIED claim in Count VII, O'Hagan Meyer's own conduct in this litigation constitutes outrageous conduct going beyond all possible bounds of decency under Rugg, 476 P.2d at 753, and Coors Brewing, 978 P.2d at 665-66: (a) a law firm that appears in federal litigation for the first time and — knowing that the plaintiff has four active matters before the presiding judge with combined exposure exceeding $67,000,000 — chooses as its first act to place that plaintiff's criticism of the presiding judge's own rulings before that judge in a pending motion, for the purpose of influencing the judicial outcome, has engaged in conduct that goes beyond all possible bounds of professional decency; (b) a law firm that doubles down on that conduct — after being placed on notice in the opposing party's federal court filing that the conduct violated the Court's own Standing Order, three Rules of Professional Conduct, and a Federal Rule of Civil Procedure — by characterizing the omission of a published Tenth Circuit reversal, binding Colorado precedent, a vacated judicial finding, and an active appellate proceeding as "a matter of advocacy strategy" — has demonstrated willful, deliberate, and sustained outrageous conduct; and (c) a law firm that destroys the prospect of any settlement — including the credit deletion that would have ended Plaintiff's housing insecurity — through doubling down on improper conduct, while knowing Plaintiff has been in

ongoing housing insecurity for over fourteen months, unable to obtain standard market-rate housing and facing the prospect of couch surfing and relying on friends for shelter, has caused outrageous harm through outrageous means.

120. O'Hagan Meyer's conduct caused Plaintiff severe additional emotional distress — beyond what Nissan's underlying conduct had already caused — including: (a) the distress of having his constitutionally protected speech weaponized against him in a federal proceeding before the judge presiding over four of his active cases; (b) the distress of watching the settlement opportunity — and the credit deletion it would have provided — destroyed by the law firm representing his adversary; (c) the ongoing distress of continued housing insecurity — the inability to obtain stable housing and the prospect of couch surfing — that the destroyed settlement and its credit deletion provision would have remediated; and (d) the distress of being forced to litigate against both a car manufacturer and its law firm simultaneously — as a pro se litigant — while in ongoing housing insecurity.

121. As a direct and proximate result of O'Hagan Meyer's independently outrageous conduct, Plaintiff has suffered severe emotional distress in an amount to be proven at trial.

122. O'Hagan Meyer's conduct was willful, wanton, and malicious, entitling Plaintiff to punitive damages under C.R.S. § 13-21-102 in an amount up to three times the compensatory damages awarded on this count.

## V. PRAYER FOR RELIEF

### D. REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

***WHEREFORE***, Plaintiff Jason T. Brooks respectfully requests that this Court enter judgment in his favor and against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC as follows:

**a. Injunctive Relief — Against Defendant Nissan North America, Inc.**

1. A permanent injunction pursuant to Fed. R. Civ. P. 65 ordering Defendant Nissan North America, Inc., within five business days of this Court's order, to transmit written deletion instructions to Experian, Equifax, and TransUnion directing the immediate and complete deletion of the Nissan-Infiniti LT lease account (Subscriber No. 3690580) — including all associated derogatory notations, delinquency reporting, charge-off entries, and any related tradeline information — from Plaintiff's consumer credit file with each bureau.

2. An order imposing daily contempt sanctions of $1,000 per day for each day of non-compliance beyond the five-business-day deadline.

3. An order requiring Nissan to provide Plaintiff with copies of all deletion instructions simultaneously with their transmission to the credit bureaus, and to confirm in writing to Plaintiff and this Court that deletion has been completed within 30 days of issuance of the order.

4. Plaintiff specifically requests that this Court treat the preliminary injunction as a matter of urgency given that: (a) Nissan's 68-day default and subsequent litigation conduct has extended the period during which no injunctive relief can issue; (b) every day of delay is a day of documented, compounding housing insecurity and financial harm that a credit deletion order could end immediately; and (c) Nissan has demonstrated by its conduct that voluntary correction is not available — only judicial compulsion with enforcement teeth can end the harm.

**b. Compensatory Damages — Against Defendant Nissan North America, Inc.**

5. Compensatory damages against Nissan North America, Inc. for all documented economic harm caused by its conduct, in the following minimum amounts:

Lease payments on defective vehicle — 5 months: $2,093.30

Down payment and signing amount: $17,378.20

Disposition fee: $395.00

EV tax credits retained on defective vehicle: $15,600.00

Lost gig income — 51 days out of service: $12,750.00

Excess replacement lease costs — Kia EV6 over 36 months: $9,012.24

Loss of Bank of America credit access: $3,700.00

Loss of Citibank credit access: $3,000.00

Nova West housing denial — economic damages: $5,000.00

Loss of housing — double deposit requirement Plaintiff could not afford: $15,000.00

Capital One excess interest — mother's vehicle — 17.99% vs. prime rate: $8,316.00

Prior settlement consumed as replacement lease down payment: $2,500.00

Housing search and instability costs: $3,500.00

Ongoing credit destruction — monthly accrual: $18,000.00

FCRA statutory damages — 4 willful violations × $1,000: $4,000.00

Pro se litigation fees — all hours expended: $35,000.00

Forward-looking damages — fraudulent charge-off through July 2032: $466,272.00

Pre-judgment interest — C.R.S. § 5-12-102 — 8% per year from May 1, 2025: Accruing

**Economic compensatory subtotal: approximately $621,517**

6. Compensatory damages for emotional distress under the FCRA and IIED counts — not less than $1,000,000 — representing the documented, severe, and ongoing emotional distress caused by fourteen months of deliberate financial coercion

including housing insecurity, credit destruction, family financial harm, and the sustained campaign of forum destruction over a $625.28 net dispute.

7. Delay damages against Nissan for the period during which Nissan's 68-day default and subsequent litigation conduct prevented Plaintiff from obtaining preliminary injunctive relief — calculated at $5,548 per month — accruing from the date default was entered through the date the charge-off is deleted pursuant to court order.

**c. Treble Damages — Against Defendant Nissan North America, Inc.**

8. Treble damages pursuant to C.R.S. § 6-1-113(2) for Nissan's knowing violations of the Colorado Consumer Protection Act — three times the economic compensatory damages — approximately $1,864,551.

**d. Punitive Damages — Against Defendant Nissan North America, Inc.**

9. Punitive damages pursuant to C.R.S. § 13-21-102 for Nissan's willful and wanton conduct — in an amount up to three times the compensatory damages awarded, not less than $1,000,000.

10. FCRA punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) for Nissan's willful violations of 15 U.S.C. § 1681s-2(b) — in an amount to be determined by the jury, not to exceed the constitutional maximum under BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) and State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) — not less than $250,000.

**e. Damages — Against Defendant O'Hagan Meyer PLLC**

11. Compensatory damages against O'Hagan Meyer PLLC for all harm caused by its litigation misconduct, including: additional pro se litigation fees caused directly by O'Hagan Meyer's conduct — 40+ hours × $150/hour: $6,000+; lost settlement opportunity — value of prospective settlement destroyed: $350,000; pre-judgment interest delay — $3,374/month from June 22, 2026 through date of judgment: Accruing; perpetuation of ongoing housing insecurity damages: $50,000; credit deletion delay damages: $25,000; emotional distress from O'Hagan Meyer's independent outrageous conduct: $250,000; delay damages — O'Hagan Meyer's litigation misconduct extended the period during which no preliminary injunction

could issue — $5,548/month from June 22, 2026 through date of any injunctive order: Accruing; if default set aside as result of O'Hagan Meyer's conduct — loss of default judgment position: $506,172.16; if recusal required across four active matters — disruption damages including delay on $60,000,000 companion matter: To be determined. O'Hagan Meyer compensatory subtotal: $1,000,000+.

12. O'Hagan Meyer is jointly liable with Nissan for all harm that accrued during the period of delay its misconduct caused — specifically, every day from June 22, 2026 through the date any injunctive order issues that O'Hagan Meyer's improper filing extended the period during which Plaintiff could not obtain preliminary injunctive relief ordering credit deletion.

13. Punitive damages against O'Hagan Meyer PLLC pursuant to C.R.S. § 13-21-102 — three times compensatory damages — for willful and wanton conduct that was deliberately doubled down on after notice — not less than $500,000.

**f. Joint and Several Liability**

14. Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC are jointly and severally liable for all damages arising from Count VII — IIED — and Count XI — Civil Conspiracy.

**g. Mandatory Fees and Costs**

15. Mandatory pro se litigation fees pursuant to: (a) 15 U.S.C. § 1681n(a)(3) — mandatory upon prevailing on the FCRA willful violation count; (b) 15 U.S.C. § 2310(d)(2) — mandatory upon prevailing on the Magnuson-Moss count; (c) C.R.S. § 6-1-113(2) — mandatory upon prevailing on the CCPA count; (d) C.R.S. § 42-10-103-3 — mandatory upon prevailing on the Colorado Lemon Law count; and (e) Fed. R. Civ. P. 11(c) — sanctions against O'Hagan Meyer for filing ECF No. 19 pages 14-15 and ECF No. 22 pages 9-11 in violation of Fed. R. Civ. P. 11(b)(1).

16. All costs of this action pursuant to Fed. R. Civ. P. 54(d).

**h. Total Damages Summary**

Economic compensatory — Nissan: $621,517

Emotional distress — FCRA and IIED: $1,000,000

CCPA treble damages: $1,864,551

Punitive damages — Nissan: $1,000,000+

FCRA punitive damages: $250,000+

O'Hagan Meyer compensatory: $1,000,000+

O'Hagan Meyer punitive: $500,000+

Delay damages — accruing

Pre-judgment interest — accruing

Mandatory fees and costs: $35,000+

**TOTAL DEMAND: $6,271,068+**

**i. Additional Relief**17. Such other and further relief as this Court deems just and proper.

18. A jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38(b) and the Seventh Amendment to the United States Constitution.

**Attorney's Fees, Costs, and Pro Se Litigation Compensation**

Plaintiff seeks an award of fees and costs pursuant to 15 U.S.C. § 2310(d)(2) (Magnuson-Moss), C.R.S. § 6-1-113 (CCPA), C.R.S. § 42-10-103(3) (Colorado Lemon Law), 28 U.S.C. § 1927, and the Court's inherent equitable powers. Plaintiff further presents a novel claim for compensation for pro se litigation services at market paralegal and associate attorney rates, grounded in the following:

(1) Under *Missouri v. Jenkins*, 491 U.S. 274 (1989), legal work has compensable market value independent of the employment relationship through which it is performed. The Supreme Court held that paralegal services are recoverable at market rates under fee-shifting statutes because they have demonstrable economic value — not by virtue of the paralegal's employment status. The Colorado General Assembly has since codified this principle by enacting C.R.S. § 13-17-102(1.5), which expressly authorizes courts to award "reasonable licensed legal paraprofessional fees" in any civil action. This legislative recognition that paraprofessional legal work carries compensable market value applies with equal force to a pro se litigant performing

equivalent, documented work of the same character.

(2) Plaintiff is not a typical pro se litigant. Plaintiff litigated *Brooks v. Colorado Department of Corrections*, No. 13-cv-02894-SKC (D. Colo.), over thirteen years, proceeding pro se for approximately 80% of the litigation, winning two remands from the Tenth Circuit Court of Appeals, and ultimately obtaining a $3.5 million resolution. That litigation required sustained, sophisticated legal work — including appellate briefing, discovery motion practice, summary judgment opposition, and settlement negotiation — that a litigation firm handling the case would have billed at between $1.5 million and $4 million in fees over the same period. Plaintiff performed the substantial majority of that work himself and produced a superior result. Plaintiff additionally litigated *Brooks v. Tarsadia Hotels*, No. 3:18-cv-02290-GPC-KSC (S.D. Cal.), a securities fraud and ILSA action in which, proceeding pro se and in forma pauperis while incarcerated, Plaintiff successfully identified and briefed a controlling legal standard that class counsel in the related *Beaver* litigation had either conceded or failed to effectively argue. The Court expressly agreed with Plaintiff's legal analysis and denied the defendants' motion to dismiss on those grounds. A pro se litigant identifying and successfully briefing a controlling legal error that represented class counsel missed is precisely the category of market-value legal work that *Jenkins* recognizes as compensable.

(3) Colorado courts have held that it is "not appropriate" to award attorney's fees to a non-attorney pro se litigant under C.R.S. § 13-17-102 because such a litigant has no "attorney fees." *Smith v. Furlong*, 976 P.2d 889 (Colo. App. 1999). Plaintiff respectfully submits, however, that *Smith* predates the General Assembly's 2024 amendment adding C.R.S. § 13-17-102(1.5), which for the first time created a parallel fee category for paraprofessional legal services. The legislature's express extension of fee-shifting to paraprofessional work reflects a recognition that sophisticated legal work has compensable market value regardless of whether it is performed by a licensed attorney. *Smith*'s rationale — that no "attorney fees" exist for a non-attorney — does not address the new paraprofessional fee category, and that gap creates space

for this Court to award fees at market paralegal rates for the legal work Plaintiff has performed in this matter.

(4) Denying compensation to Plaintiff for legal work that produced a $3.5 million result in one federal case and substantive legal victories in others — while awarding compensation to licensed paraprofessionals for functionally identical work under § 13-17-102(1.5) — creates an irrational and arbitrary classification that serves no legitimate government interest and is difficult to reconcile with the Equal Protection principles that guarantee meaningful access to courts regardless of wealth or employment status. The administrative convenience rationale for denying pro se fees — avoiding fee valuation disputes — is answered by *Jenkins* itself: market rates provide the standard. Colorado has already accepted that standard for paraprofessional work. There is no principled basis for applying it to hired legal workers but not to a pro se litigant with Plaintiff's documented record of sophisticated, successful federal litigation across multiple jurisdictions.

(5) A rule requiring pro se litigants to perform market-value legal work without compensation — while opposing counsel bills at prevailing Colorado rates of $400–$700 per hour for associate work — does not serve the remedial purposes of the CCPA, Magnuson-Moss, or the Lemon Law's mandatory fee provision. It defeats them, by making sustained pro se litigation economically irrational and effectively available only to those with independent means. Plaintiff seeks an award of pro se litigation fees at market paralegal rates for legal work performed, and at market associate attorney rates for work — including motion practice and legal research — that would have been performed by an attorney in a represented case. To the extent this Court declines to award pro se litigation fees at the trial level, Plaintiff respectfully requests that the Court certify this question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), as it presents a controlling question of law as to which there is substantial ground for difference of opinion, and immediate resolution would materially advance termination of this litigation and have substantial precedential effect on the rights of pro se litigants throughout this Circuit.

**F. PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, has overwhelming evidentiary support and more to come after a reasonable opportunity for further investigation and discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

______________________________
(Plaintiff's signature)

______________________________
(Date)