**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01385-SKC-STV

JASON BROOKS

Plaintiff(s),

v.

NISSAN NORTH AMERICA, INC,

Defendants.

---

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT [ECF NO. 16]**

---

Plaintiff Jason Brooks, appearing pro se, respectfully submits this Supplemental Brief in Support of his Motion for Entry of Default Judgment [ECF No. 16], and in support thereof states as follows:

## I. INTRODUCTION

This supplemental brief updates the damages record before this Court rules on ECF No. 16. Since that motion was filed in May 2026, four significant developments have occurred that bear directly on the damages determination.

First — the post-filing harm has continued to compound daily. The fraudulent charge-off Nissan continues to report on a legally terminated lease account has caused two documented housing denials, the loss of two credit accounts, subprime financing at 17.85% APR on a vehicle Plaintiff was forced to finance for his elderly mother, and ongoing housing insecurity leaving Plaintiff facing

the prospect of couch surfing — over fourteen months after serving a valid UCC § 2A-517 revocation notice on a $625.28 net dispute.

Second — on August 14, 2026, Nissan voluntarily withdrew ECF No. 19 — its only challenge to the default — within hours of receiving Plaintiff's near-final First Amended Verified Complaint. Nissan's own counsel confirmed in writing: "We are in receipt of the attached proposed First Amended Verified Complaint... Nissan has directed us to withdraw its Motion to Vacate." See ECF No. 26-1, Exhibit A. A defendant that reviews 122 paragraphs of documented harm across twelve counts seeking damages in excess of $6,000,000 and immediately withdraws its only challenge to default has conceded.

Third — on August 18, 2026, Nissan filed ECF No. 25 — a Second Motion to Set Aside Default — four days after withdrawing the first — with full knowledge of Plaintiff's objection, the expired settlement offer of $350,000, and the $1,100,000+ in documented damages Plaintiff had transmitted to counsel on August 15, 2026. Nissan filed that motion knowing it would destroy the settlement offer by its own terms — extending Plaintiff's housing insecurity further while simultaneously offering mediation. That conduct — the whipsaw of withdrawal and immediate refiling — is independently compensable under the IIED and bad faith counts already pled.

Fourth — the default stands completely unchallenged on the merits. The record — eighteen exhibits, a sworn affidavit, a Notice of Post-Filing Events, and this Supplemental Brief — is complete.

Plaintiff requests $750,000 in monetary damages plus pre-judgment interest, injunctive credit deletion as part of the default judgment pursuant to Fed. R. Civ. P. 55(b)(2), and declaratory relief extinguishing the $30,908.03 claimed balance.

## II. LIABILITY IS ESTABLISHED — THE DEFAULT ADMITS ALL

By defaulting for 68 days and then withdrawing its only challenge to that default, Nissan has admitted every well-pleaded factual allegation in the complaint. See *Olcott v. Delaware Flood Co.*, 327 F.3d 1115 (10th Cir. 2003). The admitted facts establish: four complete mechanical failures at 3,649 miles totaling 51 days and 36 business days out of service — meeting both Colorado Lemon Law presumption thresholds under C.R.S. § 42-10-104; refusal to honor the JAMS arbitration forum designated in the Lease's own Section 28 — confirmed in writing by Nissan's own Arbitration Specialist: "NNA does not participate with JAMS"; a valid UCC § 2A-517 revocation served May 1, 2025 — legally terminating the Lease under C.R.S. § 4-2.5-517 — see *Jackson v. Rocky Mtn. Datsun, Inc.*, 693 P.2d 391 (Colo. App. 1984); repossession 72 days after legal termination without refunding any payments in violation of C.R.S. § 4-2.5-508; and four separate false credit reporting events after written notice — reporting "voluntary surrender / balance charged to loss" on an account with no legally cognizable balance from May 1, 2025 forward — the sole derogatory mark on an otherwise unblemished seventeen-account credit profile.

## III. DAMAGES ACCRUE THROUGH JUDGMENT — NOT FILING DATE

Damages on default judgment are determined as of the date of the Court's ruling — not the date of filing. See *AirDoctor, LLC v. Xiamen Qichuang Trade Co.*, Ltd., 134 F.4th 552 (9th Cir. Apr. 11, 2025) — plaintiffs may recover full actual damages in default proceedings including damages accruing after the complaint was filed; see also *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109

F.3d 105, 111 (2d Cir. 1997) — damages calculated as of the date of ruling. The original complaint pled ongoing and continuing harm — not harm frozen at the filing date. Post-filing events are evidence of the continuing and compounding extent of harm already pled — not new claims. Under *DeCicco v. Trinidad Area Health Ass'n*, 40 Colo. App. 63, 573 P.2d 559 (1977) — and Restatement (Second) of Torts § 46, comment j (1965) — ongoing outrageous conduct generates ongoing compensable emotional distress through the date of judgment.

## IV. THE COMPLETE CAUSATION CHAIN

Plaintiff's elderly mother's vehicle broke down beyond repair. With no resources to replace it independently, she relied on Plaintiff. Plaintiff gave his mother his own paid-off personal vehicle — leaving himself without transportation for gig work, his only income source. He leased the 2024 Nissan Ariya based on three representations: 216 miles of EPA range; "all-weather confidence" and "better performance in hot and cold weather"; and Nissan's Senior Manager's public statement of January 8, 2025 that customers would "get the same performance in a wide variety of weather conditions." The economic rationale was straightforward — the lease payment would be offset by eliminating gasoline costs through home Level 1 charging.

Nissan destroyed that economic rationale on two independent grounds. First — on January 26, 2025, Plaintiff photographed the dashboard at 100% charge, stationary, plugged in, 23°F outside, zero miles driven — displayed range: 139 miles against 216 advertised — a 35.6% deficit before driving a single mile. This photograph

is already before this Court as ECF No. 15-1, Exhibit A. Second — in Colorado winter temperatures, the Ariya's battery thermal management system consumed nearly all incoming Level 1 power maintaining battery temperature — leaving approximately 3 miles of overnight range recovery. The Vehicle was functionally unchargeable at home. Plaintiff was forced to use commercial DC fast charging at rates approaching gasoline costs — eliminating the fuel savings that were the economic rationale for the lease. Nissan's own Owner's Manual Section 9.35.6.1 — never presented at point of sale — disclosed that "driving range may be substantially reduced in extremely cold conditions." Nissan knew. It advertised the opposite.

While Plaintiff operated the Ariya, an at-fault driver struck the vehicle Plaintiff had given his mother. The at-fault driver presented same-day fraudulently obtained insurance — providing no valid recovery. Plaintiff's mother sustained a broken sternum. Plaintiff's paid-off vehicle was totaled. Plaintiff was forced to finance a replacement for his mother immediately under urgent conditions with no margin to shop rates.

Because the fraudulent charge-off had suppressed Plaintiff's VantageScore to 593, Capital One financed a 2015 Honda CR-V, VIN 2HKRM3H50FH530087 — a used vehicle, the most economical option available — at 17.85% APR, Account No. 6201072009980, $18,462.00 financed, 72 months, $422.22 per month, maturing June 2, 2032. At prime rates of approximately 6-8%, the monthly payment would have been approximately $280-$310 — a difference of $112-$142 per month. Total excess interest over 72 months: approximately $8,064 to $10,224 — accruing every month

through June 2032 — every dollar caused directly by the fraudulent charge-off on a legally terminated account. Documented by Capital One records attached hereto as Exhibits A and B.

On the Kia EV6 — the fourth mechanical failure on March 1, 2025 left Plaintiff without income-generating transportation immediately. He needed the first vehicle he could qualify for without delay. The 2024 Kia EV6 GT carried a $669.39 monthly payment — $250.73 more than the Ariya — but a $23,500 manufacturer rebate made it the most economically viable option immediately available. The excess cost — $250.73 per month over 36 months — $9,026.28 total — is a direct consequence of Nissan's failure to repair the Vehicle. Documented by ECF No. 15-1, Exhibit K.

**V. THE FALSE ADVERTISING — ALREADY IN THE RECORD**

The five-source false advertising battery exhibit is already before this Court as ECF No. 15-1, Exhibit A. It documents Nissan's marketing representations alongside its own Owner's Manual disclosure that cold weather "may substantially reduce" range — never presented to Plaintiff at the point of sale. The dashboard photograph — January 26, 2025 — 100% charge, 23°F, stationary, zero miles driven, 139 miles displayed against 216 advertised — is authenticated and in the record. The real-world Level 1 charging reality of 3 miles per overnight charge in Colorado winter temperatures is documented in the Affidavit. This false advertising is the foundation of the CCPA violations admitted by the default — triggering the treble damages provision of C.R.S. § 6-1-113(2). Nissan knew from its own Owner's Manual that cold weather substantially reduces range. It advertised "all-weather confidence" and

"better performance in cold weather." That is bad faith conduct admitted by the default. See *Hall v. Walter*, 969 P.2d 224 (Colo. 1998); *Crowe v. Tull*, 126 P.3d 196, 202 (Colo. 2006).

## VI. UPDATED DAMAGES

### A. Economic Compensatory Damages

| CATEGORY | AMOUNT | SOURCE |
|---|---|---|
| Lease payments — 5 months on defective vehicle | $2,093.30 | ECF 15-1, Ex. D |
| Down payment and signing amount | $17,378.20 | ECF 15-1, Ex. D |
| Disposition fee | $395.00 | ECF 15-1, Ex. D |
| EV tax credits retained on defective vehicle | $15,600.00 | ECF 15-1, Ex. D |
| Lost gig income — 51 days / 36 business days out of service | $5,100.00 | ECF 15-1, Aff. ¶6 |
| Excess Kia EV6 costs — $250.73/month × 36 months | $9,026.28 | ECF 15-1, Ex. K |
| Bank of America credit access lost | $3,700.00 | ECF 15-1, Ex. M |
| Citibank credit access lost | $3,000.00 | Notice Post-Filing |
| Nova West housing denial — April 6, 2026 | $5,000.00 | ECF 15-1, Ex. N |
| Capital One excess interest — 17.85% vs. 6-8% prime — 72 months | $8,064–$10,224 | Exhibits A & B |
| Prior settlement consumed as replacement lease down payment | $2,500.00 | ECF 15-1, Ex. B |
| Housing instability costs | $3,500.00 | Affidavit |
| Ongoing credit destruction — 14 months accrued | $18,000.00 | ECF 15-1, Ex. M |
| Pro se litigation fees — 115 hours × $150/hour | $17,250.00 | ECF 15 |
| Pre-judgment interest — C.R.S. § 5-12-102 — 8%/year from May 1, 2025 | $12,540+ accruing | Mandatory |
| **ECONOMIC COMPENSATORY SUBTOTAL** | **~$121,000+** | |

### B. Emotional Distress — Expanded to $300,000

The original complaint pled $25,000 in emotional distress — conservative at filing. Post-filing events establish that the emotional distress caused by Nissan's conduct has continued, compounded, and deepened. Emotional distress damages are not frozen at the filing date — where a complaint pleads ongoing emotional harm, the

Court awards damages through judgment. See *DeCicco*, 573 P.2d 559; Restatement (Second) of Torts § 46, cmt. j; *AirDoctor*, 134 F.4th 552.

The emotional distress encompasses: fourteen months of deliberate financial coercion by a multi-billion dollar corporation against a gig worker rebuilding after incarceration, managing a chronic ADA-qualifying disability, with no financial cushion — Nissan had actual knowledge of all of this from the JAMS filings, see Restatement (Second) of Torts § 46, cmt. f — outrageousness amplified by knowledge of plaintiff's particular vulnerability; the Nova West housing denial — April 6, 2026 — five days after filing — documented by RentGrow Report ID 80696099 citing "Severe level of Charge-offs" as the sole reason — see *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999); *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970); loss of a second housing opportunity requiring a $3,800 double deposit Plaintiff could not afford; ongoing housing insecurity and the realistic prospect of homelessness; credit deletion uncertainty — only this Court's order can end the harm; family financial harm — forced subprime financing at 17.85% APR for 72 months; and O'Hagan Meyer's litigation misconduct — placing Plaintiff's constitutionally protected speech before this Court in ECF No. 19 as a character attack at a moment when Plaintiff had five active matters before Judge Crews with combined exposure exceeding $67,000,000 — raising the prospect of recusal across all five matters and destroying the settlement negotiations that would have ended Plaintiff's housing insecurity.

Under C.R.S. § 13-21-102.5(3)(a)(II) — as amended by Colorado House Bill 24-1472, effective January 1, 2025 — the noneconomic damages cap for civil actions filed on or after January 1, 2025 is $1,500,000. This action was filed April 1, 2026. Plaintiff's combined noneconomic request of $406,700 — $300,000 emotional distress plus $106,700 credit profile damage — is well within that cap.

**C. Credit Profile Damage — Expanded to $106,700**

The original complaint pled $10,000 for credit profile damage. The full credit profile damage encompasses the ongoing, compounding, and potentially seven-year harm to every financial opportunity that depends on credit access. Under 15 U.S.C. § 1681c, the fraudulent charge-off could report through July 2032 — 71 more months — if not deleted by court order. Credit profile damage encompasses: VantageScore suppression of approximately 100 points affecting every credit and housing application; lost credit access — $3,700 Bank of America and $3,000 Citibank; subprime financing consequences accruing monthly through June 2032; forward-looking credit suppression through July 2032; and the credit deletion uncertainty — voluntary correction is unavailable as demonstrated by Nissan's own conduct.

**D. CCPA Treble Damages**

Under C.R.S. § 6-1-113(2), bad faith conduct — fraudulent, willful, knowing, or intentional conduct causing injury — triggers the treble multiplier. Nissan admitted all CCPA violations by defaulting. Bad faith is established by the admitted facts: false advertising while knowing the opposite from the Owner's Manual; misrepresenting the JAMS forum; reporting false credit information on a legally

terminated account after written notice; and threatening litigation while refusing contractually mandated arbitration. See *Hall v. Walter*, 969 P.2d 224 (Colo. 1998). CCPA treble on the economic compensatory base of approximately $121,000 yields approximately $363,000. To the extent this Court determines that CCPA treble damages and punitive damages cannot both be awarded on the same conduct under C.R.S. § 6-1-113(2), Plaintiff elects CCPA treble as the superior remedy.

**E. Punitive Damages**

The original complaint requested $250,000 in punitive damages. Under *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), punitive damages are assessed against three guideposts: the degree of reprehensibility, the ratio of punitive to compensatory, and the difference between the civil penalty and the punitive award. On the updated compensatory record of approximately $527,700 — the $250,000 punitive request represents a ratio of less than 1:1 — well within any constitutional ceiling. Even on the original $60,405 compensatory base, the ratio was 4.1:1 — acknowledged by Nissan's own counsel in ECF No. 19 as "constitutionally permissible." On the expanded record the ratio is even more defensible. All five *State Farm* reprehensibility factors are established by the default: physical security implicated by housing insecurity approaching homelessness; indifference to Plaintiff's ADA condition and financial vulnerability known from the JAMS filings; financial vulnerability — gig worker, rebuilding after incarceration; repeated conduct — four reporting events after written notice; and intentional malice — deliberate

weaponization of credit reporting over a $625.28 dispute.All five State Farm reprehensibility factors are established by the default: physical security implicated by housing insecurity approaching homelessness; indifference to Plaintiff's ADA condition and financial vulnerability known from the JAMS filings; financial vulnerability — gig worker, rebuilding after incarceration; repeated conduct — four reporting events after written notice; and intentional malice — deliberate weaponization of credit reporting. Nissan's own counsel acknowledged in ECF No. 19 — now withdrawn — that the 4.1:1 ratio was "constitutionally permissible."

**F. Pre-Judgment Interest**

Under C.R.S. § 5-12-102, pre-judgment interest is mandatory at 8% per year on liquidated or ascertainable damages from the date the cause of action accrued — May 1, 2025, the date of the UCC revocation. From May 1, 2025 through August 18, 2026 — 15.6 months — pre-judgment interest on the economic compensatory base of approximately $121,000 at 8% per year equals approximately $12,540 already accrued and growing daily until judgment enters.

**G. Why $750,000 Is the Correct and Conservative Request**

| CATEGORY | AMOUNT | |
|---|---|---|
| Economic compensatory subtotal | ~$121,000+ | |
| Emotional distress — expanded | $300,000 | |
| Credit profile damage — expanded | $106,700 | |
| **TOTAL COMPENSATORY** | **~$527,700+** | |
| CCPA treble — 3× economic compensatory | ~$363,000 | C.R.S. § 6-1-113(2) |
| Punitive damages | $250,000 | C.R.S. § 13-21-102 |
| **TOTAL DOCUMENTED DAMAGES** | **~$1,140,700+** | |
| **PLAINTIFF REQUESTS** | **$750,000** | **Conservative floor** |

$750,000 is conservative for four reasons. First — it is below the documented total compensatory damages of approximately $527,700 before any multiplier or punitive award — Plaintiff asks for less than the compensatory damages alone. Second — it is below the CCPA treble alone on the economic base plus expanded noneconomic damages. Third — Nissan reviewed this exact damages picture in the supplemental brief transmitted August 15, 2026 — and filed ECF No. 25 anyway rather than settle for $350,000. Fourth — $750,000 is less than two-thirds of the total documented damages of $1,140,700+ and less than one-eighth of the First Amended Verified Complaint exposure of $6,271,068+.

## VII. WHAT OCCURRED AFTER A DRAFT OF THIS BRIEF WAS TRANSMITTED TO NISSAN

On August 15, 2026, Plaintiff transmitted a near-final draft of this supplemental brief to Nissan's counsel alongside a settlement demand of $350,000. The draft documented damages exceeding $1,100,000. Nissan reviewed it in full. Three days later — on August 18, 2026 — Nissan filed ECF No. 25, destroying the settlement offer by its own terms and extending the period during which the fraudulent charge-off reports, Plaintiff's housing insecurity compounds, and pre-judgment interest accrues.

That sequence — reviewing $1,100,000+ in documented damages, rejecting a $350,000 settlement, and refiling a motion Nissan knows cannot succeed on the merits — is itself evidence of the malicious, deliberate nature of Nissan's conduct. It generates additional pre-judgment interest. It causes additional emotional distress. It compounds every category of harm already documented. Nissan's filing of ECF No.

25 after reviewing this brief is part of the same fourteen-month continuous pattern of deliberate obstruction that this damages record reflects — accruing through the date of judgment under AirDoctor, 134 F.4th 552, Transatlantic Marine, 109 F.3d at 111, and DeCicco, 573 P.2d 559.

## VIII. DECLARATORY RELIEF — $30,908.03 BALANCE

Nissan's July 16, 2025 repo notice — attached hereto as Exhibit C — claimed a total redemption amount of $30,908.03 and explicitly threatened suit if the amount obtained upon disposition was insufficient to pay the adjusted lease balance. That notice has never been withdrawn. That claimed balance does not legally exist — the Lease was terminated by operation of C.R.S. § 4-2.5-517 on May 1, 2025. See *Jackson v. Rocky Mtn. Datsun, Inc.*, 693 P.2d 391 (Colo. App. 1984). Nissan never challenged the revocation in any court. Its silence is acquiescence.

Plaintiff requests pursuant to 28 U.S.C. § 2201: (a) a declaration that the Lease was validly revoked effective May 1, 2025; (b) a declaration that no balance, deficiency, or obligation of any kind is owed by Plaintiff arising from the Lease or the Vehicle from and after May 1, 2025; (c) a declaration that the $30,908.03 claimed balance is legally extinguished and unenforceable; and (d) a permanent injunction against any collection action, deficiency judgment, or further credit reporting arising from the Lease or the Vehicle.

## IX. INJUNCTIVE CREDIT DELETION

Plaintiff requests that as part of the default judgment pursuant to Fed. R. Civ. P. 55(b)(2), this Court order Defendant Nissan North America, Inc. to transmit

written deletion instructions to Experian, Equifax, and TransUnion within five business days of this Court's judgment — directing the immediate and complete deletion of the Nissan-Infiniti LT lease account, Subscriber No. 3690580, from Plaintiff's consumer credit file — subject to daily contempt sanctions of $1,000 per bureau per day for each day deletion remains unconfirmed beyond 30 days — with a compliance report filed with this Court within 30 days — and a permanent injunction against any further negative reporting in connection with the Lease or the Vehicle.

The reporting is legally false — objectively and readily verifiable from Nissan's own documents without any credibility assessment required. See *Ward v. National Credit Systems, Inc.*, No. 25-1078 (10th Cir. July 20, 2026). Voluntary correction is unavailable — Nissan's own conduct demonstrates it will not correct the reporting without judicial compulsion. The CFPB entered a consent order against Toyota Motor Credit Corporation, Docket No. 2023-CFPB-0015 (Nov. 20, 2023), ordering $60 million in consumer redress and penalties after finding that Toyota falsely reported customer accounts as delinquent after lease return and failed to correct the reporting even after knowing it was wrong — the same pattern of conduct Nissan engaged in here. Nissan's conduct is worse — it received written UCC revocation notice before any reporting event.

## X. RELIEF REQUESTED

Plaintiff respectfully requests that this Court enter judgment as follows:

(a) Monetary damages of $750,000 — representing the conservative, documented minimum of the compensatory, emotional distress, credit profile, treble, and punitive damages established by the default and supported by the record before this Court;

(b) Pre-judgment interest at 8% per year under C.R.S. § 5-12-102 from May 1, 2025 through the date of judgment — mandatory and accruing daily;

(c) Injunctive credit deletion as part of the default judgment pursuant to Fed. R. Civ. P. 55(b)(2) — ordering Nissan to transmit deletion instructions to Experian, Equifax, and TransUnion within five business days — subject to $1,000 per bureau per day contempt sanctions — with a 30-day compliance report — and a permanent injunction against further negative reporting;

(d) Declaratory judgment pursuant to 28 U.S.C. § 2201 declaring the $30,908.03 balance legally extinguished and permanently enjoining any collection action or further reporting;

(e) Pro se litigation fees — mandatory under 15 U.S.C. § 2310(d)(2) and C.R.S. § 6-1-113(2)(b) — 115 hours at $150 per hour — $17,250 — already included in the $750,000 request; and

(f) All costs pursuant to Fed. R. Civ. P. 54(d).

Respectfully submitted on this 18th day of August 2026.

s/Jason T. Brooks
Jason T. Brooks
636 Barberry Drive
Longmont, CO 80503
(925) 366-0803
geniusjasonbrooks@gmail.com
*Pro Se Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of August 2026, a true and accurate copy of the foregoing **PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT [ECF NO. 16]** was served on all parties via the Court's CM/ECF system.

s/ Jason Brooks________________

***Jason Brooks***
636 Barberry Drive
Longmont, CO 80503
Telephone: (925) 366-0803
E-mail: geniusjasonbrooks@gmail.com
Plaintiff, *pro se*