**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-01385-SKC-STV

JASON BROOKS,
Plaintiff.

v.
NISSAN NORTH AMERICA, INC, a Delaware Corporation
NISSAN MOTOR ACCEPTANCE COMPANY, LLC, a Delaware limited liability company;
and O'HAGAN MEYER PLLC, a professional limited liability company,
Defendants.

---

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not. contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**A. PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Jason Brooks 636 Barberry Drive Longmont, CO 80503
(Name and complete mailing address)

(925)366-0803 geniusjasonbrooks@gmail.com
(Telephone number and e-mail address)

**B. DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1: Nissan North America One Nissan Way
(Name and complete mailing address) Franklin, TN 37067

Phone: (615) 725-1000 Email:

Defendant Nissan North America, Inc. ("Nissan") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business at One Nissan Way, Franklin, Tennessee 37067. Nissan is registered to do business in the State of Colorado and may be served through its registered agent, Corporation Service Company, located at 1900 W. Littleton Blvd., Littleton, Colorado 80120.

Defendant 2: Nissan Motor Acceptance Company, LLC One Nissan Way
(Name and complete mailing address) Franklin, TN 37067

Phone: Email:

Defendant Nissan Motor Acceptance Company, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at One Nissan Way, Franklin, Tennessee 37067. Nissan is registered to do business in the State of Colorado and may be served through its registered agent, Corporation Service Company, located at 1900 W. Littleton Blvd., Littleton, Colorado 80120.

Defendant 3: O'Hagan Meyer PLLC 1331 17th Street, Suite 350
(Name and complete mailing address) Denver, Colorado 80202

Phone: (303) 652-5871 Email:

Defendant O'Hagan Meyer PLLC is a professional limited liability company maintaining an office at 1331 17th Street, Suite 350, Denver, Colorado 80202, within this District. O'Hagan Meyer PLLC has appeared as counsel of record for Defendant Nissan in this action since June 22, 2026, and may be served through its counsel of record and/or at its Denver office address.

**C. JURISDICTION**

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's Magnuson-Moss Warranty Act claim (Count I), 15 U.S.C. §§ 2301 et seq. and 15 U.S.C. § 2310(d)(1)(B).

This Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over all claims against Defendant Nissan North America, Inc. Plaintiff is a citizen of Colorado. Defendant Nissan North America, Inc. is incorporated in Delaware with its principal place of business in Tennessee. Complete diversity exists between Plaintiff and Defendant Nissan. The amount in controversy exceeds $75,000, exclusive of interest and costs.

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over all claims against Defendant NMAC. NMAC is a limited liability company, and its citizenship for diversity purposes is therefore determined by the citizenship of its members. See *Carden v. Arkoma Assocs*., 494 U.S. 185 (1990). NMAC is, on information and belief, a wholly owned subsidiary of Nissan, whose sole member is accordingly Nissan itself — a Delaware corporation with its principal place of business in Tennessee under 28 U.S.C. § 1332(c)(1). Plaintiff is a citizen of Colorado. Complete diversity exists between Plaintiff and NMAC.

This Court has supplemental jurisdiction over all remaining state law claims — including those against Defendant O'Hagan Meyer PLLC — pursuant to 28 U.S.C. § 1367(a), as all claims in this action form part of the same case or controversy and share a common nucleus of operative fact. See United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). The claims against O'Hagan Meyer arise from conduct that occurred within this federal proceeding and are inextricably linked to the underlying claims against Nissan. Supplemental jurisdiction over those claims is proper.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District — specifically in Longmont, Colorado, where the Vehicle was leased, where the mechanical failures occurred, where the economic harm was suffered, and where Plaintiff currently resides. Defendant O'Hagan Meyer PLLC maintains an office in Denver, Colorado, within this District, and the tortious conduct alleged against O'Hagan Meyer occurred in proceedings before this Court, which sits in this District.

## D. STATEMENT OF CLAIM(S)

## FACTUAL ALLEGATIONS

### A. The Vehicle and the Lease

1. On or about October 31, 2024, Plaintiff entered into a closed-end motor vehicle lease agreement ("the Lease") with Defendant Nissan North America, Inc., through its authorized dealership Valley Nissan, an authorized Nissan dealership located in Longmont, Colorado, for a 2024 Nissan Ariya Engage FWD electric vehicle ("the Vehicle"), VIN JN1CF0BB2RM740913.

2. The Lease carried a monthly payment of $418.66 over a 36-month term. The Vehicle was subject to a $395.00 disposition fee. At the time of origination, the Vehicle qualified for $15,600 in federal and state electric vehicle tax credits, which were applied to the transaction and retained by Nissan.

3. The Lease identifies NMAC on its face. The Motor Vehicle Lease Agreement with Arbitration Clause — Colorado is titled in NMAC's name, and the Lease provides that "Lessor [Valley Nissan, LLC] assigns and transfers to Nissan-Infiniti LT LLC ('NILT') all of Lessor's rights in and to this Lease including all amounts payable thereunder, pursuant to the terms of the applicable written Retailer Agreement between Lessor and Nissan Motor Acceptance Company, LLC ('NMAC'), the benefits of which have been assigned to NMAC to NILT for purposes of leases assigned to NILT." NMAC is accordingly not merely Nissan's agent but a direct assignee and titled party of interest to the Lease, sharing Nissan North America, Inc.'s registered agent for service of process in Colorado.

4. At all times relevant to this Complaint, NMAC serviced the Lease as Nissan's agent and as a direct assignee of Nissan's interest in the Lease, and Nissan exercised control over NMAC's actions with respect to the Lease — including the buyback/repurchase calculations described in Section B below, the vehicle's return described in Section F below, and the credit reporting described in Section G below. Acts taken by NMAC in servicing the Lease were taken within the scope of that agency and control relationship, and are accordingly attributable to Nissan as principal, in addition to NMAC's own direct liability.

5. Section 28 of the Lease contains a mandatory arbitration clause designating JAMS or AAA as the exclusive dispute resolution forums for all disputes arising from the Lease.

6. Plaintiff is a gig worker whose entire income depends on personal vehicle access. Plaintiff has no alternative income source and no alternative means of transportation for work purposes. This dependency was known to Nissan through formal JAMS arbitration filings Nissan received prior to its refusal to participate, in which Plaintiff stated explicitly: "I make all my money through the use of a car, as I am a gig worker, and lost in excess of $5,100 in income since this all started for me." Plaintiff also disclosed in those filings that he suffers from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act that is directly affected by financial stress and periods of vehicle unavailability. Plaintiff is a man rebuilding his life after incarceration, with no financial cushion and no margin for the cascading financial harm Nissan's conduct would cause.

**B. The Four Mechanical Failures (and the Settlement Reversal)**

7. The Vehicle experienced four complete and separate mechanical failures during the first five months of the Lease — at 3,649 total miles — rendering it inoperable and requiring towing on each occasion: First Failure — December 24, 2024: The Vehicle experienced a complete electrical system failure 54 days after delivery. Plaintiff was stranded. The Vehicle was towed to Valley Nissan for repair. Second Failure — January 2025: The Vehicle experienced a second complete failure. Plaintiff was again stranded and the Vehicle was towed for repair. Third Failure — February 2025: The Vehicle experienced a third complete failure. A Nissan engineer was brought in specifically to diagnose and resolve the recurring defect. The engineer declared the repair complete. The Vehicle was returned to Plaintiff. Fourth Failure — March 1, 2025: Three days after Nissan's own engineer declared the repair complete, the Vehicle experienced its fourth and final complete failure. Plaintiff was stranded for the fourth time. The Vehicle remained out of service from March 1, 2025 through March 20, 2025 — the longest of the four outages — at which point it was returned to Plaintiff. On or about March 6, 2025 — five days after the fourth failure and while the Vehicle remained out of service — Plaintiff was forced to lease a replacement vehicle, a Kia EV6, to continue his gig work. Having lost all confidence that a vehicle Nissan had failed to properly repair three times before would not fail a fourth time, Plaintiff did not resume driving the Vehicle when it was returned to him on March 20, 2025.

8. The four mechanical failures totaled 51 calendar days and 36 business days out of

service — meeting and exceeding both triggering thresholds of Colorado's Lemon Law presumption under C.R.S. § 42-10-103(2)(a), which presumes unreasonable repair attempts at four or more failures for the same or substantially similar nonconformity, or 30 or more business days out of service.

9. During each breakdown period, Plaintiff was unable to perform gig work, resulting in documented lost income exceeding $5,100.

10. A prior settlement agreement between the parties released claims through February 26, 2025 ("the Prior Settlement"). The fourth failure occurred on March 1, 2025 — three days after the release date — and is not subject to that release.

11. The value of the Prior Settlement was subsequently reversed by Nissan through the mechanics of its own repurchase offer. Nissan's initial repurchase calculation — Total Amounts Paid of $3,452.84, less a usage deduction of $1,996.78 — produced an amount due to Plaintiff of $1,456.06. A later repurchase offer, applying the identical underlying figures, added a new line item captioned "Settlement Deduction" in the amount of $2,500.00 — increasing total deductions to $4,496.78 and converting the result from a $1,456.06 payment owed to Plaintiff into a demand that Plaintiff pay Nissan $1,043.94 to surrender the same vehicle. The net effect, a swing of $2,499.94, was to claw back through the repurchase calculation the only compensation Nissan had agreed to provide for the distress, lost wages, and loss of use Plaintiff had already suffered through three complete mechanical failures — leaving Plaintiff with no functioning vehicle, no wage compensation, and no distress compensation, and now facing a demand that he pay Nissan to return a vehicle that had failed a fourth time.

This fundamental unfairness — being asked to pay Nissan for the privilege of surrendering a car Nissan had already acknowledged was defective, after receiving nothing for the harm already suffered — is what drove Plaintiff to seek relief through the Lease's own mandatory arbitration clause in the first place, as set forth in Section D below. It is also the first instance of a pattern Nissan repeats throughout this litigation: agreeing to or conceding a position, then reversing course once doing so becomes financially advantageous, as further demonstrated in Section J below.

12. After Nissan's repurchase calculation converted the value of the Prior Settlement into a demand that Plaintiff pay Nissan $1,043.94, Plaintiff made an additional lease payment of $418.66 in a good-faith attempt to resolve the dispute and reduce what Nissan claimed he owed. That payment reduced the disputed amount to $625.28 — the same net dispute figure referenced throughout this Complaint. Nissan never acknowledged that payment or adjusted its position in response to it; it continued to treat the pre-payment figures as controlling. It was this $625.28 residue — what remained of Nissan's own reversal of the Prior Settlement after Plaintiff's own good-faith payment against it — that Nissan refused to resolve through JAMS, refused to resolve through BBB AUTO LINE, and ultimately chose to weaponize through false credit reporting.

13. Plaintiff made that additional payment while still carrying the Lease's ongoing $418.66 monthly payment obligation on a vehicle that had already failed four times and was producing no reliable transportation for his gig work — income already reduced by more than $5,100 by the failures themselves. Continuing to pay both the

ordinary monthly Lease payment and an extra payment toward a buyback demand Nissan had inflated by reversing the Prior Settlement was not financially sustainable. It was this — not a change of heart about the Vehicle — that led Plaintiff to serve the UCC § 2A-517 revocation notice on May 1, 2025 rather than continue paying toward a car Nissan had already shown it would not make right.

**C. Nissan's False Advertising of the Vehicle**

14. At the time Plaintiff leased the Vehicle, Nissan marketed the 2024 Ariya through its official platforms with the following representations: (a) Nissan USA Features Page — "Its liquid-cooled thermal management system means better performance in hot and cold weather" and "all-weather confidence," prominently displaying an EPA-estimated range of 216 miles; (b) 2024 Nissan Ariya Range & Charging Interactive Brochure — "An advanced liquid-cooled thermal management system allows ARIYA to better handle extremes — whether it's freezing cold or very hot outside," stating the vehicle was "Built for Extreme Conditions"; and (c) Nissan North America Press Release — January 8, 2025 — Nissan's Senior Manager of Zero Emission Vehicles stated publicly: "We want to test the worst-case scenario so that our customers will still get the same performance in a wide variety of weather conditions."

15. On January 26, 2025 — eighteen days after Nissan's Senior Manager publicly promised "the same performance in a wide variety of weather conditions" — Plaintiff documented the following with an authenticated dashboard photograph: Vehicle at 100% charge, stationary, plugged in, outside temperature 23°F, zero miles driven. Displayed range: 139 miles. Advertised EPA range: 216 miles. Deficit: 77 miles — a

35.6% range reduction before driving a single mile.

16. The practical usable range degradation was far more severe than the documented 35.6% deficit alone suggests. Plaintiff's residence is equipped with a Level 1 charger — a standard 120V residential electrical outlet — which is the standard charging infrastructure available to the majority of residential consumers without specialized and costly electrical upgrades. Under normal conditions, Level 1 charging typically provided Plaintiff approximately 3 miles of range per hour. In Colorado winter temperatures — consistently below freezing during the months Plaintiff operated the Ariya — Plaintiff documented an overnight Level 1 charging gain of only approximately 1 to 2 miles of range per hour, a reduction of roughly one-third to two-thirds off the normal rate, because the Ariya's battery thermal management system consumed a disproportionate share of the incoming Level 1 power simply to maintain the battery at a temperature sufficient to accept a charge. To operate the vehicle for gig work requiring meaningful daily range, Plaintiff had no alternative but to use public DC fast charging at commercial rates of approximately $0.48 per kWh — exceeding the gasoline costs of a conventional vehicle, eliminating the fuel savings that were central to the economic rationale for the lease.

17. The 139-mile displayed range documented in paragraph 15 above was itself Nissan's best-case cold-weather figure. The Vehicle was stationary, at 100% charge, and plugged in at the time of the photograph, and Nissan's own guidance instructs owners to precondition the vehicle while plugged in during cold weather specifically so that heating energy is drawn from the grid rather than the battery. The

photograph therefore captures the most favorable displayed range the Vehicle could produce under the documented conditions — before a single mile of actual driving, before any cabin heat had been drawn from the battery, and before any aerodynamic drag or cold-weather battery inefficiency had been incurred.

18. Nissan's own July 7, 2026 written response to Plaintiff's arbitration demand acknowledged that highway-speed driving causes a further reduction of "up to 20%" in usable range. Applied to the Vehicle's documented 139-mile stationary charge-level range, that additional reduction leaves a real-world usable range of approximately 111 miles — roughly half of the advertised 216-mile EPA range. This further reduction is nowhere disclosed to consumers in Nissan's marketing materials, its interactive range and charging brochure, or its press release. Plaintiff separately owns and operates a 2024 Kia EV6 GT electric vehicle; as Plaintiff documented in writing to Nissan on March 26, 2025, the Kia EV6 does not lose range overnight when left uncharged, and its actual range does not depart from its stated and expected range the way the Vehicle's did — confirming that the extent of the Ariya's range loss is not an ordinary or unavoidable characteristic of electric vehicles generally.

19. This deception is documented in Nissan's own marketing pages, its own interactive brochure, its own press release, and Plaintiff's authenticated dashboard photograph. The falsity of the "all-weather confidence" and "same performance in a wide variety of weather conditions" representations is established independently by Plaintiff's own documented 35.6% range deficit at 100% charge before a single mile was driven — a deficit that exists regardless of what Nissan did or did not disclose

elsewhere. Nissan's Senior Manager of Zero Emission Vehicles made the "same performance" representation publicly, in Nissan's own name, with the cold-weather range limitations of lithium-ion electric vehicle batteries being a matter of well-established, publicly known engineering fact within the automotive industry. Nissan knew, or was reckless in not knowing, that its own vehicle could not perform as represented.

**D. The Systematic Destruction of Every Dispute Forum**

20. Following Nissan's reversal of the Prior Settlement through its own repurchase calculation and Plaintiff's good-faith payment reducing the resulting dispute to $625.28 — both described in Section B above — Plaintiff attempted to resolve that $625.28 dispute and to recover the value Nissan had already agreed he was owed, through every forum available to him. Nissan destroyed each one in succession, as set forth below.

21. Forum One — JAMS Arbitration: On March 26, 2025, Plaintiff filed a formal demand for arbitration with JAMS pursuant to Section 28 of the Lease, which expressly designates JAMS or AAA as the mandatory and exclusive arbitration forum. JAMS assigned the proceeding Case ID No. 37461, captioned Brooks, Jason v. Nissan North America, Inc., and formally commenced the arbitration. JAMS Case Manager Brianne Strickland confirmed commencement and on April 8, 2025 wrote: "I will give Nissan a week to respond, and will reach out again if we don't hear anything." On April 15, 2025, JAMS confirmed: "For 37461 Brooks vs. Nissan, I haven't seen a reply come back from Nissan at all." Nissan did not respond to the

arbitrator at JAMS. It did not respond to JAMS. It did not acknowledge the proceeding in any manner. On April 23, 2025 — copied simultaneously to JAMS — Desiray Neely, Arbitration Specialist, Dispute Resolution Programs, Nissan North America, Inc., stated in writing: "NNA does not participate with JAMS. JAMS is only for if you have an actual concern with your lease. The BBB auto line is for if you believe there is a defect with your vehicle." This affirmative, written statement by Nissan's own Arbitration Specialist — transmitted simultaneously to Plaintiff and to JAMS — constitutes deliberate refusal to participate in a formally commenced arbitration proceeding under the forum Nissan itself designated in its own Lease. Nissan also failed to pay the required JAMS arbitration fees under the JAMS Consumer Minimum Standards of Procedural Fairness, causing those costs to shift to Plaintiff — a gig worker whose income had been destroyed by four vehicle failures — who was informed that continuing the arbitration would require him to pay between $4,000 and $5,000 in fees he could not afford. Nissan abandoned the contractually designated forum entirely.

22. Forum Two — BBB AUTO LINE: Nissan directed Plaintiff to BBB AUTO LINE — a forum its own Lease does not designate — in direct contradiction of the Lease's mandatory arbitration clause. Even apart from how it was administered, BBB AUTO LINE was never capable of resolving this dispute: by the express terms of Nissan's own BBB AUTO LINE Program Summary, it cannot award lost income, emotional distress, consequential damages, or punitive damages — the exact categories of harm the mechanical failures and false advertising described in Sections B and C above

had already caused. A forum that cannot award the relief a dispute actually requires does not provide resolution; it exists in name only. BBB AUTO LINE opened Case No. NIS2507014 and closed it within two days — on April 25, 2025 — on the false grounds that the dispute had been resolved by the Prior Settlement. The Prior Settlement released claims only through February 26, 2025. The fourth failure occurred March 1, 2025 — three days after that release date. Nissan received notice of the erroneous closure and took no corrective action.

23. Forum Three — UCC § 2A-517 Revocation: On May 1, 2025, Plaintiff served Nissan with a formal written notice of revocation of acceptance pursuant to UCC § 2A-517, codified at C.R.S. § 4-2.5-517. The notice explicitly warned Nissan that the Lease was legally terminated and that any further negative credit reporting would constitute a willful violation of the Fair Credit Reporting Act and would be litigated accordingly. Nissan did not respond. Nissan did not challenge the revocation in any court. Nissan never refunded any payments.

24. Forum Four — This Litigation: Plaintiff filed his Verified Complaint on April 1, 2026. Service was effected April 10, 2026 through Nissan's registered agent. Nissan did not respond by the May 1, 2026 deadline and default was entered against Nissan on May 5, 2026. Nissan did not appear in this action at all for 68 days after service — until June 22, 2026, when it came in through counsel O'Hagan Meyer PLLC and filed a Motion to Set Aside Default, whose first act was to attack Plaintiff's character before the Court, later admitting Nissan had actual knowledge of this lawsuit eleven days before its own response deadline. O'Hagan Meyer doubled down on that attack

in its Reply. Nissan then withdrew its own Motion to Set Aside Default on August 14, 2026, once faced with the exposure of this First Amended Complaint and allowed the default to stand unchallenged. Four days later, on August 18, 2026, once the default judgment amount itself had grown too concerning to leave uncontested, Nissan refiled — a Second Motion to Set Aside Default — seeking the same relief it had just abandoned. That sequence — attack, appear, concede, then refile once the exposure became too concerning to leave unaddressed — combined with the Court's own extended failure to rule on Plaintiff's fully briefed and unopposed Motion for Default Judgment, forced Plaintiff into the last option remaining to him: a motion to disqualify the presiding judge, filed August 20, 2026, and denied the very next day — the same day the Court granted the Second Motion to Set Aside Default. Even this litigation — the forum of last resort after JAMS, BBB AUTO LINE, and UCC revocation were each destroyed in turn — became a forum in which Plaintiff was forced to fight for the ordinary, unhurried consideration his filings warranted, as set forth in Section J below.

**E. The UCC § 2A-517 Revocation — Legal Effect**

25. Plaintiff's May 1, 2025 revocation of acceptance was valid and effective under C.R.S. § 4-2.5-517 for the following reasons: (a) Nonconformity substantially impairing value — four complete mechanical failures at 3,649 miles, totaling 51 days and 36 business days out of service, meeting both Colorado Lemon Law presumption thresholds under C.R.S. § 42-10-103(2)(a). For a gig worker whose entire income depends on vehicle access, four complete failures in five months constitutes

substantial impairment under Colorado's subjective test; (b) Accepted on reasonable assumption nonconformity would be cured — Plaintiff accepted the Vehicle on October 31, 2024. Nissan's own engineer declared the repair complete before the fourth failure. The Vehicle failed three days later. The nonconformity was never seasonably cured; (c) Revocation within reasonable time — Plaintiff served the revocation notice on May 1, 2025, approximately two months after the fourth failure, during which time Plaintiff was pursuing JAMS arbitration and BBB dispute resolution while also attempting, through the payment described in paragraph 11 above, to resolve Nissan's buyback demand directly. Revocation became necessary once continuing to carry both the Lease's ordinary monthly payment and an additional payment toward that demand, as described in paragraph 12 above, was no longer financially sustainable. Two months — spent in good-faith attempts at resolution rather than delay — is reasonable under the circumstances; (d) Written notice to lessor — the May 1, 2025 revocation notice was served on Nissan in writing. No formal notice format is required under Colorado law; (e) Not a finance lease — the Vehicle was selected, manufactured, and supplied by Nissan through its own authorized dealership network. Full revocation rights apply.

26. Upon Plaintiff's valid revocation of acceptance on May 1, 2025: (a) the Lease was legally terminated by operation of Colorado law; (b) Nissan was thereby placed in default under the Lease, see C.R.S. § 4-2.5-508(1); (c) Plaintiff was entitled to cancel the Lease under C.R.S. § 4-2.5-508(1)(a), ending any further financial obligations from that date forward — meaning no delinquency and no charge-off could lawfully

accrue on the account after May 1, 2025; and (d) Plaintiff was separately entitled to recover so much of the cost and security he had paid as was just under the circumstances, see C.R.S. § 4-2.5-508(1)(b). As set forth in Section F below, even generously crediting Nissan with the same usage allowance it applied in its own repurchase calculation, what is just under the circumstances here still left Nissan owing Plaintiff money — not the reverse.

**F. The Vehicle's Return and Nissan's Failure to Refund**

27. On July 12, 2025 — 72 days after the Lease was legally terminated by Plaintiff's UCC § 2A-517 revocation — Plaintiff voluntarily returned the Vehicle to Defendant Nissan, acting through its wholly owned subsidiary and agent NMAC. Having lawfully revoked acceptance of the Vehicle more than two months earlier, Plaintiff returned the Vehicle and its keys because it was no longer his to retain or use and specifically to make clear he was not exercising any continued ownership or use of a vehicle he had already revoked. Nissan's default under the Lease, triggered by that revocation, entitled Plaintiff to recover so much of the cost and security he had paid as was just under the circumstances, under C.R.S. § 4-2.5-508(1)(b). Nissan and NMAC have refunded nothing.

28. The amount Nissan actually owed Plaintiff upon his valid revocation was substantially larger than any figure Nissan ever offered him — and larger than even a Colorado Lemon Law buyback would have produced. Nissan's own March 20, 2025 repurchase calculation documented Total Amounts Paid by Plaintiff of $3,452.84 as of that date. That calculation then applied a $1,996.78 "usage" deduction — a wear-

and-tear-style offset drawn from the Colorado Lemon Law's mileage-based "reasonable allowance for use" formula under 42-10-103(1), a framework that governs Lemon Law buyback claims, which Plaintiff never brought, not any statute actually applicable to a UCC revocation — producing a net amount due to Plaintiff of only $1,456.06.

29. Plaintiff need not dispute whether some usage allowance may be part of what is "just under the circumstances" under C.R.S. § 4-2.5-508(1)(b). Even applying Nissan's own $1,996.78 usage figure against Plaintiff's full $3,871.50 in payments — the $3,452.84 documented in Nissan's own calculation, plus the additional $418.66 payment described in paragraph 11 above — Nissan still owed Plaintiff $1,874.72. Conceding the usage deduction in full does not produce any balance owed by Plaintiff, under any calculation Nissan itself has ever put forward.

30. The Prior Settlement permitted Nissan to deduct the $2,500.00 settlement value against a future repurchase of the Vehicle. That provision never took effect because no repurchase of the Vehicle by Nissan was ever completed. Nissan's own repurchase paperwork describes a process requiring Plaintiff's acceptance, surrender of the Vehicle through Nissan's third-party vendor Morley VSPC, execution of title-transfer documents, and completion of that surrender within six to eight weeks of acceptance — none of which ever occurred. Plaintiff never accepted either repurchase offer. Instead, Plaintiff exercised his independent statutory right to revoke acceptance of the Vehicle under UCC § 2A-517 on May 1, 2025 — a separate and independent legal remedy from the voluntary repurchase transaction the Settlement's deduction

provision contemplated. Nissan cannot invoke a contractual deduction conditioned on a repurchase it never completed to reduce, offset, or defeat the recovery Plaintiff was independently entitled to as a matter of law through his statutory revocation.

31. Even conceding Nissan's own usage deduction in full, the $1,874.72 Nissan owed Plaintiff stands in stark contrast to what Nissan ultimately demanded. Nissan's repurchase calculation, by adding the $2,500.00 Settlement Deduction described in paragraphs 10 and 18 above, converted a debt Nissan owed Plaintiff into a demand that Plaintiff pay Nissan $1,043.94 instead — a swing of $2,918.66, attributable entirely to the improper Settlement Deduction and to Nissan's failure to credit the additional $418.66 payment described in paragraph 11 above. (That same $418.66 payment is separately referenced in paragraph 11 as reducing Nissan's own $1,043.94 demand to a claimed $625.28 "net dispute" — the two figures describe the same payment applied two different ways: once against Nissan's flawed demand, and once, here, against the correct total Nissan actually owed.)

32. On July 16, 2025, NMAC transmitted to Plaintiff a Notice of Intent to Dispose of Repossessed or Surrendered Motor Vehicle. That notice stated a total amount to redeem of $30,908.03 — including an "Unpaid Adjusted Lease Balance" of $29,202.05 and "Estimated expenses of retaking the vehicle" of $450.00. No such balance legally existed after the May 1, 2025 revocation: as set forth in paragraphs 17 through 20 above, Nissan and NMAC owed Plaintiff money, not the reverse. The $450.00 in expenses NMAC charged in connection with retaking a Vehicle Plaintiff had already lawfully returned on a legally terminated lease was itself an improper charge

assessed against a debt that did not exist. The notice also stated: "We are attempting to collect a debt and any information obtained will be used for that purpose" — treating the extinguished $30,908.03 figure as a collectible obligation eleven weeks after Plaintiff's revocation had eliminated it.

33. Nissan and NMAC's own account history documents a further $20,375 reduction in the amount claimed owing, from $31,337.00 reported to the credit bureaus in August and September 2025 — consistent with the $30,908.03 figure demanded in the July 16, 2025 notice — to $10,962.00 reported from October 2025 forward through the most recent bureau reinvestigation results reviewed by Plaintiff, in June 2026. Neither Nissan nor NMAC has ever provided Plaintiff with any notice of a sale or other disposition of the Vehicle, any accounting of a sale price, or any documentation whatsoever explaining how or why the claimed balance changed by $20,375.

34. Nissan and NMAC's remedies under C.R.S. §§ 4-2.5-523 through 4-2.5-528 — which govern a lessor's rights following a lessee's default — never arose in the first place because Plaintiff was not in default: he had validly revoked acceptance of the Vehicle under UCC § 2A-517 more than two months before returning it, extinguishing the Lease and any balance, as set forth in Section E above. Even assuming, solely for the sake of argument, that Nissan and NMAC could invoke these default-remedy provisions, C.R.S. § 4-2.5-527(2) permits a lessor to recover under a favorable damages formula only where a disposition is by a substantially similar lease "made in good faith and in a commercially reasonable manner"; where a disposition does not qualify — including a sale, or a disposition Nissan and NMAC cannot document —

C.R.S. § 4-2.5-527(3) directs that damages instead be calculated under C.R.S. § 4-2.5-528, which requires establishing "the present value... of the total rent for the then remaining lease term... minus the present value... of the market rent at the place where the goods are located," or, under the alternative lost-profit measure in § 4-2.5-528(2), "due credit for payments or proceeds of disposition." Nissan and NMAC have provided no evidence of any disposition, sale price, market rent, or proceeds under either measure. Their own unexplained and undocumented $20,375 reduction in the claimed balance — from $31,337.00 to $10,962.00 — cannot be tested or verified under any statutory formula because Nissan and NMAC have disclosed nothing about how that figure was derived.

35. Neither the $30,908.03 figure demanded in the July 16, 2025 notice nor the $10,962.00 figure reported from October 2025 forward is a legitimate, substantiated balance — whether measured against the revocation that extinguished any balance in the first place, or against the statutory disposition formulas Nissan and NMAC would need to satisfy even under their own contrary theory. Plaintiff pleads both figures as equally unsubstantiated and reserves the right to seek full discovery of any disposition records in Nissan's and NMAC's possession.

**G. The Fraudulent Credit Reporting**

36. No credit reporting on the Lease account was legally permissible at all after May 1, 2025. Plaintiff's valid UCC § 4-2.5-517 revocation legally terminated the Lease and eliminated any balance capable of becoming delinquent or being "charged to loss." The entirety of what remained in dispute between the parties, after Nissan clawed

back the $2,500.00 Prior Settlement and applied Plaintiff's additional payment, was approximately $625.28 — an amount Nissan claimed Plaintiff owed, not the reverse. Rather than accept Plaintiff's lawful revocation, Nissan responded to a $625.28 disagreement by destroying every dispute forum available to resolve it — refusing the JAMS arbitration the Lease itself designated, directing Plaintiff to a BBB AUTO LINE forum that could never have awarded anything different from Nissan's own buyback offer and close without a hearing, and taking no action on Plaintiff's UCC revocation notice — while simultaneously reporting Plaintiff as delinquent and then charged off to all three national credit bureaus. Nissan did not report false information because a balance existed. It reported false information because Plaintiff would not pay the $625.28 Nissan demanded after taking back the $2,500.00 it had already given him and Nissan had no other coercive avenue left once every dispute forum had been foreclosed. What follows is the documented mechanism of that retaliation.

37. Following the May 1, 2025 revocation, Nissan, through NMAC as its agent, furnished false information regarding the Lease account to Experian, Equifax, and TransUnion on at least eleven separate occasions, which is ongoing monthly. Experian's own records, generated June 3, 2026, document the account coded "Charge Off" every month from August 2025 through June 2026 — eleven consecutive monthly furnishings of the same false status, continuing for six months after this lawsuit was filed on April 1, 2026, and continuing through this action. Each of those reports was false because no balance was owed by Plaintiff since May 1, 2025.

38. The balance NMAC furnished for this same charged-off account was not even internally consistent and the inconsistency reveals a further, independent problem. Experian's records show a reported balance of $31,337 in August and September 2025, which then dropped — without explanation and without any notice to Plaintiff — to $10,962 for every month from October 2025 forward. A reduction of that magnitude, on an account already charged off, is consistent with an undisclosed disposition or sale of the Vehicle during that window, as set forth in Section F above. Nissan cannot simultaneously withhold the notice of sale and accounting a disposition would require and silently feed the credit bureaus a revised, unexplained balance reflecting that same undisclosed disposition.

39. NMAC's own July 16, 2025 notice undermines the accuracy of this reporting on its face: it checks "voluntary surrender" while, in the same document, listing a "Date of Repossession" of July 12, 2025 — two inconsistent characterizations of the same event, generated by NMAC itself, neither of which supports reporting a "balance charged to loss" on an account that carried no legal balance.

40. The false reporting is the Nissan-Infiniti LT lease account, Subscriber No. 3690580. It is the sole derogatory mark on an otherwise unblemished credit profile consisting of seventeen accounts — two auto loans and fifteen credit accounts — each with a perfect payment history.

41. The fraudulent charge-off has suppressed Plaintiff's VantageScore by approximately 100 points — from a score that would have qualified for prime credit products to a score of 593, which triggers automatic denials and subprime terms

across housing, credit, and financing applications.

**H. The Documented Post-Filing Harm**

42. The following harms arose during the pendency of this litigation — after the Complaint was filed on April 1, 2026, after service was effected on April 10, 2026, after the response deadline expired on May 1, 2026, and after default was entered on May 5, 2026 — while Nissan sat silent: Nova West housing denial — April 6, 2026: Five days after Plaintiff filed this lawsuit, Plaintiff was denied housing at Residences at Nova West Phase 2, 525 Dry Creek Drive, Longmont, Colorado. The RentGrow screening report (Report ID 80696099) cited one reason: "Severe level of Charge-offs." That is the only charge-off on Plaintiff's entire credit history. Double security deposit requirement — April 29, 2026: Plaintiff was conditionally approved for housing at a second property but was required to pay a double security deposit of $3,800 as a condition of tenancy solely because the Nissan charge-off suppressed his VantageScore below the standard 680-point threshold. Plaintiff could not afford the double deposit requirement and lost housing he was otherwise fully qualified to occupy. Citibank non-renewal — April 30, 2026: Citibank declined to reissue Plaintiff's credit card (credit limit: $3,000) effective April 30, 2026 — one day before Nissan's response deadline expired. Citibank's written response (Reference No. 20260312170121133 6005) cites a credit scoring review. The sole derogatory item on Plaintiff's credit report is the Nissan charge-off. PayPal Credit denial — August 12, 2026: Plaintiff applied for a PayPal Credit account, issued by Synchrony Bank, on August 11, 2026. Synchrony Bank issued a written denial the following day, stating

as its sole reason: "Charged-off accounts in the last 12 months with an aggregate balance greater than $100." The denial identifies TransUnion as the consumer reporting agency whose report formed the basis of the decision. The Nissan-Infiniti LT lease account is the only charged-off account anywhere on Plaintiff's credit profile. Imminent homelessness — September 1, 2026: As of the date of this First Amended Complaint, Plaintiff can no longer sustain the financial and emotional cost of continuing to apply for housing he already knows will be denied. Every housing application Plaintiff has submitted has been denied, or conditioned on an unaffordable double security deposit, on the same ground — the fraudulent Nissan charge-off, the sole derogatory mark on an otherwise unblemished 17-account credit profile. Absent deletion of the fraudulent charge-off, Plaintiff will be without housing as of September 1, 2026.

**H(a). The Mother's Vehicle — Direct Causation Chain**

43. The circumstances giving rise to Plaintiff's obligation to finance a replacement vehicle began when Plaintiff's mother — an elderly woman surviving on approximately $1,300 per month in Social Security income — experienced a mechanical breakdown of her own vehicle that rendered it permanently inoperable and beyond economical repair. With no financial resources to replace it and no ability to obtain financing independently on a fixed Social Security income, Plaintiff's mother was left without transportation entirely. Without a vehicle she could not attend medical appointments, access groceries, or meet essential daily needs. Plaintiff was obligated to provide her with transportation. To do so, Plaintiff gave his mother his

own second personal vehicle — a fully paid-off car he owned free and clear of any lien — so that she could continue to function independently.

44. Plaintiff leased the Ariya specifically because he needed a vehicle for gig work while giving his mother his paid-off personal vehicle. The economic decision was built on Nissan's representations: the Ariya's advertised 216-mile range, fuel savings from home electricity charging instead of gasoline, and "all-weather confidence" in Colorado conditions. Plaintiff calculated that the elimination of gasoline costs — replaced by the modest cost of Level 1 home electricity charging — would offset a meaningful portion of the monthly lease payment, making the Ariya economically viable while simultaneously solving his mother's transportation crisis. Nissan's false advertising destroyed that economic calculation entirely.

45. While using Plaintiff's paid-off vehicle, Plaintiff's mother was subsequently struck by another driver who was 100% at fault in the collision. The at-fault driver presented insurance documentation to law enforcement at the scene to avoid an additional citation — however, the policy had been purchased the same day as the accident, providing no valid recovery. Plaintiff was forced to use his own insurance to cover the total loss. Plaintiff's fully paid-off vehicle — a free-and-clear asset representing years of financial effort — was totaled with no recovery from the at-fault driver. Plaintiff's mother also sustained serious physical injury in the collision — including a broken sternum — requiring medical treatment and a period of recovery.

46. Plaintiff was therefore left in the following position simultaneously: his mother's original vehicle had broken down beyond repair; he had leased the Ariya specifically

to solve that transportation problem — only to receive a vehicle that failed four times and whose false advertising destroyed the economic rationale for the lease; his own paid-off vehicle had been totaled by a driver carrying same-day insurance with no valid recovery; his mother was injured and unable to drive; and he needed transportation for both himself — for gig work — and for his mother's daily needs. He was forced to finance a replacement vehicle. This was not a discretionary purchase. It was an unavoidable emergency obligation created by a cascading series of circumstances — every one of which traces directly or proximately to Nissan's false advertising, Nissan's defective vehicle, and Nissan's fraudulent credit reporting.

47. It is at this point that Nissan's fraudulent charge-off became the proximate cause of direct, quantifiable, ongoing financial harm. Prior to Nissan's fraudulent charge-off — with a 17-account, perfect-payment-history credit profile — Plaintiff would have qualified for prime financing at approximately 6-8% APR. The fraudulent charge-off was the sole derogatory mark on that profile. It suppressed Plaintiff's VantageScore to 593 — deep subprime territory. Because of that suppression — caused entirely by Nissan's continued reporting of a false charge-off on a legally terminated account — Plaintiff was forced to finance through Capital One at 17.85% APR on an $18,462.00 financed amount over 72 months, generating a monthly payment of $422.22. Without the fraudulent charge-off, Plaintiff would have accessed prime financing and paid approximately $306-$324 per month on the same amount. The difference — approximately $98-$116 per month — is money Nissan's fraudulent reporting costs Plaintiff every single month for 72 months. Total excess interest over

the loan term: approximately $7,092 to $8,379. Every dollar of that excess comes directly out of Plaintiff's pocket as a direct and proximate result of Nissan's fraudulent charge-off on a legally terminated account

48. The fraudulent charge-off is not self-correcting. Under 15 U.S.C. § 1681c, a derogatory entry may remain on a consumer's credit report for seven years from the date of first delinquency. Without a mandatory court order compelling deletion, the fraudulent charge-off could remain on Plaintiff's credit file for years — housing application denials, credit score suppression, subprime financing rates, and financial opportunities foreclosed, all flowing from a $625.28 net dispute Nissan chose to weaponize rather than resolve.

**I. Nissan's Knowledge of Plaintiff's Vulnerability**

49. Nissan had actual, documented knowledge that: (a) Plaintiff was a gig worker whose entire income depended on his personal registered vehicle, having stated in writing to Nissan: "I make all my money through the use of a car, as I am a gig worker, and lost in excess of $5,100 in income since this all started for me"; (b) Plaintiff suffered from a long-standing autoimmune condition qualifying as a disability under the Americans with Disabilities Act, having disclosed in writing that the condition "is now being directly affected and interfered with" and that he had been forced to miss a scheduled gastroenterology appointment because Nissan refused to provide a loaner vehicle during the second breakdown; (c) four complete mechanical failures had already destroyed more than $5,100 in income; (d) Plaintiff had no alternative income source and no financial cushion to absorb the cascading consequences of Nissan's

fraudulent credit reporting; and (e) clawing back the $2,500.00 Prior Settlement through the repurchase offer would "negate any benefit" of the settlement and cause Plaintiff "further economic harm" — the precise objection Plaintiff raised to Nissan in writing on March 26, 2025, months before Nissan proceeded to do exactly that.

50. Nissan's own Arbitration Specialist received and read this information before responding "NNA does not participate with JAMS." Having received that knowledge and chosen deliberate non-engagement over resolution, Nissan then weaponized credit reporting — reporting false information on at least eleven separate occasions after written notice — against a gig worker managing a chronic ADA-qualifying disability, with no alternative income and no financial margin, over a $625.28 net dispute that existed only because Nissan had already taken back the $2,500.00 it knew Plaintiff could not afford to lose and which had to be used as a down payment for the Kia EV6.

51. Beyond Plaintiff's specific circumstances — which Nissan knew — any reasonable corporation in Nissan's position knows that weaponizing credit reporting against an individual consumer causes catastrophic, compounding financial harm. Nissan's deliberate decision to report false information — after receiving written notice, after consumer bureau disputes, and after the filing of this lawsuit — was not an accident or a good faith error. It was a deliberate deployment of the most powerful financial weapon available to a corporate creditor for the purpose of coercing capitulation in a $625.28 dispute. Any corporation that deliberately uses credit reporting as a coercive instrument to gain compliance knows the harm it causes. Nissan used it anyway —

deliberately, with malice, and only after closing every forum it was contractually obligated to use to resolve exactly this kind of dispute — intentionally causing ongoing financial destruction to Plaintiff's life.

**J. O'Hagan Meyer PLLC's Litigation Misconduct**

52. On June 22, 2026, Defendant O'Hagan Meyer PLLC, through its partner Russell S. Kalvelage, appeared as counsel of record for Nissan and filed a Motion to Set Aside Default [ECF No. 19]. That motion devoted pages 14-15 to a public quote in which Plaintiff criticized the Court's legal reasoning in unrelated litigation — Brooks v. Colorado Department of Corrections, Case No. 13-cv-02894-SKC — presenting it as evidence of improper litigation motive in connection with a Rule 55(c) motion.

53. The finding Plaintiff criticized was already on appeal to the Tenth Circuit as of the day ECF No. 19 was filed. The very next day — June 23, 2026 — the Tenth Circuit vacated the exact finding Plaintiff had been critical of. O'Hagan Meyer presented Plaintiff's criticism to the Court as evidence of bad motive — a characterization simply belied by the facts and unrelated to any factor Rule 55(c) actually asks a court to weigh in this case.

54. At the time O'Hagan Meyer filed ECF No. 19 on June 22, 2026, Plaintiff had four active matters pending before Judge Crews simultaneously — this case, the companion civil rights matter Case No. 1:25-cv-02610-SKC-STV with a $60,000,000 damages claim and a pending preliminary injunction, the underlying CDOC matter Case No. 13-cv-02894-SKC with an active en banc petition in Case No. 25-1256, and Brooks v. DraftKings, Inc., Case No. 1:26-cv-01692-SKC-STV. The combined value of

those matters exceeds $67,000,000.

55. On July 7, 2026 — the same day Nissan transmitted a settlement counteroffer to Plaintiff — O'Hagan Meyer filed a Reply in Support of the Motion to Set Aside Default [ECF No. 22], pages 9-11, doubling down on the same material and describing it as bearing "directly on Plaintiff's relationship with this Court" — a justification that only underscores the material was being offered to influence the Court's own view of Plaintiff, not to address any recognized factor under Rule 55(c).

56. O'Hagan Meyer's conduct ended the settlement negotiations between Plaintiff and Nissan. Prior to June 22, 2026, Plaintiff and Nissan were actively engaged in those negotiations. By filing the Reply — after having been placed on notice, in Plaintiff's Opposition [ECF No. 20], of his objection to this material — O'Hagan Meyer ended them. As Plaintiff advised counsel in his written rejection on July 7, 2026, the settlement window closed not because of the inadequacy of Nissan's counteroffer, but because of what O'Hagan Meyer chose to do the same day the counteroffer arrived.

57. Plaintiff served a Rule 11 safe harbor letter on O'Hagan Meyer on July 7, 2026, pursuant to Fed. R. Civ. P. 11(c)(2), demanding withdrawal of pages 14-15 of the Motion to Set Aside Default and pages 9-11 of the Reply within 21 days. The 21-day safe harbor period expired on July 28, 2026. O'Hagan Meyer did not withdraw the offending material.

58. On July 7, 2026, in response to Plaintiff's $350,000 settlement demand, Nissan's counteroffer consisted of the vehicle repurchase amount already required by the Colorado Lemon Law, C.R.S. § 42-10-103(1), plus a $5,000 "goodwill payment." On

credit reporting — the item directly responsible for Plaintiff's housing denials — Nissan offered only to "work with third parties to, if possible, request deletion" of the lease tradeline and required Plaintiff to acknowledge in writing that "Nissan cannot guarantee any such deletion or control the timeframe within which the credit reporting agencies process deletion requests." This was Nissan's negotiating position fourteen months into the underlying dispute, with Plaintiff's housing insecurity looming.

59. Measured against what it purported to resolve, that offer is disproportionate on the record already before the Court. By July 7, 2026, Plaintiff had already pursued four separate forums over more than fourteen months to resolve what began as a $625.28 dispute: JAMS arbitration, BBB AUTO LINE, a UCC revocation notice, and this litigation. By August 19, 2026, the docket in this case alone contained twenty-seven entries, including eighteen exhibits and a sworn affidavit filed in support of the Motion for Default Judgment. This First Amended Complaint itself pleads multiple counts against three defendants. None of that reflects a single credit bureau dispute letter, phone call, or hours of unpaid pro se drafting time spent trying to get the Nissan tradeline deleted across Experian, Equifax, and TransUnion — efforts that, as of the filing of this Complaint, still have not resulted in deletion. A $5,000 goodwill payment, offered in exchange for Plaintiff giving up any guarantee that the credit reporting driving his housing denials would ever actually be removed, is not a serious measure of what resolving this dispute has actually cost Plaintiff to pursue. Nissan is not unaware of that disparity — a corporation of its size and sophistication knows

precisely what fourteen months of litigation across four forums, twenty-seven docket entries, and a multi-count federal complaint actually costs to produce and knows that contested federal litigation of this kind routinely takes years to resolve. Offering $5,000 anyway, with full knowledge of both what it dismisses and how long resisting it can be made to last, is not a negotiating position. It is an affront.

60. On August 12, 2026, Plaintiff transmitted to O'Hagan Meyer, on behalf of Nissan, notice that if the Court granted the Motion to Set Aside Default, Plaintiff would immediately file this First Amended Complaint. On August 14, 2026, O'Hagan Meyer filed a Motion to Withdraw & Strike its Motion to Set Aside Default [ECF No. 23], confirming in writing: "We are in receipt of the attached proposed First Amended Verified Complaint... Nissan has directed us to withdraw its Motion to Vacate and its corollary documents." The Court granted the withdrawal the same day [ECF No. 24]. Plaintiff's Motion for Default Judgment remained the only motion before the Court — fully briefed, unopposed, and ready for immediate ruling.

61. On August 15, 2026, Plaintiff transmitted a $350,000 settlement demand and supplemental damages brief to Nissan's counsel.

62. Four days after withdrawing its Motion to Set Aside Default, on August 18, 2026, O'Hagan Meyer filed a Second Motion to Set Aside Default [ECF No. 25], seeking relief substantively identical to the motion it had just withdrawn. By its own written terms, Plaintiff's $350,000 settlement offer "expire[d] the moment Nissan files any motion with the Court" — O'Hagan Meyer's filing was itself the act that ended the settlement negotiation. It also put back before the Court, as a brand-new motion, the

identical question the Court had already had a complete, ripe record to decide five weeks earlier.

63. On August 19, 2026, rather than rule on the Second Motion to Set Aside Default directly on the existing record, the Court referred it to Magistrate Judge Varholak [ECF No. 28] and set a hearing for September 23, 2026 — five weeks later. Under the ordinary course, a referral of this kind is followed by a hearing, then a Report and Recommendation, then a minimum 14-day objection period under Fed. R. Civ. P. 72(b) before the presiding judge can rule — a sequence that, left to run its ordinary course, would have added months of further delay on top of the 107 days Plaintiff's Motion for Default Judgment had already sat fully briefed and unopposed.

64. Facing the loss of his housing beginning September 1, 2026 and now facing months of additional delay caused directly by O'Hagan Meyer's decision to withdraw and refile rather than simply litigate its Motion to Set Aside Default to a ruling, Plaintiff filed a Motion for Reconsideration of the Referral Order [ECF No. 29] that same day, asking the Court to withdraw the referral and rule on both pending motions directly, without further hearing. When the referral was not withdrawn, Plaintiff filed a Motion for Disqualification of Judge S. Kato Crews [ECF No. 32] on August 20, 2026, pursuant to 28 U.S.C. §§ 455(a) and 455(b)(1). Plaintiff felt the comments made by Defendants had created a bias against him.

65. Plaintiff's decision to seek disqualification was not made lightly. The Court had personally decided every motion presented to it — including granting a motion the same day it was filed on August 14, 2026 — until August 19, 2026, when, for the first

time, it referred a motion to a magistrate judge rather than ruling directly, doing so without addressing Plaintiff's same-day request that it retain the motion and rule on the existing record. Against that backdrop and with eleven days remaining before he faced losing his housing, Plaintiff filed a Motion for Disqualification of Judge S. Kato Crews [ECF No. 32] on August 20, 2026, pursuant to 28 U.S.C. §§ 455(a) and 455(b)(1).

66. On August 21, 2026 — two days after determining that a referral to Magistrate Judge Varholak and a hearing five weeks out were the appropriate way to resolve the Second Motion to Set Aside Default — the Court reversed that determination on its own initiative, withdrew the referral, and ruled on the motion directly, without the hearing and without any Report and Recommendation. In the same Minute Order [ECF No. 33], it denied Plaintiff's Motion for Disqualification, denied Plaintiff's Motion for Reconsideration of the Referral Order, granted the Second Motion to Set Aside Default, and, as a direct result, denied Plaintiff's Motion for Default Judgment and Motion to Supplement as moot. The Minute Order found "no indication that Defendant willfully defaulted" — notwithstanding that the Second Motion to Set Aside Default it granted in that same order had itself admitted Nissan had actual internal knowledge of this lawsuit on April 20, 2026, eleven days before its May 1, 2026 response deadline.

67. The Minute Order stated that the financial hardship Plaintiff described "appears to be attributable to Defendant's purported underlying conduct," while holding that this was a matter for Plaintiff to prove at trial rather than a basis to alter the outcome

of the Second Motion to Set Aside Default.

68. Filing a motion to disqualify the judge presiding over this case carried its own severe and now-realized cost. Plaintiff has four other active matters pending before Judge Crews, with combined exposure exceeding $67,000,000. Having been forced by Defendants' conduct to seek that judge's disqualification due to its comments and having had that request denied, Plaintiff is now in the position of continuing to litigate five related matters before the same judge whose impartiality he was compelled to challenge. Plaintiff reserves the right to show that any adverse ruling issued against him in those other matters, if later reversed on appeal, is proximately traceable to Defendants' conduct described in this Section J — conduct that left Plaintiff no option but to file that motion in the first place.

69. The Court's August 21, 2026 order ending the referral and resolving all four pending motions in a single ruling was, in that narrow respect, necessary — it stopped a process that would otherwise have pushed Nissan's re-entry into this litigation months further out. But the cost of reaching that point cannot be measured by that outcome alone. The pressure Defendants' conduct placed on Plaintiff came from the delay itself, not from how any single motion was ultimately decided: every additional week that withdrawing, refiling, and referring pushed the case's resolution further out was, independent of the eventual ruling, another week of compounding financial harm and housing insecurity.

70. Nissan's conduct, documented at every stage of this fourteen-month dispute, has been to obstruct resolution rather than provide it: refusing the JAMS arbitration its

own Lease designated as the mandatory forum; directing Plaintiff to BBB AUTO LINE, a forum that provides no resolution; taking no action on a formal UCC revocation notice for fourteen months without ever challenging it in any court; reporting a legally terminated lease account as charged off on eleven separate occasions, each one a willful violation of federal law; filing a motion in this Court containing a materially false statement about when Nissan learned of this lawsuit; conceding a default it could have contested on the merits the moment its exposure grew too concerning to leave uncontested, then withdrawing that concession and refiling the identical motion four days later once a still larger exposure made re-entry worth the cost; and offering, as its final negotiating position after fourteen months of this conduct, a $5,000 payment with no guarantee that the harm it caused would ever actually be corrected. Lie, delay, and obstruct — repeated across every forum Plaintiff was entitled to use to resolve this dispute — is not incidental to Nissan's litigation posture in this case. It is the posture. The intended and actual effect was to use the resources of a multi-billion-dollar corporation to outlast an individual, pro se litigant with a documented disability and, until this dispute, a perfect credit history spanning seventeen accounts — to cause, and to continue, eventual homelessness and housing insecurity, and the total loss of access to credit, that every additional day of delay was already producing.

## CLAIMS FOR RELIEF

### COUNT I — MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. §§ 2301 et seq.

### (Against Defendant Nissan North America, Inc.)

71. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72. The Vehicle is a "consumer product" as defined by 15 U.S.C. § 2301(1). The Lease is a "written warranty" and/or "service contract" as defined by 15 U.S.C. § 2301(6) and (8). Plaintiff is a "consumer" as defined by 15 U.S.C. § 2301(3).

73. Nissan provided written warranties in connection with the Vehicle — including the 2024 Nissan Ariya New Vehicle Limited Warranty — warranting that the Vehicle would be free from defects in materials and workmanship.

74. The Vehicle was not free from defects in materials and workmanship. It experienced four complete mechanical failures at 3,649 miles totaling 51 days and 36 business days out of service — within the first five months of the Lease. Nissan failed to repair or replace the defective components within a reasonable number of attempts or within a reasonable time.

75. Nissan's failure to remedy the Vehicle's defects after a reasonable number of attempts constitutes a breach of written and implied warranties under the Magnuson-Moss Warranty Act.

76. Plaintiff provided Nissan with reasonable opportunity to cure the defects through four separate repair attempts — including a repair declared complete by Nissan's

own engineer that failed within three days. Nissan failed to cure[1].

77. As a direct and proximate result of Nissan's breach of warranty, Plaintiff has suffered actual damages in an amount to be proven at trial, including but not limited to all lease payments made, consequential damages, and all damages set forth in the damages section of this Complaint.

78. Pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover costs and expenses upon prevailing on this Count. Because Plaintiff is a non-attorney proceeding pro se, Plaintiff seeks fees for the legal work performed in this matter at market paralegal and associate attorney rates, rather than as conventional attorney's fees for his own time, for the reasons set forth in the Request for Relief below.

**COUNT II — BREACH OF CONTRACT**

**(Against Defendants Nissan North America, Inc. and NMAC)**

79. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. The Lease constitutes a valid and enforceable contract. NMAC is a direct party of interest to the Lease as set forth in paragraph 3 above, and Nissan is liable both directly and through its control of NMAC as its wholly owned subsidiary and agent.

81. Nissan and NMAC materially breached the Lease in the following respects: (a) by

[1] Nissan's own written offer forecloses any argument that the Vehicle's repair history failed to present a nonconformity subject to a reasonable number of repair attempts under Colorado law. On March 25, 2025 — after all four breakdowns had occurred and with the complete repair history in hand — Nissan wrote to Plaintiff: "Based on the repair history of your vehicle, Nissan would like to voluntarily repurchase the above referenced vehicle under the terms of the Colorado Lemon Law."

failing to provide Plaintiff with a vehicle free from defects and in good working condition throughout the Lease term; (b) by failing to repair or replace the Vehicle's defective components within a reasonable number of attempts or within a reasonable time; (c) by structuring repurchase offers that required Plaintiff to pay $1,043.94 to return a vehicle Nissan twice acknowledged was defective, when in fact Nissan owed Plaintiff money, as set forth in Section F above; (d) by refusing to honor Section 28 of the Lease — the mandatory JAMS arbitration clause — despite formally commencing the arbitration proceeding, receiving the demand, and responding through its own Arbitration Specialist that "NNA does not participate with JAMS"; (e) by taking back the Vehicle on July 12, 2025 — 72 days after the Lease was legally terminated by Plaintiff's valid UCC § 2A-517 revocation — without ever refunding the payments Plaintiff was statutorily entitled to recover under C.R.S. § 4-2.5-508(1)(b); and (f) by reporting false credit information on a legally terminated account.

82. As a direct and proximate result of Nissan's and NMAC's breach of contract, Plaintiff has suffered actual damages in an amount to be proven at trial, including all lease payments made, consequential damages, lost income, and all damages set forth in the damages section of this Complaint.

**COUNT III — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants Nissan North America, Inc. and NMAC)**

83. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Every contract in Colorado contains an implied covenant of good faith and fair dealing that prohibits a party from exercising discretion under the contract in a manner that deprives the other party of the contract's benefits. See *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).

85. Nissan and NMAC breached that covenant through a sustained pattern of discretionary conduct that deprived Plaintiff of the practical benefit of the Lease's own terms: (a) refusing, through its own Arbitration Specialist, to participate in the JAMS arbitration Plaintiff commenced under Section 28 of the Lease, while separately failing to pay the arbitration fees required to keep that forum open to him; (b) directing Plaintiff to BBB AUTO LINE — a forum the Lease itself does not designate and that provides no resolution; (c) taking no action of any kind in response to Plaintiff's formal UCC § 2A-517 revocation notice — neither contesting it, responding to it, nor refunding the payments it triggered; and (d) reporting false derogatory credit information on the Lease account on eleven separate occasions after receiving written notice that the account was legally terminated and that continued reporting would constitute.

86. This pattern — refuse the forum the Lease names, redirect to a forum incapable of resolving the dispute, take no action on the statutory notice that followed, and report false credit information throughout — deprived Plaintiff of the benefit he was entitled to expect from the Lease: a functioning means of resolving a dispute over the Vehicle without being forced into default, litigation, and financial coercion.

87. As a direct and proximate result of Nissan's and NMAC's breach of the implied

covenant of good faith and fair dealing, Plaintiff has suffered actual damages in an amount to be proven at trial, including all damages set forth in the damages section of this Complaint.

**COUNT IV — COLORADO CONSUMER PROTECTION ACT C.R.S. §§ 6-1-101 et seq.**

**(Against Defendant Nissan North America, Inc.)**

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. The Colorado Consumer Protection Act prohibits deceptive trade practices in the course of a person's business, vocation, or occupation. C.R.S. § 6-1-105(1).

90. Nissan engaged in the following deceptive trade practices in violation of C.R.S. § 6-1-105: (a) false advertising of vehicle range and cold-weather performance, as set forth in Section C above; (b) misrepresenting the return of the Vehicle in inconsistent terms on the same document, as set forth in Section F above; (c) false credit reporting on a legally terminated account, as set forth in Section G above; (d) threatening litigation while refusing contractually mandated arbitration — Nissan's July 16, 2025 notice threatened "SUIT AND LIABILITY" against a consumer whose Lease had been validly revoked 72 days earlier, in a matter the Lease commits exclusively to arbitration; (e) directing consumers to an inadequate alternative forum, BBB AUTO LINE, which the Lease does not designate; and (f) misrepresenting the

contractually designated dispute resolution forum through its own Arbitration Specialist's written statement excluding defect claims from JAMS.

91. Nissan's deceptive trade practices significantly impact the public as actual and potential consumers, not merely Plaintiff individually. The false range and cold-weather performance claims were disseminated publicly — on Nissan's official marketing website, in a consumer-facing interactive brochure, and in a press release attributed to Nissan's Senior Manager of Zero Emission Vehicles — reaching any consumer researching or purchasing this vehicle model, not privately negotiated with Plaintiff alone.

92. Beyond the advertising, Nissan's dispute-resolution structure is itself designed to leave consumers with no forum capable of providing relief for the exact category of dispute — a defective vehicle — that Nissan's own Lease is most likely to generate. Section 28 of the Lease designates JAMS or AAA arbitration for "all disputes arising from the Lease," with no exclusion for vehicle-defect claims anywhere in its text. Nissan's own Arbitration Specialist, however, stated in writing that JAMS "is only for if you have an actual concern with your lease" and that vehicle defect claims must instead go to "the BBB auto line" — a carve-out that appears nowhere in the Lease itself and that no consumer signing Nissan's standard-form Lease would have any way of knowing in advance. BBB AUTO LINE, the substitute forum Nissan directs defect claimants to, is not named anywhere in the Lease and is not a forum the consumer agreed to, and — by the express terms of Nissan's own BBB AUTO LINE Program Summary — cannot award lost income, emotional distress, consequential

damages, or punitive damages, the exact categories of harm a defective vehicle predictably causes. Applied to every consumer who leases a Nissan vehicle on this same standard-form Lease and later experiences a defect, the practical effect of this structure is that no forum outside of Nissan's own unilateral settlement offer is available: not JAMS, which Nissan's own stated policy excludes defect claims from; and not BBB AUTO LINE, which cannot award the damages a defect claim requires and which, in Plaintiff's own case, closed the claim within two days on false and internally contradictory grounds. A consumer left in that position has nothing to choose from except Nissan's own take-it-or-leave-it repurchase or settlement offer, or no forum for relief at all. This is not incidental to Nissan's standard-form Lease and stated policies. It is the structure those policies produce for every consumer who signs the same Lease Plaintiff signed.

93. This dynamic runs in only one direction. A mandatory arbitration clause in a standard-form consumer contract is meant to bind both parties — the company that drafts and imposes the clause is bound by it as well and must ordinarily pursue its own claims against the consumer through the same arbitration forum rather than in court. NMAC did not do so here. When NMAC sought to collect on the balance described in Section F above, it did not invoke Section 28 or initiate arbitration — it threatened Plaintiff directly with "SUIT AND LIABILITY" in its July 16, 2025 notice. The arbitration clause was accordingly treated as binding in only one direction: available to redirect and ultimately deny Plaintiff's own claim and disregarded entirely the moment ordinary civil litigation served Nissan's affiliate's own interest

in collection. A consumer bound by this Lease receives neither of the two things a mandatory arbitration clause is supposed to provide: a forum in which the consumer's own claims will actually be heard, or protection from being sued directly by the company. That combination — invoked against consumer claims, abandoned whenever litigation serves the company instead — is not particular to Plaintiff's dispute. It is what this standard-form Lease produces for every consumer who signs it.

94. Nissan's deceptive trade practices were committed knowingly. Nissan's Senior Manager of Zero Emission Vehicles publicly represented "the same performance in a wide variety of weather conditions" while the cold-weather range limitations of electric vehicle batteries are a matter of well-established, publicly known engineering fact within the automotive industry. Nissan knew through its own Arbitration Specialist that it was directing Plaintiff away from the contractually designated JAMS forum. Nissan knew through Plaintiff's written UCC revocation notice that the account was legally terminated before reporting derogatory information to the credit bureaus.

95. Plaintiff suffered actual damages as a direct and proximate result of Nissan's deceptive trade practices as set forth in the damages section of this Complaint.

96. Pursuant to C.R.S. § 6-1-113(2), Plaintiff is entitled to treble damages — three times the amount of actual damages — upon proof by clear and convincing evidence that Nissan's deceptive trade practices constituted bad faith conduct within the meaning of C.R.S. § 6-1-113(2.3), plus attorney fees and costs.

**COUNT V — FRAUDULENT MISREPRESENTATION**

**(Against Defendant Nissan North America, Inc.)**

97. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Nissan made the following false representations of material fact in connection with the lease of the Vehicle: (a) that the Vehicle delivers 216 miles of EPA-estimated range; (b) that the Vehicle provides "better performance in hot and cold weather"; (c) that the Vehicle provides "all-weather confidence"; and (d) that customers would "get the same performance in a wide variety of weather conditions."

99. These representations were false. Nissan knew they were false — or made them with reckless disregard for their truth or falsity — because: (a) the substantial reduction in usable range experienced by electric vehicles in cold weather is a matter of well-established, publicly known engineering fact within the automotive industry, of which Nissan, as a sophisticated manufacturer of electric vehicles, was aware or recklessly disregarded; (b) Plaintiff's authenticated dashboard photograph documented a 35.6% range deficit at 100% charge in 23°F temperature before driving a single mile — a deficit of a magnitude inconsistent with any good-faith belief in the "same performance in a wide variety of weather conditions" representation Nissan's own Senior Manager made eighteen days earlier; (c) the photograph was taken while the Vehicle was stationary, fully charged, and plugged into a charger — the condition Nissan's own guidance identifies as optimal for preserving cold-weather range, since preconditioning while plugged in draws heating energy from the electrical grid rather

than the Vehicle's battery. No driving had occurred. No cabin heat had been drawn from the battery. No aerodynamic drag had been encountered. The 35.6% deficit existed under the most favorable conditions available to the Vehicle, before any of the factors Nissan later identified — in its July 7, 2026 written response to Plaintiff's demand — as causes of cold-weather range reduction while driving, including Nissan's own quoted representation that "using the climate control system to heat the cabin... uses more electricity and affects driving range," could have played any role; and (d) Plaintiff's own contemporaneous written notice to Nissan, dated March 26, 2025, documented that driving the Vehicle above 55 mph caused a consistent additional loss of up to 20% of the Vehicle's already-degraded displayed range — reducing the Vehicle's usable range to approximately 111 miles, barely half of the advertised 216-mile EPA range, under ordinary highway driving speed. Neither Nissan's marketing representations nor the climate-control-related range disclosure Nissan later identified discloses or addresses this additional highway-speed range loss[2].

100. Plaintiff's subsequent experience operating a 2024 Kia EV6 — the replacement vehicle he was forced to lease after Nissan's conduct destroyed his ability to rely on

[2] Nissan's representations here are specific and verifiable. The 216-mile EPA-estimated range is a precise, externally measurable figure, not an opinion. And Nissan's public statement that customers would 'get the same performance in a wide variety of weather conditions' was not an unquantifiable brand generality; it was made in the specific context of Nissan's own description of internal cold-weather test methodology — 'we want to test the worst-case scenario so that our customers will still get the same performance' — rendering it a specific representation about tested, verifiable vehicle capability, not puffery.

the Vehicle — confirms the Ariya's range performance was not an ordinary or expected characteristic of electric vehicles generally. As Plaintiff documented in writing to Nissan on March 26, 2025, the Kia EV6 does not lose range overnight when left uncharged and its actual range does not depart from its stated and expected range the way the Vehicle's did.

101. Nissan made the representations described in paragraph above with the intent that Plaintiff and other consumers would rely on them in making leasing decisions.

102. Plaintiff reasonably relied on Nissan's representations in entering into the Lease on October 31, 2024. Specifically, Plaintiff leased the Ariya because: (a) he needed to give his mother his paid-off personal vehicle to replace her broken-down car; (b) Nissan's advertised range of 216 miles would support his gig work; and (c) Level 1 home charging would eliminate gasoline costs, offsetting the lease payment. All three of those economic premises were destroyed by Nissan's false advertising.

103. As a direct and proximate result of Nissan's fraudulent misrepresentations, Plaintiff suffered actual damages including but not limited to all lease payments made, the cost of replacement transportation, and all damages set forth in the damages section of this Complaint.

104. Nissan's fraudulent misrepresentations were made knowingly and with willful disregard for Plaintiff's rights. Because a claim for exemplary damages may not be included in an initial claim for relief under Colorado law, Plaintiff intends to seek leave to amend to add a claim for exemplary damages under C.R.S. § 13-21-102 following the exchange of initial disclosures, once Plaintiff is able to establish prima

facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5).

**COUNT VI — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, Jointly)**

105. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

106. A defendant is liable for intentional infliction of emotional distress where its conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and causes severe emotional distress. Whether conduct meets this threshold is ordinarily a question for the jury. See *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753 (1970); *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo. 1999).

107. Under Restatement (Second) of Torts § 46, comment f (1965), the outrageous character of conduct is amplified by the defendant's knowledge of the plaintiff's particular vulnerability. Defendant Nissan had actual, documented knowledge — through the formal JAMS arbitration filings it received and ignored — that Plaintiff was a gig worker with no alternative income source, financially dependent on a single vehicle for all earnings, and managing a chronic autoimmune condition qualifying as a disability under the ADA. By the time of the litigation conduct described below, O'Hagan Meyer also had direct, written notice from Plaintiff himself of his active litigation history, and Plaintiff's history of more than twelve years of incarceration was independently part of the public record in this case.

108. The following course of conduct by Defendants Nissan and O'Hagan Meyer — individually and in combination, spanning fourteen months and continuing as of the filing of this Complaint — constitutes outrageous conduct going beyond all possible bounds of decency: (a) leasing Plaintiff a vehicle that failed four complete times in five months at 3,649 miles — while advertising "all-weather confidence" and "better performance in cold weather" that proved false by Plaintiff's own documented experience; (b) refusing to honor the contractually designated JAMS arbitration forum — in writing — while simultaneously offering no viable alternative for complete relief; (c) destroying every dispute resolution forum available to Plaintiff — JAMS, BBB AUTO LINE, UCC revocation, and this litigation — over a $625.28 net dispute; (d) weaponizing credit reporting — reporting false information on eleven separate occasions after written notice that is ongoing — against a gig worker managing a chronic ADA-qualifying disability, with no alternative income and no financial margin, over a $625.28 net dispute; (e) taking back the Vehicle 72 days after the Lease was legally terminated, without ever refunding any payments; (f) causing three documented housing and credit denials — Nova West, the double security deposit requirement, and the PayPal Credit denial — each caused solely by the fraudulent charge-off and leaving Plaintiff facing homelessness and continued housing insecurity as of September 1, 2026, having reasonably concluded that continuing to pay non-refundable application fees for guaranteed denials is neither financially nor emotionally sustainable; (g) causing the loss of a credit account and forcing Plaintiff into subprime auto financing at 17.99% APR — excess interest that

comes directly out of Plaintiff's own pocket every month — compounding his ongoing daily financial destruction; (h) defaulting in this federal action for 68 days after service — then appearing through counsel whose first act was to attack Plaintiff's character before the presiding judge in violation of the Court's own Standing Order; (i) O'Hagan Meyer PLLC doubling down on that character attack in its reply brief — after being placed on notice of the problem — and repeating the pattern a third time in its second motion to set aside default — simultaneously destroying the prospect of settlement and perpetuating every harm the settlement would have remediated; and (j) subjecting Plaintiff to a recurring cycle of delay throughout this litigation — filing a motion, conceding it, then refiling substantively the same motion once the stakes had grown larger, each cycle forcing Plaintiff to restart the same fight and prepare for the same relief all over again — culminating in a sequence that left Plaintiff no avenue to protect his position except to seek the Court's own disqualification on August 20, 2026, a motion Plaintiff was forced to file by Defendants' own conduct, not by choice, after which the Court denied that motion and granted the Second Motion to Set Aside Default within a single day, foreclosing the ordinary and unhurried consideration both matters warranted and compounding, rather than resolving, the harm Defendants' own conduct had caused.

109. Nissan's and O'Hagan Meyer's conduct has caused Plaintiff severe emotional distress — including anxiety, shame, fear, helplessness, and ongoing psychological harm — arising from: (a) fourteen months of deliberate financial coercion, continuing as of the filing of this Complaint, over a $625.28 dispute; (b) three documented

housing and credit denials and the imminent, dated prospect of homelessness beginning September 1, 2026 — including the specific humiliation of repeated, guaranteed denial on applications Plaintiff can no longer afford to submit; (c) the ongoing burden of Plaintiff's own subprime auto financing at 17.99% APR — a cost Plaintiff alone carries every month as a direct result of Nissan's fraudulent charge-off; (d) the knowledge that the fraudulent charge-off may remain on his credit file for years; (e) the continued litigation misconduct by O'Hagan Meyer in this proceeding — including a second and third motion built on the same misconduct — which has destroyed the prospect of settlement and the immediate credit deletion it would have provided; and (f) having been forced, by Defendants' own conduct, to prepare and file an emergency motion seeking disqualification of the very judge presiding over his case — while simultaneously facing homelessness beginning September 1, 2026 — only to have that motion, and the underlying default dispute Defendants' misconduct had placed at issue, both resolved adversely to Plaintiff within a single day.

110. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff has suffered severe emotional distress in an amount to be proven at trial, not less than $500,000 in compensatory damages. Independent of and in addition to that general emotional distress, Plaintiff has suffered the specific, concrete, and irreparable harm of loss of housing security culminating in imminent homelessness as of September 1, 2026 — the loss of safety, stability, and basic shelter that no measure of money can fully restore — caused by Defendants with actual, documented knowledge of Plaintiff's vulnerability and with no alternative housing option available to him.

Plaintiff seeks not less than $750,000 in damages for this specific and distinct harm, for a combined non-economic compensatory total of not less than $1,250,000

111. Defendants' conduct was willful, wanton, and malicious — reflecting the outrageous and sustained nature of the conduct set forth above. Because a claim for exemplary damages may not be included in an initial claim for relief under Colorado law, Plaintiff intends to seek leave to amend to add a claim for exemplary damages under C.R.S. § 13-21-102, jointly against Nissan and O'Hagan Meyer PLLC, following the exchange of initial disclosures, once Plaintiff is able to establish prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5).

**COUNT VII — ABUSE OF PROCESS (Against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, Jointly and Severally)**

112. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

113. Colorado recognizes abuse of process as an independent tort requiring: (1) the defendant engaged in a legal proceeding; (2) the defendant possessed an ulterior purpose for that proceeding — one the proceeding was not designed to accomplish; (3) the defendant willfully used the process improperly to accomplish that ulterior purpose; and (4) the defendant's conduct caused Plaintiff's injuries or damages. See *Mintz v. Accident & Injury Medical Specialists*, PC, 284 P.3d 62, 66 (Colo. App. 2010); *Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994). Because the conduct at issue consists of filings made in this litigation,

Colorado's heightened standard for abuse of process claims arising from petitioning activity applies: Plaintiff must show the filings lacked factual support or legal basis, that their primary purpose was to harass Plaintiff or achieve an improper objective, and that they had the capacity to adversely affect Plaintiff's legal interests. See *Protect Our Mountain Environment, Inc. v. District Court*, 677 P.2d 1361 (Colo. 1984).

114. O'Hagan Meyer's filing of Plaintiff's public criticism of the presiding judge's own reasoning in unrelated litigation satisfies each part of that standard. It lacked factual and legal basis: no provision of Fed. R. Civ. P. 55(c) makes a litigant's public statements about an unrelated case relevant to whether default should be set aside, and the material was, at the time it was filed, about a ruling then under active appeal. Its primary purpose was improper: O'Hagan Meyer's own reply brief defended the material by arguing it "bears directly on Plaintiff's relationship with this Court" — a factor that appears nowhere in the governing Rule 55(c) standard, which asks only whether the moving party's culpable conduct caused the default, whether it has a meritorious defense, and whether the non-moving party would be prejudiced by relief. And it had the capacity to, and did, adversely affect Plaintiff's legal interests — injecting material irrelevant to any Rule 55(c) factor into a motion pending before the very judge being asked to rule on it. Plaintiff had told O'Hagan Meyer directly, in writing, that this conduct would leave him no option but to seek the Court's disqualification — Defendants proceeded regardless.

115. The willful act is established by the filing of the character-attack material in the first motion, in a filing supported by a declaration signed under penalty of perjury

falsely stating that Nissan's legal department first learned of this lawsuit on June 17, 2026 — a date Nissan later admitted, in its own subsequent filing, was false; the actual date was April 20, 2026, eleven days before Nissan's response deadline. O'Hagan Meyer then doubled down on the character-attack material in its reply brief, after being placed on notice that the conduct violated the Court's Standing Order, Colo. RPC 3.4(e), Colo. RPC 3.5(a), Colo. RPC 8.4(d), and Fed. R. Civ. P. 11(b)(1). A party that files a sworn falsehood and then doubles down on separate improper conduct after receiving notice cannot claim inadvertence as to either.

116. The character-attack material's true purpose was to influence how the Court would view Plaintiff — not to address any factor Rule 55(c) actually asks a court to weigh. O'Hagan Meyer's own reply brief admits as much, arguing the material "bears directly on Plaintiff's relationship with this Court." Defendants filed that material with actual knowledge — from Plaintiff's own written notice — that doing so would leave him no option but to seek the presiding judge's disqualification. Pursuing an advantage through the Court's impression of Plaintiff, rather than through the standard Rule 55(c) actually applies, was the point of the filing; forcing Plaintiff into an emergency disqualification motion he had explicitly warned them he would have no choice but to file was a direct and foreseeable cost of that strategy that Defendants accepted rather than avoided.

117. Nissan itself, independently of O'Hagan Meyer's character-attack conduct, separately misused Rule 55(c) process through the concede-then-refile sequence described above. The withdrawal of Nissan's first motion served two purposes at once:

it let Nissan and O'Hagan Meyer withdraw the very documents containing the character-attack material described above from active consideration, and it let them refile a second motion, free of that material, whose stated justification was framed as a simple correction — Nissan's own words describe the false June 17, 2026 date as "previously tendered inaccurate information" that Nissan "discovered" and "corrects." That framing mischaracterizes what happened. It was not an inaccuracy Nissan discovered on its own initiative — it was a sworn falsehood, submitted under penalty of perjury as the factual basis for relief from default, that sat uncorrected on the record for 57 days before Nissan acknowledged it, and only once Nissan needed a new motion to refile. Correcting a sworn falsehood does not explain why Nissan needed to refile a motion to set aside the very default it had, four days earlier, chosen to let stand unchallenged. The actual timing shows the real purpose: Nissan conceded the default when facing a $6,000,000 amended complaint, then moved to set it aside a second time only once Plaintiff's supplemental brief established the default judgment itself had grown too concerning to leave uncontested. That is not a party correcting the record — it is a party using a mischaracterized correction as cover to gain access to and contest a damages determination it had no right to participate in, having already elected not to defend on the merits. Each additional month this sequence has consumed is a month a corporation of Nissan's size can absorb without consequence and Plaintiff cannot — the same asymmetry of resources that has closed off every forum described throughout this Complaint, continuing to operate here as pressure toward capitulation rather than resolution.

118. Nissan retained O'Hagan Meyer to represent it in this action, clothing O'Hagan Meyer with authority to act on Nissan's behalf in the litigation. Under ordinary principal-agent law, a corporate party is bound by, and responsible for, the litigation conduct of counsel it retains and who acts within the scope of that representation. That Nissan exercised specific, granular control over its counsel's litigation decisions — not merely general oversight — is independently confirmed by Nissan's own documented written direction to withdraw its first motion and its corollary filings. Nissan and O'Hagan Meyer are jointly and severally liable for the resulting abuse of process.

119. As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered the following damages: (a) additional pro se litigation fees caused directly by the improper filings — approximately 60+ hours at $150 per hour: $9,000+; (b) pre-judgment interest delay at the rate of 8% per year under C.R.S. § 5-12-102 on $750,000 — accruing from June 22, 2026 through the date of judgment; (c) destruction of the prospective settlement — the negotiations active as of July 7, 2026, and again as of August 15-21, 2026, were destroyed by Defendants' conduct; (d) perpetuation of all ongoing harms — credit suppression, housing application denials, and the imminent homelessness described above — that a settlement with credit deletion would have remediated; (e) the loss of the default judgment position, valued at $750,000 plus injunctive credit deletion, now a completed and actual harm following the Court's August 21, 2026 order setting aside the default; and (f) the disruption and delay damages actually incurred from Plaintiff's Motion for Disqualification of Judge

Crews, filed August 20, 2026 and denied August 21, 2026, across Plaintiff's several active matters before the Court — including delay damages on the $60,000,000 companion matter at 8% per year.

120. Defendants' abuse of process was willful, wanton, and malicious — particularly given the doubling down after notice and the calculated default strategy. Because a claim for exemplary damages may not be included in an initial claim for relief under Colorado law, Plaintiff intends to seek leave to amend to add a claim for exemplary damages under C.R.S. § 13-21-102 following the exchange of initial disclosures, once Plaintiff is able to establish prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5).

**COUNT VIII — CIVIL CONSPIRACY (Against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, Jointly)**

121. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

122. Colorado recognizes civil conspiracy requiring: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result. See *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989). A conspiracy to procure a judgment by improper means states a cognizable claim. See *Dixon v. Bowen*, 85 Colo. 194, 274 P. 824 (Colo. 1929).

123. Element One: Defendant Nissan North America, Inc. — a corporation — and Defendant O'Hagan Meyer PLLC — a law firm — are two separate legal persons.

124. Element Two: Obtaining a favorable ruling permitting Nissan to escape the consequences of its default — first attempted through Nissan's first Motion to Set Aside Default, then achieved through its second — through means unrelated to the legal standard governing a Rule 55(c) motion: specifically, by placing Plaintiff's public criticism of the Court's judicial reasoning in unrelated litigation before the Court for a purpose outside that legal standard and by timing the second motion's filing to coincide with the moment the default judgment exposure became too concerning for Nissan to leave uncontested, rather than filing it in a good-faith effort to defend on the merits.

125. Element Three: Nissan retained O'Hagan Meyer to represent it in this action, clothing O'Hagan Meyer with authority to act on Nissan's behalf in the litigation. Under ordinary principal-agent law, a corporate party is bound by, and responsible for, the litigation conduct of counsel it retains and who acts within the scope of that representation. That Nissan exercised specific, granular control over its counsel's litigation decisions — not merely general oversight — is independently confirmed by Nissan's own documented written direction to withdraw its first motion and its corollary filings, establishing that Nissan was an active participant directing the litigation conduct at issue, not a passive principal.

126. Element Four: Two independent unlawful acts furthered that object: (a) Nissan's submission of a declaration, signed under penalty of perjury and filed in support of its first Motion to Set Aside Default, falsely swearing that Nissan's legal department first learned of this lawsuit on June 17, 2026 — a sworn falsehood later admitted, in

Nissan's own second motion, to be false, the true date being April 20, 2026, eleven days before Nissan's response deadline — submitted as the very factual basis the Court was asked to rely on in granting relief from default, in violation of Colo. RPC 3.3(a)(1); and (b) O'Hagan Meyer's filing of the character-attack material in Nissan's first and second motions, in violation of Colo. RPC 3.4(e), Colo. RPC 3.5(a), Colo. RPC 8.4(d), Fed. R. Civ. P. 11(b)(1), and the Court's Standing Order § A.2.

127. Element Five: All damages set forth in Count VII above, proximately caused by the conspiracy's overt acts.

128. As a direct and proximate result of the civil conspiracy between Nissan and O'Hagan Meyer, Plaintiff has suffered damages in an amount to be proven at trial. Both Defendants are jointly and severally liable for all damages arising from the conspiracy.

129. The conspiracy was willful and malicious. Because a claim for exemplary damages may not be included in an initial claim for relief under Colorado law, Plaintiff intends to seek leave to amend to add a claim for exemplary damages under C.R.S. § 13-21-102 following the exchange of initial disclosures, once Plaintiff is able to establish prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5)

**D. REQUEST FOR RELIEF**

***WHEREFORE***, Plaintiff Jason Brooks respectfully requests that the Court enter judgment in his favor and against Defendants Nissan North America, Inc., Nissan Motor Acceptance Company, LLC, and O'Hagan Meyer PLLC, jointly and severally as set forth above, and award the following relief:

**a. Injunctive and Declaratory Relief**

1. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that the $10,962.00 balance Defendants currently report as owing — and the $30,908.03 figure originally demanded in NMAC's July 16, 2025 notice from which it descended — are both legally extinguished and unsubstantiated, having been discharged by Plaintiff's lawful revocation of acceptance under the Uniform Commercial Code, with Nissan's and NMAC's own failure to refund the amounts owed following that revocation compounding rather than curing the discharge, and with neither figure ever supported by any accounting, disposition notice, or sale documentation as required under C.R.S. §§ 4-2.5-527 through 528;

2. A permanent injunction, pursuant to C.R.S. § 6-1-110, ordering Defendants Nissan and NMAC to request deletion of all trade lines, charge-off notations, and derogatory remarks associated with this account from each consumer reporting agency to which they have furnished such information, and to cease all further reporting of the disputed balance;

3. An order specifically directing Defendants Nissan and NMAC to request deletion of the Nissan-Infiniti LT lease account, Subscriber No. 3690580, from Experian, Equifax, and TransUnion within a time certain set by the Court; and

4. Such other equitable relief as the Court deems just and proper.

**b. Compensatory Damages — Against Defendant Nissan North America, Inc.**

5. Compensatory damages against Nissan North America, Inc. for all documented economic harm caused by its conduct, in the following minimum amounts: Net revocation damages — lease payments Nissan has never refunded following Plaintiff's lawful UCC § 2A-517 revocation: $3,871.50; Disposition fee: $450.00; Lost gig income: $5,100.00; Excess replacement lease costs — Kia EV6 over 36 months: $9,026.28; Loss of Citibank credit access: $3,000.00; Capital One excess interest — mother's vehicle — 17.85% vs. prime rate: not less than $8,379.00; Prior settlement consumed as replacement lease down payment: $2,500.00; Housing search and instability costs: $3,500.00; Continuing harm to Plaintiff's credit standing and

housing security for so long as the false charge-off remains reportable — up to eighty-four months (seven years) through approximately July 2032 absent a court-ordered deletion, valued at not less than $1,000.00 per month: not less than $84,000.00; Pro se litigation fees — approximately 190 hours, conservatively valued at $150.00 per hour as a floor pending the market paralegal and associate attorney rate calculation set forth in the Request for Relief below: not less than $28,500.00; PayPal Credit/Synchrony Bank denial of August 12, 2026 — economic damages, amount to be proven at trial; Pre-judgment interest — C.R.S. § 5-12-102 — 8% per year from May 1, 2025: accruing. Economic compensatory subtotal: approximately $148,326.78. Of this subtotal, the net revocation damages and disposition fee items arise from breach of the Lease and are accordingly owed jointly and severally by Nissan and Defendant Nissan Motor Acceptance Company, LLC ("NMAC") pursuant to Count II above; the remaining items are owed by Nissan alone.

6. Non-economic compensatory damages under Count VI — jointly and severally against Nissan and O'Hagan Meyer PLLC as set forth in that Count — for emotional distress: not less than $500,000.00; and for the distinct harm of loss of housing security and homelessness: not less than $750,000.00; for a combined non-economic compensatory total of not less than $1,250,000.00. This is separate from, and not a substitute for, the punitive damages sought in paragraph 10 below for the same underlying conduct.

7. Delay damages against Nissan for the period during which Nissan's 68-day default and subsequent litigation conduct prevented Plaintiff from obtaining preliminary injunctive relief — calculated at $5,548 per month — accruing from the date default was entered through the date the charge-off is deleted pursuant to court order.

**c. Treble Damages — Against Defendant Nissan North America, Inc.**

8. Treble damages pursuant to C.R.S. § 6-1-113(2) for Nissan's knowing violations of the Colorado Consumer Protection Act — three times the economic compensatory damages set forth in paragraph 5 above — approximately $444,980.34.

**d. Punitive Damages**

9. Plaintiff reserves the right to seek leave to amend to add a claim for exemplary damages against Defendants Nissan North America, Inc. and Nissan Motor Acceptance Company, LLC, pursuant to C.R.S. § 13-21-102, for Nissan's willful and wanton conduct underlying Count V (Fraudulent Misrepresentation), following the exchange of initial disclosures and upon establishing prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5).

10. Plaintiff reserves the right to seek leave to amend to add a claim for exemplary damages against Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC, jointly, pursuant to C.R.S. § 13-21-102, for the willful, wanton, and malicious conduct underlying Count VI (Intentional Infliction of Emotional Distress) — reflecting the outrageous and sustained nature of that conduct as set forth in that Count — following the exchange of initial disclosures and upon establishing prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5). Punitive damages are not separately sought under Counts I (Magnuson-Moss Warranty Act), II (Breach of Contract), III (Implied Covenant of Good Faith and Fair Dealing), or IV (Colorado Consumer Protection Act, addressed instead through treble damages in paragraph 8 above), as Colorado law does not extend exemplary damages under C.R.S. § 13-21-102 to those claims

**e. Damages — Against Defendant O'Hagan Meyer PLLC**

11. Compensatory damages against O'Hagan Meyer PLLC for all harm caused by its litigation misconduct, including: additional pro se litigation fees caused directly by O'Hagan Meyer's conduct — 60+ hours at $150.00 per hour: $9,000.00+; lost settlement opportunity — value of the prospective settlement destroyed by the conduct described above: $350,000.00; pre-judgment interest delay — 8% per year under C.R.S. § 5-12-102 on $750,000.00, accruing from June 22, 2026 through the date of judgment; incremental housing insecurity delay damages, distinct from and in addition to the non-economic compensatory damages set forth in paragraph 6 above, caused specifically by O'Hagan Meyer's litigation misconduct extending Plaintiff's exposure to that harm: $50,000.00; credit deletion delay damages:

$25,000.00; emotional distress arising specifically from O'Hagan Meyer's independent outrageous litigation conduct — the character attacks in ECF No. 19 and ECF No. 22 and the sworn falsehood underlying ECF No. 25 — distinct from the Count VI emotional distress set forth in paragraph 6 above: $250,000.00; and the disruption and delay damages actually incurred from Plaintiff's Motion for Disqualification of Judge Crews, filed August 20, 2026 and denied August 21, 2026 within a single day of the Second Motion to Set Aside Default being granted, including delay damages on the $60,000,000 companion matter at 8% per year: to be determined. O'Hagan Meyer compensatory subtotal, fixed figures only: $684,000.00+.

12. O'Hagan Meyer is jointly and severally liable with Nissan for all harm that accrued during the period of delay its misconduct caused — specifically, every day from June 22, 2026 through the date any injunctive order issues that O'Hagan Meyer's improper filings extended the period during which Plaintiff could not obtain preliminary injunctive relief ordering credit deletion, as further set forth in paragraph 14 below.

13. Plaintiff reserves the right to seek leave to amend to add a claim for exemplary damages against O'Hagan Meyer PLLC pursuant to C.R.S. § 13-21-102 for willful and wanton conduct underlying Count VII (Abuse of Process) that was deliberately doubled down on after notice, following the exchange of initial disclosures and upon establishing prima facie proof of a triable issue as required by C.R.S. § 13-21-102(1.5). Exemplary damages against O'Hagan Meyer would also be available derivatively under Count VIII (Civil Conspiracy) to the extent the conspiracy is proven

**f. Joint and Several Liability**

14. Defendants Nissan North America, Inc. and O'Hagan Meyer PLLC are jointly and severally liable, in a single, undivided amount rather than as separately additive obligations, for: the loss of Plaintiff's default judgment position, valued at $750,000.00, as set forth in Count VII above; the delay damages described in paragraph 7 above, at the rate of $5,548 per month, accruing from June 22, 2026 through the date any injunctive order issues; and all damages arising from Count VI

(Intentional Infliction of Emotional Distress), Count VII (Abuse of Process), and Count VIII (Civil Conspiracy) above.

15. Defendants Nissan North America, Inc. and Nissan Motor Acceptance Company, LLC are jointly and severally liable for all damages arising from Count II (Breach of Contract) above, as further itemized in paragraph 5 above.

**g. Mandatory Fees and Costs**

16. Mandatory attorney's and pro se litigation fees pursuant to: (a) 15 U.S.C. § 2310(d)(2) — mandatory upon prevailing on the Magnuson-Moss count; and (b) C.R.S. § 6-1-113(2)(b) — mandatory upon prevailing on the CCPA count. Plaintiff's pro se litigation fees, valued conservatively in paragraph 5 above, are further supported by the grounds set forth in Section i below. Plaintiff further reserves the right to seek sanctions against O'Hagan Meyer PLLC pursuant to Fed. R. Civ. P. 11(c) for filing ECF No. 19 pages 14-15 and ECF No. 22 pages 9-11 in violation of Fed. R. Civ. P. 11(b)(1), following the safe harbor letter served July 7, 2026.

17. All costs of this action pursuant to Fed. R. Civ. P. 54(d).

**h. Total Damages Summary**

Economic compensatory — Nissan, jointly and severally with NMAC as to the portions identified in paragraph 5 above (paragraph 5): $148,326.78. Non-economic compensatory — Count VI, joint, Nissan and O'Hagan Meyer (paragraph 6): $1,250,000.00. CCPA treble damages — Nissan only (paragraph 8): $444,980.34. O'Hagan Meyer compensatory, fixed figures (paragraph 11): $684,000.00+. Joint default-judgment-loss — Nissan and O'Hagan Meyer (paragraph 14): $750,000.00. Delay damages and pre-/post-judgment interest: accruing, not included below. Exemplary damages sought under Counts V, VI, and VII (paragraphs 9, 10, and 13) are not included in this summary or in the total below, because Colorado law does not permit a claim for exemplary damages to be included in an initial claim for relief. See C.R.S. § 13-21-102(1.5). Plaintiff will seek leave to add those claims, with specific requested amounts, by amendment following the exchange of initial disclosures.

**TOTAL DEMAND: approximately $3,277,307.12, or more, to be proven**

**precisely at trial and subject to amendment as additional harm continues to accrue, exclusive of any exemplary damages that may later be added by amendment under C.R.S. § 13-21-102.**

**i. PLAINTIFF'S ENTITLEMENT TO PRO SE LITIGATION FEES**

Plaintiff Jason Brooks seeks an award of fees and costs for pro se litigation services performed in this matter, pursuant to 15 U.S.C. § 2310(d)(2), C.R.S. § 6-1-113(2)(b), and the Court's inherent equitable powers, on the following grounds:

First, under Missouri v. Jenkins, 491 U.S. 274 (1989), paralegal and law clerk time is compensable at market rates under a fee-shifting statute because that work carries demonstrable economic value distinct from the work of the supervising attorney. The Colorado General Assembly extended a parallel principle in C.R.S. § 13-17-102(1.5), enacted in 2024, which for the first time authorizes courts to award reasonable fees for licensed legal paraprofessional work in a civil action. Plaintiff recognizes that § 13-17-102(1.5) by its terms applies to a formally licensed legal paraprofessional under Colorado Supreme Court rules, a credential Plaintiff does not hold; Plaintiff cites it not as a statute that independently governs this fee request, but as evidence that Colorado has already accepted market-value compensation for non-attorney legal work as a matter of policy, undercutting any categorical assumption that only a bar license can make legal work compensable.

Second, Plaintiff Brooks is not a typical pro se litigant. Plaintiff litigated Brooks v. Colorado Department of Corrections, No. 13-cv-02894 (D. Colo.), for over thirteen years, proceeding pro se for approximately 80% of the litigation, winning two remands from the Tenth Circuit Court of Appeals, and ultimately obtaining a $3.5 million resolution. That litigation required sustained, sophisticated legal work — including appellate briefing, discovery practice, summary judgment opposition, and settlement negotiation — that a litigation firm handling the case would have billed at between $1.5 million and $4 million over the same period. Plaintiff performed the substantial majority of that work himself and produced a superior result. Plaintiff researched, drafted, and developed this multi-count action spanning federal

warranty, state consumer-protection, contract, and tort theories — work that in a represented case would have been performed by licensed attorneys billing at prevailing Colorado rates. Plaintiff has further saved fellow inmates over 600 years of incarceration drafting ineffective-assistance-of-counsel motions, with his arguments winning more than 60 post-conviction motions in every court in Colorado.

Third, Colorado courts have held it inappropriate to award attorney's fees to a non-attorney pro se litigant under C.R.S. § 13-17-102 because such a litigant has no "attorney fees." Smith v. Furlong, 976 P.2d 889 (Colo. App. 1999). That holding, however, predates the General Assembly's 2024 enactment of C.R.S. § 13-17-102(1.5), which for the first time created a parallel fee category for paraprofessional legal services. Smith's categorical rationale — that no compensable fee category can exist outside a bar license — does not address, and is in tension with, the paraprofessional fee category the legislature has since created.

Fourth, the remedial purpose of MMWA fee-shifting under 15 U.S.C. § 2310(d)(2) and CCPA fee-shifting under C.R.S. § 6-1-113(2)(b) is to make consumer-protection and warranty enforcement economically viable for ordinary consumers, not merely those who can afford to retain counsel. Denying compensation to a pro se plaintiff for legal work that would be fully compensable if performed by a hired attorney or paralegal — while Nissan and O'Hagan Meyer PLLC retain counsel billing at prevailing Colorado commercial litigation rates — does not serve that remedial purpose. It defeats it, by making sustained pro se consumer-protection litigation economically irrational and effectively available only to those who can already afford a lawyer.

Fifth, denying compensation to Plaintiff for legal work functionally identical to that performed by compensable paraprofessionals under § 13-17-102(1.5) creates a classification — compensable when hired, uncompensable when performed by the party himself to the same standard — that serves no purpose the fee-shifting statutes were designed to advance. The administrative-convenience rationale for denying pro se fees is answered by Jenkins itself: market rates provide the standard, and Colorado has already accepted that standard for paraprofessional work performed for a party.

There is no principled basis for applying it to hired legal workers but not to a pro se litigant with Plaintiff's documented record of sophisticated, successful litigation.

Plaintiff seeks an award of pro se litigation fees at market paralegal rates for legal work performed in this matter, and at market associate attorney rates for work — including legal research, motion practice, and briefing — that would have been performed by a licensed attorney in a represented case. To the extent this Court declines to award pro se litigation fees at the trial level, Plaintiff respectfully requests that the Court certify this question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), as it presents a controlling question of law as to which there is substantial ground for difference of opinion, and immediate resolution would materially advance termination of this litigation and have substantial precedential effect on the rights of pro se litigants throughout this Circuit.

**F. PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, has overwhelming evidentiary support and more to come after a reasonable opportunity for further investigation and discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

s/Jason Brooks
(Plaintiff's signature)

09/02/2026
(Date)